# Appendix Index

| Exhibit | Document |
| --- | --- |
| A | *Turner v. State*, 422 S.W.3d 676, 696-97 (Tex. Crim. App. 2013), *reh'g denied (Apr. 2, 2014)* |
| B | May 30, 2014 Reporter's Record on Determination of Retrospective Competency |
| C | September 25, 2014 Order on Feasibility of Retrospective Competency Trial |
| D | April 28, 2014 State's Bench Memorandum on the Feasibility of a Retroactive Competency Hearing |
| E | January 16, 2015 Reporter's Record on Determination of Retrospective Competency |
| F | January 16, 2015 Defendant's Motion to Address Mr. Turner's Current Incompetency and Brief in Support |
| G | July 7, 2014 State's Motion for Enforcement of the Trial Court's Limited Jurisdiction on Remand |
| H | *In re McCann,* 422 S.W.3d 701 (Tex. Crim. App. 2013) |

# Exhibit A

2013 WL 5808250
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Criminal Appeals of Texas.

Albert James TURNER, Appellant

v.

The STATE of Texas.

No. AP–76580.  |  Oct. 30, 2013.

**Synopsis**
**Background:** Defendant was convicted in the District Court,
Fort Bend County, Brady Elliott, J., of the intentional murder
of his wife and mother-in-law during the same criminal
transaction, which was a capital offense. Defendant appealed.

**[Holding:]** The Court of Criminal Appeals, Price, J., held that
formal competency trial became warranted approximately
one month after initial evaluations by psychologist and
psychiatrist finding defendant competent to stand trial.

Abated and remanded.

Keller, P.J., dissented and filed opinion in which Meyers,
Keasler, And Hervey, JJ., joined.

West Headnotes (12)

**[1]**    **Constitutional Law**
           Incompetency or Mental Illness
    A criminal defendant who is incompetent may
    not be put to trial without violating due process.
    U.S.C.A. Const.Amend. 14.

    1 Cases that cite this headnote

**[2]**    **Mental Health**
           Mental Disorder at Time of Trial

The constitutional standard for competency to
stand trial asks whether the defendant has a
sufficient present ability to consult with his
lawyer with a reasonable degree of rational
understanding and whether he has a rational as
well as factual understanding of the proceedings
against him.

5 Cases that cite this headnote

**[3]**    **Mental Health**
           Mental Disorder at Time of Trial

The legislative criteria for competency to stand
trial contemplate a defendant who is at least
minimally able to interact with his trial counsel in
a reasonable and rational way, even if they do not
necessarily agree, in formulating decisions how
most effectively to pursue his defense.

1 Cases that cite this headnote

**[4]**    **Mental Health**
           Mental Disorder at Time of Trial

In the context of competency to stand trial,
there is particular cause for concern when a
defendant's mental impairment directly touches
upon certain fundamental decisions that the
criminal justice system reserves for him to make
personally, albeit after engaging meaningfully
with counsel, such as whether to testify in his
own defense.

Cases that cite this headnote

**[5]**    **Mental Health**
           Mental Disorder at Time of Trial

Precisely because the defendant retains ultimate
authority over fundamental decisions that the
criminal justice system reserves for him to make
personally, such as whether to testify in his
own defense, it is critical, in deciding whether
defendant is competent to stand trial, that he be
able to consult with counsel with a reasonable
degree of rational understanding about them.

1 Cases that cite this headnote

**[6]**    **Mental Health**

 Mental Disorder at Time of Trial

A defendant's mental illness plus his failure to communicate with counsel will invariably or necessarily add up to a finding of incompetence to stand trial.

Cases that cite this headnote

**[7]** **Mental Health**
 Mental Disorder at Time of Trial

Neither the fact that a defendant is mentally ill nor that he obstinately refuses to cooperate with his trial counsel by itself mean he is incompetent to stand trial.

Cases that cite this headnote

**[8]** **Criminal Law**
 Doubt as to Competency; Reasonable Cause or Grounds

In determining whether some evidence from any source of defendant's incompetency to stand trial had arisen by the time of informal competency inquiry, trial court must consider only that evidence tending to show incompetency, putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency. Vernon's Ann.Texas C.C.P. art. 46B.004(c).

3 Cases that cite this headnote

**[9]** **Constitutional Law**
 Necessity; Right to Hearing
**Criminal Law**
 Successive Proceedings in General

Should the formal competency trial result in a finding of competency, the trial court is not obliged to revisit the issue later, absent a material change of circumstances suggesting that the defendant's mental status has deteriorated; however, especially when there has been a suggestion of incompetency, but no formal adjudication of the issue, due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate. U.S.C.A.

Const.Amend. 14; Vernon's Ann.Texas C.C.P. art. 46B.004.

2 Cases that cite this headnote

**[10]** **Criminal Law**
 Doubt as to Competency; Reasonable Cause or Grounds

Trial court was not required to conduct a formal competency trial following initial evaluations by psychologist and psychiatrist in prosecution for intentional murder of defendant's wife and mother-in-law during the same criminal transaction, where psychologist and psychiatrist deemed him to be competent, and trial counsel made no request at the time for a formal competency trial. Vernon's Ann.Texas C.C.P. art. 46B.004.

1 Cases that cite this headnote

**[11]** **Criminal Law**
 Successive Proceedings in General

Approximately one month after initial evaluations by psychologist and psychiatrist finding defendant competent to stand trial, there was at least some evidence that supported a rational finding that defendant lacked the capacity to engage with his trial counsel rationally or to make rational choices with respect to his legal strategies and options and, thus, formal competency trial was warranted in prosecution for intentional murder of defendant's wife and mother-in-law during the same criminal transaction, which was a capital offense, where defendant threatened his attorney with physical violence over disagreement with strategy to depose defendant's children, defendant was upset that trial counsel was not pursuing defendant's apparently delusional and clearly irrelevant defense that the mayor had sired his youngest child, and defendant's paranoia had progressed to the point that he believed that his attorneys were openly conspiring with the prosecutors to secure his conviction. Vernon's Ann.Texas C.C.P. art. 46B.004.

Cases that cite this headnote

**[12]** **Criminal Law**
 Conduct of Trial or Hearing

To the extent that the defendant's disastrous decision to testify was the product of a conflict with trial counsel that derived from a paranoid pathology, it was constitutionally intolerable in prosecution for intentional murder of his wife and mother-in-law during the same criminal transaction, which was a capital offense, and, thus, a formal competency trial that could have ruled out that substantial possibility before proceeding to trial on the indictment was warranted, where defendant took the witness stand against the advice of counsel, he proceeded to testify at odds with the defensive posture of his lawyers based upon a wholesale denial of responsibility that was worse than implausible, which opened the door for the prosecutors to expose the irrationality of his account on cross-examination and then to highlight, at both the guilt and punishment phases of trial, that his willful refusal to acknowledge blame was nothing but a clear signal of his enduring threat to society. Vernon's Ann.Texas C.C.P. art. 46B.004.

Cases that cite this headnote

**Attorneys and Law Firms**

Gail Kikawa McConnell, Assistant District Attorney, Richmond, TX, for Appellant.

Robert A. Morrow, Attorney at Law, The Woodlands, TX, Lisa C. McMinn, State's Attorney, Austin, for the State.

**Opinion**

### *OPINION*

PRICE, J., delivered the opinion of the Court in which WOMACK, JOHNSON, COCHRAN, and ALCALA, JJ., joined.

**\*1** The appellant was convicted of the intentional murder of more than one person during the same criminal transaction, namely, his wife and his mother-in-law, which is a capital offense.[1] The jury answered the statutory special issues in such a way that the trial court was required to assess the death penalty.[2] Direct appeal is automatic in this Court.[3]

The appellant does not challenge the sufficiency of the evidence to support either his conviction or death sentence. In fourteen of his twenty-four points of error, he claims that he was incompetent to stand trial, or that the trial court should at least have paused the proceedings at various stages of trial to conduct a formal competency hearing, as his trial counsel repeatedly requested.[4] In order to address these various points of error adequately, we must undertake a detailed recitation of certain events transpiring before and during trial.

### COMPETENCY TO STAND TRIAL

The evidence at trial showed that, just after midnight on December 27, 2009, the appellant entered the home of his in-laws and killed his wife, Keitha Turner, and his mother-in-law, Betty Jo Frank, cutting their throats while his three young children were present in the house.[5] Although we find no indictment in the clerk's record, the docket sheet indicates that on March 3, 2010, Ralph Gonzalez was appointed to represent the appellant, that a grand jury indicted the appellant for capital murder on April 5, 2010, and that, on May 17, 2010, Gonzalez filed a motion to have the appellant evaluated for his competency to stand trial. The trial court immediately granted that motion, and the appellant was promptly evaluated by two forensic mental-health experts: psychologist Dr. Karen Gollaher and psychiatrist Dr. David Axelrad.

### I. The Facts

#### A. The Initial Competency Reports

Dr. Gollaher conducted the first evaluation on May 18th and 19th, 2010. In her report, Gollaher notes that the appellant "reported the belief that his wife had been having an affair for many years with the Mayor of Kendleton, Texas [,]" but that "she had repeatedly denied any extramarital relationship, calling him paranoid." Gollaher also noted that the appellant's recent jail records "appear to refer to possible delusional thinking[.]" While the appellant denied any such delusional thinking during the evaluation, Gollaher nevertheless noted "several statements" that he made to her "that raise[d] the

possibility of paranoid thinking." Moreover, "he reported the jail psychiatrist prescribed him Risperdal but he has not taken his medications because he does not believe he needs it." [6] Gollaher did not diagnose the appellant as suffering from any particular thought disorder. She did not believe his possible paranoid thoughts would "undermine his ability to participate in the court procedures." She also concluded that the appellant was "capable of communicating events in an understandable manner and can report his state of mind." It was her ultimate professional opinion that the appellant was, as of that time, competent to stand trial.

**\*2** Dr. Axelrad evaluated the appellant a month later, on June 14, 2010, also ultimately concluding that he was competent to stand trial. In his report, [7] however, Axelrad acknowledged that the appellant "is an individual who may have a mental illness and the diagnosis may be a paranoid disorder." Although he did not note any impairment in the appellant's thought process or content, he nevertheless found the appellant to be "mildly impaired" in his abilities: 1) to disclose to counsel pertinent facts, events, and states of mind; 2) to engage in a reasoned choice of legal strategies and options; and 3) to engage with counsel. From the recent jail records, Axelrad noted that the attending psychiatrist had found the appellant to be "exhibiting some paranoid ideation, and he does appear to be delusional." The appellant also exhibited "some paranoid ideas" and "mild paranoid functioning" during Axelrad's evaluation. The appellant reported to Axelrad that he had "lost confidence in his attorney, and [he did] appear to have significant problems in his relationship with his current attorney, Mr. Gonzalez." The appellant would not discuss the circumstances of the offense with Axelrad; consequently, Axelrad was "unable to address, at this time, as to whether [the appellant] had a paranoid disorder. In the event he has a paranoid disorder, this may be contributing to the problems he is experiencing with his attorney." With this caveat, Axelrad concluded that the appellant was nonetheless competent to stand trial—and even that he was competent "to enter into plea negotiations concerning his alleged offense in the event that he and his attorney can develop an effective working relationship."

### B. Pretrial Proceedings

The first pretrial hearing on record was an *ex parte* conference that took place in chambers on June 23, 2010. By this time the trial court had appointed a second attorney, Pat McCann. Gonzalez reported to the trial court that, while he

had not yet seen the experts' competency reports, he had been told that Gollaher deemed the appellant competent to stand trial and that Axelrad had found him to be "perfectly fit." Even so, Gonzalez informed the trial court that "[w]e're having difficulty with [the appellant] accepting a lot of things that happened. And one of the biggest things is his family, his children. There is a little bit of disconnect right now." Nevertheless, the appellant's counsel did not request any further proceedings at this time with respect to his competency to stand trial.

More than four months later, on November 9, 2010, counsel for the appellant filed a notice of intent to take the depositions of two of the appellant's children. On November 22, 2010, in open court, at the beginning of a hearing on pretrial motions, the appellant personally informed the trial court that he had filed a grievance against his lawyers and wanted a new "defense team" appointed. He complained that he did not wish to have his children deposed and that his lawyers had not explained to him the purpose behind the various pretrial motions on file. Defense counsel denied that they had failed to explain the motions and asserted that they needed to depose the children to obtain discovery and for other undisclosed purposes in the service of their client's best interests. The trial court denied the appellant's request for new lawyers.

**\*3** Another *ex parte* conference occurred in chambers on December 10, 2010, [8] the same day that the deposition of the appellant's children was originally scheduled. The appellant's counsel revealed that the relationship between the appellant and Gonzalez had deteriorated to the point that the appellant had physically threatened Gonzalez. Gonzalez related:

> In my thirty years, I've been threatened on several occasions but never as adamantly and never [as] menacingly as this guy. I believe that no matter what I tell him, if I could tell him that he would be getting out of jail tomorrow and nothing would happen to him, he would not believe me. There is nothing that I can do to convince that man that I have anything of benefit to do for him or that I can do for him.

Because the attorney/client relationship had become so "untenable," Gonzalez filed a motion to withdraw. That same day, in open court, the appellant personally reiterated that he was "opposed to the depositions" of his children and did not "want Mr. Gonzalez on my case." The trial court granted

Gonzalez's motion to withdraw. Because Gonzalez had been the member of the defense team who had prepared to conduct the depositions, they were rescheduled. On December 14, 2010, the trial court appointed Tyrone Moncriffe to replace Gonzalez and, on January 5, 2011, the trial court granted the defense a trial continuance until April 18, 2011, with final pretrial motions to be heard on April 11, 2011, in order to give Moncriffe sufficient time to familiarize himself with the case.

The April 11th hearing began with a renewal of the appellant's efforts to replace his trial counsel. The trial court had received "letters" by fax from a woman purporting to be the appellant's sister that asked the trial court to "fire[ ]" the appellant's trial counsel. Because the faxed copies of the letters did not bear his signature, however, the appellant refused to "endorse" them as his. The trial court therefore declined to "take them up[.]" McCann told the trial court that "we are doing everything possible to prepare for this trial; but [the appellant] has not agreed to speak with us on many occasions[.]"

Later during the same pretrial hearing, the trial court returned to the issue of the appellant's displeasure with his trial counsel, directly asking the appellant whether he wished to represent himself. The appellant unequivocally responded, "No." He complained, however, that trial counsel "have not shown me any evidence." He acknowledged that they had played for him a recording of the 911 call in which his daughter had reported the murders, but he complained that he had not been able to hear it. McCann answered that the appellant had been provided everything except for the actual physical evidence, including offense and autopsy reports, and that, not only had the appellant been able to hear the 911 recording, it had made him weep. McCann agreed to make all the evidence available for the appellant again. The appellant then complained that his lawyers had not contacted the Mayor of Kendleton or conducted any paternity testing to determine whether the Mayor was the real father of the appellant's youngest child. McCann explained that they had in fact interviewed the Mayor but that the result of any paternity testing was, in any event, "sadly not legally relevant." The trial court informed the appellant that it would not remove trial counsel from the case and suggested that he "start cooperating with them."

**\*4** Later that same day, another *ex parte* conference took place in chambers. McCann informed the trial court that "we're going to attempt to go speak with him; but at some point, based upon his clear paranoia that somehow I and the

rest of the Defense team are working with the State to ensure his conviction, we may need to revisit competency at some point with you." The trial court responded that "we can do a competency exam while we are doing the voir dire."

## C. Voir Dire

Voir dire was set to commence the next week, on April 18, 2011. In the interim, McCann filed a "Motion for a Contested Competency Hearing." Attached to this motion were an affidavit from Moncriffe, dated April 7, 2011, and a competency evaluation from a neuropsychologist, Dr. Shawanda Williams–Anderson, dated April 12, 2011. Moncriffe explained that it was part of the defensive strategy to depose the appellant's children and then agree for the State to use the deposition testimony in lieu of live testimony at trial, since, in their estimation, "the impact of [the appellant's] children describing their mother and grandmother's horrible [deaths] was much more damaging live than by deposition." Accordingly, McCann had conducted the depositions on April 1, 2011, while Moncriffe and the appellant watched by video link from an adjoining room. The appellant watched with "a bewildered look on his face." Afterwards, he yelled at his lawyers, accusing them of making his children testify against him, in conspiracy with the District Attorney. "He cannot assist his defense team," Moncriffe concluded, "nor does he have a rational understanding of the magnitude of these proceedings. He seems to have one train of thought and he disregards all other rational thoughts completely." Dr. Williams–Anderson evaluated the appellant on April 12, 2011. She concluded that, "[b]ecause of the seriousness of [the appellant's] charges, his unwillingness to participate in his defense, and his extreme distrust of every member of his team, his competency to stand trial is questionable."

At a hearing on the motion for a formal competency hearing, which convened on April 18th, the first day of voir dire, McCann argued that the appellant's "paranoia has grown to the level of delusions[.]" "It's become an issue to the point where [the appellant] actively appears to believe that we are working against his own interests, and the delusion seems complete and full-blown." McCann explained that the appellant's

> attitude has gotten worse in the last several weeks, that we have spent numerous hours with [him] over the last several days since the hearing on

the 11th; and we have all come to the conclusion that at this point he is—although he interacts with us on this plane of reality, he frankly is thinking and living in another one that does not appear to comport with either the evidence we've shown him, our views of the case, or anything that we can determine as a group as rational.

**\*5** Responding to the prosecutor's argument that simple disagreement between a lawyer and his client does not raise an issue of competency, and the trial court's request that McCann "focus on the fact that we've already conducted the competency evaluation in this case[,]" McCann asserted:

> I have defended serial killers and people who have killed their whole families, and this case is challenging even my ability to ... see how this could not be originating from anything but mental illness. * * * It has now gotten to a place ... where [the appellant's] version of the reality of the facts that he deals with day-to-day, whatever evidence is shown, whatever discussions we have, comes from a place of such deep rooted paranoia that I can no longer believe it is simply a difficult person that I'm dealing with.

Given the competency evaluations that had already been conducted by Drs. Gollaher and Axelrad, the trial court found that what Dr. Williams–Anderson characterized as the appellant's simple "unwillingness to participate in his defense" provided insufficient grounds to conduct a competency hearing, and it therefore denied the motion.

McCann broached the subject of competency again about a week into voir dire when, on April 26, 2011, he complained that, "although I have attempted to engage with my client in regards to his opinions, for whatever reason, it appears to have been shut down." He urged the trial court take up his motion for a competency hearing again. The trial court advised him to file a new motion with accompanying affidavit. McCann apparently did,[9] because a renewed hearing was held on April 27, 2011. While persisting in its refusal to order a formal competency hearing, the trial court at this time decided "to direct the Court's behavioral mental health director to do an evaluation to determine whether [the appellant's]

status has changed since the last time a competency hearing occurred."[10] Afterwards, "I'll do an initial evaluation about whether [the appellant's] status has changed." Accordingly, the trial court ordered Dr. Connie Almeida, a licensed clinical psychologist and Director of the Fort Bend County Behavioral Health Services, to evaluate the appellant, with an emphasis on whether he was "able to rationally assist his lawyers in the defense of his case."

Dr. Almeida filed a report on May 19, 2011, and appeared at a hearing the next day, on May 20th. She testified that the appellant would not cooperate with her several attempts to evaluate him, and that the best she could do was to report her impressions from a half-hour conversation she had managed to have with him on May 17, 2011, during which "[h]e did express disagreement with some of the strategies and 'tactics' of his defense team." As of that date, the appellant was not taking any psychotropic medications, nor did the behavioral health staff at the jail deem such medications presently warranted. From all this, Almeida was unable to draw any conclusions about the appellant's competency to stand trial. But she believed there to be "no significant changes in his functioning" since he was initially evaluated for competency by Drs. Gollaher and Axelrad the previous summer. She could not say "definitively" that the appellant was not paranoid.

**\*6** On cross-examination by the prosecutor, Almeida opined that, "based on my limited interaction with him, I would say that he would have a rational and factual understanding of the proceedings against him."[11] She also acknowledged an observation she had made in her written report that "there is no current evidence to substantiate a delusional or other psychiatric disorder." Nor was she aware of "any behaviors that warrant a psychiatric intervention" since the appellant had been jailed. She nevertheless stood by her position that she was unable to reach a determination of her own whether the appellant had a present ability to assist his counsel, as the trial court had requested. The best she could say was that she perceived "no significant changes in [his] emotional or cognitive functioning since" the earlier evaluations that would adversely impact his competency to stand trial.

After hearing argument from the parties, the trial court denied the motion for a formal competency hearing. While acknowledging that Drs. Gollaher and Axelrad had made "notation of paranoia" in their initial competency reports, the trial court observed that they had not found the appellant's paranoia to be "sufficient to meet the statutory guidelines" for incompetency. The trial court opined that

the appellant's evidence of incompetence, measured against those "statutory guidelines," "does not call for secondary competency evaluations unless there's a clear change in [the appellant's] whole aspect that raises a clear concern." The only such change that the trial court could see was the appellant's "failure to cooperate with [counsel] and that's his choice to make [.]" Even so, the trial court believed this had been enough to justify appointing Almeida, in an abundance of caution, "to explore this area to see if there was such a change that it would require a full competency hearing." Although Almeida was unable to reach a conclusion whether the appellant's failure to cooperate with his counsel rendered him incompetent, the trial court reasoned, her inability was itself the product of the appellant's choice not to talk to her about his case. "That is a reasoned decision on his part. Does it reach to the level of incompetency, there's nothing to show today that it does that."

### D. Trial on the Merits

Trial on the merits began on May 25, 2011. During opening statements, McCann informed the jury that the defense expected the evidence to show that the appellant killed his wife in a "jealous rage," but that the killing of his mother-in-law, with whom the appellant had always gotten along, occurring in the close quarters of the upstairs hallway, had not been perpetrated intentionally—that the appellant, while certainly guilty of "two terrible horrible crimes[,]" was not guilty of a capital offense. Along the way, McCann explained to the jury that the appellant "doesn't like me very much." Later, he observed: "And if you look at him there, he's a large man, as he sits there scowling at me. Because he can't admit what he did, to himself or anybody else." The ensuing defensive strategy was to acknowledge that the State's evidence showing that the appellant was responsible for the two murders was at least substantial, if not overwhelming, but to try to engender a reasonable doubt in the jurors' minds whether he harbored the requisite culpable intent with respect to the death of his mother-in-law to satisfy the statutory criteria for a capital offense.

**\*7** On May 27th, the Friday before Memorial Day, the appellant exercised his right to testify in his own behalf, against the advice of counsel. After having the appellant identify photographs of his children, wife, and mother-in-law, McCann simply asked him whether there was "something you would like to tell this jury[.]" The prosecutor objected that the question called for a narrative response. Instructed to

narrow his inquiry, McCann asked the appellant whether he had something to tell the jury about the night of the murders. After some additional wrangling, the appellant was allowed to describe in narrative fashion what he had done during the day of December 26, 2009, before the murders. As his narrative approached the time of the murders, however, the trial court directed McCann to ask another question. At a bench conference, McCann explained that he was ethically constrained from asking more specific questions, and the prosecutor speculated that McCann "can't do it because he knows it's a lie." [12] McCann was then allowed to ask the appellant whether he had "something else [he] wanted to add[.]" At that point, the appellant vehemently denied having ever "put [his] hands on [his] wife[,]" and claimed that his daughter had said as much during a portion of her deposition testimony "that y'all recorded over." When the prosecutor's hearsay objection was sustained, McCann asked the appellant to describe the events *after* December 27th, and the appellant was once again allowed to narrate. He was not specifically asked on direct examination about the killings themselves.

On cross-examination, the appellant denied having threatened his first attorney, Gonzalez. He claimed that Gonzalez withdrew from the case because the appellant had tried to put a stop to the depositions of his children. The appellant further maintained that his children were coerced into giving the deposition testimony against him. At this juncture, McCann renewed his motion for a competency examination, but the trial court denied it, observing that "[t]here's nothing that I have been shown that changes anything that I have been shown before." The appellant next denied that his attorneys were "trying to save [his] life[.]" When the prosecutor asked the appellant whether McCann had been misleading the jury panel during his opening statement, the following transpired:

A I asked him, before he made his statement, what—what I was curious about what exactly was he going to make in his opening statement. And the reason I said that—the reason I asked that question is because that we weren't talking. They weren't coming to see me. They didn't want to hear anything I had to say about the things that I was saying about the mayor and all the allegations that I was saying. They wouldn't investigate it. They kept bringing me—I have proof of everything that I'm saying.

Q Do you know they talked to the mayor?

A That's what they told me.

Q I know. Everybody did.

**\*8** A And I've, you know—I looked at the thing. He was obviously lying.

Q Do you know these two gentlemen have tracked everything you have ever said down?

A No.

Q And it comes to one conclusion: You killed those two women.

A I didn't kill anyone.

Q And they're trying to save your life. You understand that?

A I didn't kill anyone.

The appellant further testified that his daughter had made a mistake to identify him as the killer. He explained that he fled the state after the killings because the Mayor had threatened him and had sent two unidentified men to break into his house. Asked whether his lawyers were part of this apparent "conspiracy" against him, the appellant replied that they were not "going out and getting the evidence that I was talking about, and I was wondering why." The prosecutor wrapped up his cross-examination of the appellant by asking him:

Q All right. Let me ask you this way: Is there any way, Mr. Turner, you want to change any of your story right now and beg for forgiveness from this jury at all?

A I didn't kill anyone.

Q I know. Do you know how dangerous that makes you?

McCann's objection was sustained, but his motion for mistrial was denied. On redirect, McCann simply asked:

Q Mr. Turner, in your mind, all that drivel was true, wasn't it?

A It is true.

Shortly after, the defense rested and both sides closed.

On Tuesday, May 31st, the morning that final arguments for the guilt phase were set to begin, the appellant unequivocally announced that he was "firing my defense team and representing myself. I should be able to represent myself at any stage of this trial. I have that right." [13] When the trial court asked why, the appellant asserted:

They have seriously neglected my case. They have ignored the information I have provided them for my defense. Witnesses for my defense haven't been contacted that I've given them.

He made up—he came up with an opening statement when I had—signed an affidavit or even told him that I—that I killed anyone. So where did he get this opening statement from, that it's an accident? He has not defended me.

McCann reminded the trial court that he had recently renewed his request for a competency hearing based upon the appellant's paranoia. Directed to respond specifically to the appellant's complaints, McCann replied:

We have, during the course of this investigation—Without going into too much client confidence, Mr. Turner has indicated that there were entourage members of the mayor of Kendleton who might fit his description as well as other individuals whom he might have hired who was part of his hang-around crew. We have found no such individual who would refute the 100 percent-certain eyewitness identification of his own children during the incident.

THE COURT: Mr. Turner testified that he was afraid of certain individuals and indicated that that was part of the reason why he fled. Did you pursue that investigation?

**\*9** MR. MCCANN: We have located no such individuals, either as a friend of the mayor of Kendleton nor any indication that the mayor of Kendleton was anywhere near his home on the night that he mentioned, nor that he has any proclivity or, indeed, any real relationship with his wife. That doesn't mean that Mr. Turner didn't think that there was one, but at the same time, we found no such indication.

THE COURT: Mr. Turner has raised the issue that you have not pursued the theory that it was an accident. Would you respond to that allegation?

MR. MCCANN: I understood him to mean that he rejected the theory that it was an accident because his testimony indicated he was not there. The only plausible defense that Mr. Moncriffe and I could see coming from the evidence that we examined is that the second killing—while the first killing may have been an act of passion between a jealous husband and wife, the second killing would appear to have been unintended. At least there was no indication of any quarrel or violence between Mr. Turner and Betty Jo.

And given the circumstances and the placement of the second floor, it is conceivable that he did not intend that killing and that killing was, in fact, either accidental or perhaps done in a reckless manner that would have indicated a lesser charge might be available or that we could argue plausibly that that killing was not intentional.

Based upon these representations, the trial court summarily denied the appellant's demand to "fire" his trial counsel and represent himself. Closing arguments began soon after.

The prosecutors used their opening remarks to highlight the appellant's claim that his children had mistakenly identified him and to pound away at his failure to take responsibility. [14] For his part, McCann described the appellant's behavior this way:

> When I got up and talked to you in opening, I told you that my client, Albert James Turner, still hasn't accepted what happened because on that night, he snapped. You actually got to watch what he thinks is the truth because he literally cannot accept what happened. In his mind, very sadly, it is the truth.

He then went on to urge the jury nevertheless to accept the defensive theory that the appellant had not intended to kill his mother-in-law and, on that account, to find him not guilty of capital murder.

The State argued in response that the wound inflicted on the appellant's mother-in-law was too severe to justify a finding that it was not intentionally inflicted. Along the way, the prosecutor once again emphasized the absurdity of the appellant's testimony, reminding the jury that even McCann had characterized his story as "drivel." Later, during their closing arguments at the punishment phase of trial, the State similarly relied upon the appellant's implausible guilt-phase testimony to argue that the remorselessness he displayed in the courtroom and from the witness stand constituted compelling evidence that should convince the jury that he would constitute a future danger to society. [15]

## II. The Law

**\*10** [1] [2] A criminal defendant who is incompetent may not be put to trial without violating due process. [16] "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." [17] The constitutional standard for competency to stand trial asks whether the defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. [18] Due process also mandates state procedures that are adequate to assure that incompetent defendants are not put to trial. [19] To that end, our statutory scheme has codified the constitutional standard for competency to stand trial and has elaborately described the circumstances that require, and procedures for making, a determination of whether a defendant is competent to stand trial. [20]

### A. Substantive Standard

The Texas Legislature has adopted the constitutional standard for competency to stand trial in Article 46B.003(a) of the Texas Code of Criminal Procedure. [21] The appellant in this case does not contend that he lacked at least a factual understanding of the proceedings against him. There is no reason to doubt that he understood that his life and liberty were at stake and what roles the various participants in the proceedings played. At issue is whether there was any substantive indication that he lacked either a rational understanding of the proceedings or a present sufficient ability to consult with counsel with a reasonable degree of rational understanding—or, as the trial court in this case ordered Dr. Almeida to assess, whether he was "able to rationally assist his lawyers in the defense of his case."

[3] The Legislature apparently regards a defendant's capacity to rationally assist in the preparation and execution of his defense to be indispensable to a defendant's competency to stand trial. We may infer this from the fact that it has directed that forensic psychologists and psychiatrists appointed by the trial court to perform competency evaluations should specifically consider, among other things: 1) the defendant's "capacity ... during criminal proceedings to ... *engage* in a *reasoned* choice of legal strategies and options;" as well as 2) "the impact of the mental illness or mental retardation, if existent, on the defendant's capacity *to*

*engage with counsel in a reasonable and rational manner* [.]"[22] These legislative criteria for competency contemplate a defendant who is at least minimally able to interact with his trial counsel in a "reasonable and rational" way (even if they do not necessarily agree) in formulating decisions how most effectively to pursue his defense.

 **[4]    [5]**    Other jurisdictions have construed the constitutional standard for competence to stand trial consistent with this understanding. Various courts have declared defendants to be incompetent under the constitutional standard upon findings that they suffered from mental illnesses causing paranoid delusions that impacted their perception of reality in ways that adversely affected their ability to rationally comprehend the proceedings against them or interact rationally with trial counsel.[23] And we think there is particular cause for concern when a defendant's mental impairment directly touches upon certain fundamental decisions that the criminal justice system reserves for him to make personally—albeit after "engaging" meaningfully with counsel—such as whether to testify in his own defense.[24] Precisely because the defendant retains ultimate authority over these decisions, it is critical that he be able "to consult with counsel with a reasonable degree of rational understanding" about them.[25]

 **\*11    [6]    [7]**    This is not to imply that a defendant's mental illness plus his failure to communicate with counsel will invariably or necessarily add up to a finding of incompetence. The fact that a defendant is mentally ill does not by itself mean he is incompetent.[26] Nor does the simple fact that he obstinately refuses to cooperate with his trial counsel.[27] Indeed, even a mentally ill defendant who resists cooperating with his counsel may nevertheless be found competent if the manifestations of his particular mental illness are not shown to be the engine of his obstinacy.[28] But when a defendant's mental illness operates in such a way as to prevent him from rationally understanding the proceedings against him or engaging rationally with counsel in the pursuit of his own best interests, he cannot be made to stand trial consistent with due process. Evidence that raises this possibility necessitates an informal inquiry, and if that inquiry reveals that the possibility is substantial, a formal competency trial is required.

### B. Procedure

Under our current statutory scheme,[29] any "suggestion" of incompetency to stand trial calls for an "informal inquiry" to determine whether evidence exists to justify a formal competency trial.[30] In 2009, this Court held that evidence that a "suggestion" of incompetency sufficient to trigger an informal inquiry was the same as the *bona fide* doubt standard from the previous statutory regime.[31] The Legislature has subsequently rejected the *bona fide* doubt standard for purposes of Article 46B.004, but the amendment by which this was accomplished did not become effective until September 1, 2011, several months after the appellant's trial.[32] In any event, here, at least as of May 20, 2011, when voir dire was interrupted for the hearing at which Dr. Almeida testified, the trial court was obviously persuaded that a *bona fide* doubt *did* exist as to the appellant's competency.

 **[8]**    The question therefore becomes whether, in light of what became known to the trial court by the conclusion of this informal inquiry, it should have conducted a formal competency trial. The answer depends upon whether "some evidence from any source" had arisen by that time "that would support a finding that [the appellant] may be incompetent to stand trial."[33] In making this determination, a trial court must consider only that evidence tending to show incompetency, "putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency."[34] If so, then "evidence exists to support a finding of incompetency," and the statutory scheme requires the trial court to conduct a formal competency trial.[35]

 **[9]    [10]**    Should the formal competency trial result in a finding of competency, the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated.[36] However, especially when there has been a suggestion of incompetency but no formal adjudication of the issue, due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate.[37] In the instant case, we find no fault in the trial court's failure to conduct a formal competency trial following the initial evaluations by Drs. Gollaher and Axelrad, since they deemed the appellant to be competent. After all, the appellant's trial counsel made no request for a formal competency trial at that time. But as of May 20, 2011, when the trial court concluded its informal inquiry, there was some evidence to support a rational finding

of incompetence, and, for the reasons that we describe below, the appellant's request for a formal competency trial should then have been granted.

## III. Analysis

**\*12** Shortly after indictment in April of 2010, and before the appellant was afforded much of an opportunity to interact with Gonzalez, his first-appointed trial counsel, both Dr. Gollaher and Dr. Axelrad deemed him competent to stand trial. The record does not show that the appellant had a history of mental illness. Nevertheless, both of the competency reports reflect the substantial possibility that he was suffering from paranoia that may have been the product of "a paranoid disorder," and that he was apparently exhibiting delusions. Gollaher expressly found that the appellant had a factual understanding of the proceedings and could "communicate events in an understandable manner and can report his state of mind." But her report did not speak specifically to whether his condition would adversely affect his capacity either to "engage with counsel in a reasonable and rational manner[,]" or to "engage in a reasoned choice of legal strategies and options[.]" [38] Axelrad's report *did* speak to those capacities and, in fact, he found the appellant to be "mildly impaired" with respect to both. Axelrad noted that, "[i]n the event [that the appellant] has a paranoid disorder, this may be contributing to the problems he is experiencing with his attorney." Notwithstanding the experts' ultimate conclusions that the appellant was competent, the trial court was effectively put on notice of the need to maintain vigilance to assure that the appellant's due process rights were preserved.

**[11]** Barely over a month after the initial evaluations, the appellant's attorneys were already experiencing "a little bit of a disconnect" with him. By November of 2010, the appellant had filed a grievance against his lawyers and requested a new "defense team." In December, Gonzalez's continued representation of the appellant became "untenable" after the appellant threatened him with physical violence over their disagreement with the defense strategy to depose the appellant's children. By April of 2011, it began to emerge that the appellant's displeasure with trial counsel involved more than the depositions alone; he was also upset that trial counsel were not pursuing a sufficiently vigorous investigation into his apparently delusional—and, in any event, clearly irrelevant—claim that the Mayor of Kendleton had sired his youngest child. According to Moncriffe, "He

seems to have one train of thought and he disregards all other rational thoughts completely." The appellant's paranoia had progressed to the point that, if the representations of his own lawyers are to be credited, he believed that they were openly conspiring with the prosecutors to secure his conviction. He flatly refused to communicate with them during the voir dire proceedings.

We think the preceding information constitutes at least some evidence that would support a rational finding that the appellant lacked the capacity to "engage" with his trial counsel rationally or to make rational choices with respect to his legal strategies and options. In finding otherwise at the conclusion of the informal inquiry on May 20, 2011, the trial court made two mistakes. First, the trial court focused erroneously on evidence of competency rather than evidence of incompetency, relying upon the ultimate conclusions of Drs. Gollaher and Axelrad, as well as Dr. Almeida's subsequent opinion that the appellant's cognitive functioning had not significantly changed in the interim. But Almeida was unable to say that the appellant was competent to assist counsel in his defense, and both Gollaher and Axelrad observed signs of paranoid delusions that would at least minimally support a finding that the appellant suffered from a mental disorder that impaired his ability to participate rationally in the preparation and presentation of his defense. The interactions between the appellant and his trial counsel in the intervening months constituted substantial evidence that Axelrad's nascent concerns about the appellant's capacity to consult rationally with his attorneys were subsequently borne out. There was some evidence that would rationally support a finding of incompetency to stand trial, notwithstanding other evidence to the contrary.

**\*13** **[12]** Second, the trial court erred to the extent that it denied the appellant's request for a formal competency trial on the grounds that the appellant failed to demonstrate any "change" of status since the earlier findings of competency by Gollaher and Axelrad. There was no adjudication of the competency issue in the summer of 2010 following their evaluations—not even an informal inquiry to decide whether there was sufficient evidence at that time to invoke a formal competency trial. Thus, there was no prior judicial competency determination to justify a requirement of a change in circumstances. Moreover, even had there been some previous judicial finding of competency, the trial court was mistaken to conclude that no new circumstances existed to merit a second look. By May of 2011, there had arisen new evidence in the form of the appellant's obviously irrational

belief that his ongoing delusion with respect to the Mayor of Kendleton somehow provided him with a defense to prosecution for capital murder that was preferable to the approach that his trial lawyers urged him to pursue. That the appellant persisted in this delusion-fueled belief against the emphatic advice of counsel, together with the earlier suggestions that he suffered from a paranoid disorder, was enough to raise the likelihood of incompetency to a level beyond that which is evinced by a mere dispute between an ordinarily obstinate defendant and his legal counsel over plausible trial strategies. It is at least some evidence to support a rational finding that, because of mental illness, the appellant was unable to engage rationally with his lawyers and was therefore incapable of participating rationally in his own defense. [39] Most critically, he may well have been incapable of making a rational, non-delusional decision with respect to whether or not to accept his trial counsel's advice not to testify. [40]

We hasten to emphasize the limited scope of our holding today. This is not a case in which there is some evidence of mental illness but no evidence from which it may reasonably be inferred that the defendant's mental illness renders him incapable of consulting rationally with counsel. Nor is it a case in which there is some evidence that the defendant obstinately refuses to cooperate with counsel but nothing from which to rationally infer that his obstinacy is fueled by mental illness. It is not even a case in which there is some evidence of mental illness, some evidence of obstinacy, but ultimately no rational basis to infer that the obstinacy is a *product* of the mental illness. None of these scenarios would compel a formal competency trial. Instead, this case presents one of the relatively rare instances in which there is at least *some* evidence from which it may rationally be inferred *not only* 1) that the defendant suffers some degree of debilitating mental illness, and that 2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that 3) his mental illness is what fuels his obstinacy. Whenever a trial court's informal inquiry establishes that there is some evidence that could rationally support all three of these inferences, it should conduct a formal competency trial.

 **\*14** Therefore, bearing firmly in mind that the standard for requiring a formal competency trial is not a particularly onerous one—whether, putting aside the evidence of competency, there is more than a scintilla of evidence that would support a rational finding of fact that the accused is incompetent to stand trial [41]—we hold that the trial court

erred in failing to grant the appellant's request for a formal competency trial under Article 46B.005.

### DISPOSITION

Accordingly, we sustain the appellant's ninth point of error, abate the appeal, and remand the cause to the trial court. On remand, the trial court shall first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence, and any other pertinent considerations. [42] Should the trial court deem a retrospective competency trial to be feasible, it shall proceed to conduct such a trial in accordance with Chapter 46B, Subchapter C, of the Code of Criminal Procedure. [43] Regardless of whether the trial court deems a retrospective competency trial to be feasible, the record of the proceedings on remand shall then be returned to this Court for reinstatement of the appeal. [44]

KELLER, P.J., filed a dissenting opinion in which MEYERS, KEASLER, and HERVEY, JJ., joined.

KELLER, P.J., filed a dissenting opinion in which MEYERS, KEASLER and HERVEY, JJ., joined.
 **\*14** Appellant, who has no history of mental illness, understands what he is accused of and the nature of the proceedings, and he understands who his attorneys are and that they are tasked with representing him. His refusal to cooperate with his attorneys does not, in my view, make him incompetent to stand trial. The Court maintains, however, that there is some evidence that appellant is incompetent to stand trial as a result of paranoid delusions about his attorneys' motives and other aspects of the case. I disagree.

Under our statute a person is incompetent to stand trial if he does not have:

> (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or

> (2) a rational as well as factual understanding of the proceedings against the person. [1]

No one disputes appellant's competence under part (2); that is, no one suggests that he lacks a rational as well as factual understanding of the proceedings against him. The issue

before us is his competence under part (1), whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.

The trial court had before it three types of evidence relevant to this determination: (1) expert evaluations, (2) statements by appellant's attorneys, and (3) appellant's own statements. None of this evidence shows that appellant lacked the sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding.

### A. The Experts

Appellant was first evaluated by Dr. Karen Gollaher in May of 2010. He largely cooperated with the competency evaluation but would not discuss his actual actions at the time of the crime in order to protect his Fifth Amendment rights. Although appellant reported some possible paranoid thoughts, Dr. Gollaher concluded that "these do not undermine his ability to participate in the court procedures." With respect to competence to stand trial, Dr. Gollaher found:

> **\*15** Mr. Turner knows the charge against him and a possible punishment. He understands the role of various courtroom person[ne]l, the available pleas and the plea bargaining process.... [H]e was concerned that his version of events was heard by the public and he discussed issues that might be considered mitigating. This suggests that he does have an interest in defending himself and may not be as indifferent as he presents himself to be. He is capable of communicating events in an understandable manner and can report his state of mind.

Dr. Gollaher ultimately concluded that, within a reasonable degree of certainty, appellant was currently competent to stand trial.

In June of 2010, appellant was evaluated by Dr. David Axelrad. Dr. Axelrad said that appellant "may have a mental illness and the diagnosis may be a paranoid disorder" but that appellant was unwilling to disclose the nature of the relationship with his wife immediately preceding the commission of the murders. Though appellant might benefit from psychiatric medications (which he was refusing to

take), Dr. Axelrad nevertheless concluded that appellant "is presently mentally competent to stand trial."

In April of 2011, appellant was referred by his attorneys to Dr. Shawanda Williams–Anderson. She concluded, "Because of the seriousness of Mr. Turner's charges, his unwillingness to participate in his defense, and his extreme distrust of every member of his team his competency to stand trial is questionable." She further stated that appellant is "making dire decisions that are detrimental to his defense and has understanding of doing so. Thus his mental capacity to stand trial is not the source of contention, but his ability to participate in the legal process was closely evaluated." She concluded that, "To date, his participation and involvement have had adversarial effects and hindered the defense team in every way. Therefore, Mr. Turner cannot be expected to comply with his team during the progression of his defense including trial. Under Article 46B, Mr. Turner's actions would deem him incompetent to stand trial."

Essentially, Dr. Williams–Anderson conceded that appellant had the mental capacity to stand trial but concluded that appellant distrusted the defense team and was acting in a way detrimental to his defense. But Dr. Williams–Anderson's focus on appellant's motives and actions is beside the point. Appellant had the mental capacity to work with the members of his defense team but chose not to work with them because he distrusted them. Dr. Williams–Anderson's conclusion that appellant's "actions would deem him incompetent to stand trial" is faulty because a person's actions can never render him incompetent to stand trial. It is the person's mental ability that matters.

Finally, at the urging of defense counsel, the trial court appointed Dr. M. Connie Almeida to evaluate appellant in May of 2011. Dr. Almeida said that she could not reach a professional opinion regarding appellant's competency to stand trial based on her interview "because of his limited cooperation." However, based on her review of records, interview with jail staff, and her limited interview with appellant, it was her professional opinion that appellant's "functioning has not changed significantly since his previous assessments of competency" by Dr. Gollaher and Dr. Axelrad. "It is my opinion," she stated "that there have been no significant changes in Mr. Turner's emotional or cognitive functioning since the time of these evaluations (6/1/10 and 6/18/10) that would adversely impact his competency to stand trial at the present time." When questioned at a hearing, Dr. Almeida stated that she could not definitively say that he

was not paranoid and that such condition was not interfering with his ability to rationally assist his defense. But she also affirmed, "There is no current evidence to substantiate a delusional or other psychiatric disorder."

### B. The Attorneys

**\*16** Attorneys Tyrone Moncriffe and Patrick McCann executed affidavits, but these affidavits were not directly introduced into evidence before the trial court. Some of the content of these affidavits was introduced through Dr. Almeida's testimony. Dr. Almeida summarized these affidavits as expressing the concern that appellant was accusing counsel of coercion, hiding and misusing information, and not representing appellant's best interests. Counsel elicited testimony from Dr. Almeida that appellant actually believed that the defense attorneys were coercing appellant's children into testifying against him and that McCann was part of a secret society that desired appellant's conviction. Dr. Almeida also recalled that Moncriffe had "indicated several instances of delusional comments and thinking." It was partly based upon these affidavits that Dr. Almeida said that she could not definitively say that appellant did not have a paranoid condition that was interfering with his ability to assist his defense. But even considering those affidavits, Dr. Almeida nevertheless testified that appellant's condition had not changed from the prior interviews and that there was no current evidence to substantiate a delusional or other psychiatric disorder.

At the conclusion of the hearing, McCann argued that appellant's paranoia had impaired the defense because appellant was refusing to discuss any of the jurors with counsel during voir dire. McCann conceded that "examinations in the year prior," by Dr. Gollaher and Dr. Axelrad, "although they showed some of the problem, did not at that time rise to the level, in their opinion of incompetency." But McCann said, "I can tell you that it has materially changed over the last several months, perhaps only because of the proximity of the actual case that's brought this out, but it has—it has brought us to a complete standstill in our ability to determine or advise Mr. Turner about whether to testify or whether to assist in any of this." At that point, the prosecutor interjected, "I don't—I don't mind him arguing, but I've got to be able—to be able to cross-examine somebody if he's going to give you new evidence, Judge." McCann responded, "He's right. He's right, and I'll rephrase that. The Court has watched Mr. Moncriffe and myself struggle with what appeared at first

to us to be a recalcitrant client and it has—has clearly, to us, gotten beyond that."

McCann remarked that, "I've never been in a place where the client has withdrawn to this degree." McCann stated that he believed there had been a change, though perhaps not witnessed by the jail, but a noticeable change in appellant's demeanor and behavior over the last several months. McCann urged the trial court "to give us a chance to sit there and flesh this out during a competency trial, and even if necessary, to appoint Mr. Turner other counsel and allow Mr. Moncriffe and I to testify and subject us to cross."

I believe an attorney's statements about his client's mental state can, in appropriate circumstances, raise an issue of incompetency without regard to expert testimony. But sometimes an attorney's observations, especially with respect to delusions, are not alone a sufficient basis for concluding that a defendant is incompetent.[2] Regardless, in the present case, the defense attorneys specifically refrained from relying upon their own recollections as evidence. Their affidavits were not introduced into evidence and were addressed only as part of the basis for Dr. Almeida's opinions. But as explained above, Dr. Almeida ultimately concluded, despite these affidavits, that there was no current evidence to substantiate a delusional or other psychiatric disorder. And in making statements to the trial court, McCann refrained from framing those statements as testimony, which would have subjected him to cross-examination. Instead, he invited the trial court to rely upon its own observations.

**\*17** Pointedly, the trial court articulated its own observations, concluding that there was no evidence of incompetency, as follows:

> I have watched Mr. Turner throughout these several weeks that we've been going through the jury selection. He has been paying attention; he has been reacting. Your comment this afternoon about suspicion had a definite reaction from Mr. Turner, so he's paying attention. He knows what's going on. The fact that he will not talk to you, while that makes defense counsel's representation difficult, it doesn't rise to the level of incompetency. The evidence just doesn't show that. And the case cited by the prosecution in this

case recognizes that behavior alone doesn't meet the requirements. It's one part of a whole matter that has to be looked at. I wanted to hear evidence that would lead us to a full hearing, but I have not heard that; therefore, I'm denying it.

Even if the attorneys' observations were taken as evidence, those observations do not indicate that appellant was incapable of consulting with his attorneys with a reasonable degree of rational understanding. They show merely that he was *unwilling* to do so. No one disputes that appellant understood what the proceedings were about and that he was mentally able to consult with the attorneys if he so desired. That he lacked the desire to do so is not evidence of incompetence. And to the extent appellant's lack of cooperation escalated, this was based on the fact that the attorneys progressively engaged in tactics with which appellant disagreed, e.g. deposing appellant's children, and by the fact that the trial date loomed ever closer, both of which are at least somewhat rational explanations for appellant's uncooperative behavior.

### C. Appellant's Testimony

Appellant testified at trial that he did not commit the murders and that he was not even present at the time. He also testified that his wife had been having an affair with the mayor and that the mayor had been threatening him. He claimed that his children were coerced into making statements against him. He disagreed with his attorneys' decision to allow his children to participate in depositions, and he disagreed with his attorneys' strategy to admit in opening statement that he killed his wife. Appellant also made statements that indicated he believed the defense attorney and the prosecutor were suppressing evidence and conspiring to convict him.

On redirect, McCann asked appellant, "Mr. Turner, in your mind, all that drivel was true, wasn't it?" Appellant responded, "It is true."

On cross, the prosecutor asked, "Do you understand your attorney just said that you're lying, that it's drivel?" Appellant responded, "He's been saying this and trying to pretend.

He went out and got a—tried to get a doctor to rule me incompetent. And the reason that he was trying to do that ... another defense attorney here tried to get legal guardianship of me so they could file stuff on my behalf instead of getting my family members."

**\*18** Appellant would not be the first guilty defendant to refuse to cooperate with his attorneys. Despite overwhelming evidence showing that he intentionally killed two people, appellant wanted an acquittal. He concocted a far-fetched story to attempt to show his innocence. It might not be an exaggeration to say that his position was extremely shortsighted and wrongheaded, but that does not make him incompetent. His attorneys refused to go along with appellant's desired strategy. While I don't fault them for that, it is understandable that appellant would. The attorney-client relationship had deteriorated to the point that his own attorney was calling his testimony "drivel." It is not difficult to see why appellant is upset with them. Appellant has been an extraordinarily difficult client who seems to have made bad choices about trial strategy. But bad choices are not the same as irrational choices, except in the loosest, non-legal sense. To the extent that the Court conflates the two, I believe that it errs.

The trial court was within its discretion to find, after the testimony of three expert witnesses, that appellant had not established a right to a full hearing.

I respectfully dissent.

Footnotes

TEX. PENAL CODE § 19.03(a)(7)(A).

TEX.CODE CRIM. PROC. art. 37.071, §§ 2(b) & 2(e)(1).

TEX.CODE CRIM. PROC. art. 37.071, § 2(h).

In his ninth point of error, the appellant specifically argues that we should remand the cause for a retrospective competency hearing. Appellant's Brief at 29–31.

There is no evidence that the home was broken into, and the appellant was not charged with committing murder in the course of a burglary, another theory of capital murder. TEX. PENAL CODE § 19.03(a)(2).

According to the 2010 edition of the Physicians' Desk Reference, Risperdal is an "atypical antipsychotic" prescribed for the treatment of schizophrenia and bipolar disorder. PHYSICIANS' DESK REFERENCE 2682 (64th ed.2010).

Axelrad's report was submitted on the form approved by the Texas Correctional Office on Offenders with Medical or Mental Impairments under Section 614.0032(b) of the Texas Health and Safety Code. TEX.CODE CRIM. PROC. art. 46B.025(d); TEX. HEALTH & SAFETY CODE § 614.0032(b).

Because the presiding judge for the 268th Judicial District Court was out sick on December 10, 2010, both this *ex parte* conference in chambers and the hearing that occurred in open court later that same day were presided over by the judge of the 434th Judicial District Court.

We find no such motion or affidavit, however, in the record.

Other than the informal hearing on April 18th, after which the trial court ruled that no formal competency hearing was necessary, there had been no prior competency hearing.

We note here that having a rational understanding of the proceedings is not the same thing as having the ability to consult with trial counsel with a reasonable degree of rational understanding or to "rationally assist his lawyers in the defense of his case"—the specific issue that the trial court asked Almeida to evaluate. Unless a criminal defendant satisfies both criteria, he is incompetent to stand trial. TEX.CODE CRIM. PROC. art. 46B.003(a).

Trial counsel later renewed their claim that the appellant was incompetent in a motion for new trial. At a hearing on that motion, McCann testified that, prior to trial, the appellant "gave, at one point, three different versions of what had happened the night of the killings to myself and Mr. Moncriffe, and at no point in the conversation, did he indicate which one he intended to testify to." McCann continued:

> He became extremely upset with us and me, in particular, and began to ask if, you know, I was part of a secret society that was trying to get him killed or that was advancing my career by failing to defend him. He, at one point, when we were sitting next to each other, asked me if I was putting things in his coffee. It—it had got to the point of absurdity in some of our conversations. He constantly referred me to Biblical passages that appeared to have no relevance in terms of his defense.
>
> [The appellant] was obsessed with the Mayor of Kendleton with whom he believed his wife had had an affair. He was constantly attempting to blame the killings on this—that person, and that's essentially what he testified to, almost as if he wanted it to be true. And I don't—I'm not a mental health professional. I can only tell you that I have done this for many years. I have never had a client who, so fundamentally refused to acknowledge the daily reality that we were dealing with to the point that it was as if he was telling you the sky was always green. That—I have to attribute to something other than ... a simple attempt to lie because there was no basis for the lie. There was not a fact to support his view of what was going on.

In three points of error, the appellant argues that, if he was indeed competent, then he was denied his Sixth Amendment right to represent himself under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In view of our disposition of this appeal, we need not presently address this claim.

The jury heard a recording of the 911 call that the appellant's daughter placed to report the killings as they were occurring. The first prosecutor argued:

> And I know that the only person not affected by that 9–1–1 call was the man who created it, the Defendant. And he basically told you that when he got up on that stand. He told that [his daughter] had misidentified him, that maybe she thought she saw him, but that's not who it was.
>
> Misidentified him? This is a 12–year–old girl who's not identifying a stranger; she's not giving just a general description of someone. It's her father. She knows who he is, and she knows what he did.
>
> He chose to testify and tell you a story, and that's exactly what it was, a story. But it doesn't make sense because lies don't make sense.

The second prosecutor took up the theme of the appellant's demeanor from the witness stand:

> There were no tears from the Defendant. And what you saw of him on Friday, there was no admissions by him of what he had done. There was no shame for what he had done. "I wasn't there."
>
> And it was defiance. It was defiance with a complete lack of acceptance of what the facts are in his demeanor from the witness stand.

He comes up with a story it's the mayor of Kendleton's fault. What does that tell you about his demeanor and what his mindset is in this?

Those arguments include the following:

And then what does he do? He gets up on the stand and he tells you that he wasn't even there. With all the overwhelming evidence against him, he still can't admit that he did it. He gets up on the stand and he says, I wasn't there, even though his own attorneys told you that he did it.

What does that say about a person? What kind of person can sit and listen to the 9–1–1 call that y'all heard [the appellant's daughter] describing her grandmother and mother dying before her eyes and show no emotion? What kind of person can sit there and look at autopsy photos of what he's done, his wife and mother-in-law's necks open, and show no emotion? What kind of person is that?

What does that say about a person? It says that they're a threat. It tells you that they're dangerous.

He's shown absolutely no remorse and instead has done the complete opposite by saying he wasn't even there.

You watched him testify during guilt/innocence. Do you remember he told you the story of how he went to his house and there was a man inside of his house? "I don't know who it was. It wasn't me. I wasn't there."

I know who was in his house and so do you. It was the Defendant. It was the Defendant. And it's not that he can't tell you; he won't. And just as we discussed during cross-examination of the Defendant, what kind of dangerous does that make him? What kind of dangerous does that make him? What kind of dangerousness is engendered in the lack of remorse?

*E.g., Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) ("We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' ") (quoting *Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).

*Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

*Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

*Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

TEX.CODE CRIM. PROC. ch. 46B, subch. A–C.

*See* TEX.CODE CRIM. PROC. art. 46B.003(a)(1) & (2) ("A person is incompetent to stand trial if the person does not have ... sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or ... a rational as well as factual understanding of the proceedings against the person.").

TEX.CODE CRIM. PROC. art. 46B.024 §§ (1)(C) & (4) (emphasis added). (Section 4 of Article 46B.024 was amended in 2011, after the appellant's trial, and presently reads: "the degree of impairment resulting from the mental illness or mental retardation, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner." Acts 2011, 82nd Leg., ch. 822, § 7, p. 1897, eff. Sept. 1, 2011.). *See Morris v. State,* 301 S.W.3d 281, 285–86 & n. 10 (Tex.Crim.App.2009) (factors listed in Article 46B.024 are "relevant" to the determination of competency, including whether the defendant can "engage in a reasoned choice of legal strategies and options").

*See, e.g., Commonwealth v. Kennedy,* 451 Pa. 483, 305 A.2d 890 (1973) (evidence did not support trial court's finding that the appellant was competent to stand trial when testimony showed without contradiction that he suffered from paranoid schizophrenia and his mental illness prevented him from cooperating with trial counsel); *State v. Pedersen,* 309 N.W.2d 490, 501 (Iowa 1981) (although the defendant appeared to have a factual understanding of the proceedings against him, delusions fueled by schizophrenia prevented him from cooperating with defense counsel, rendering him "unable to assist effectively in his defense"); *United States v. Blohm,* 579 F.Supp. 495, 505 (S.D.N.Y.1983) (*Dusky* standard not satisfied when, although he had factual understanding of the proceedings, the defendant harbored certain delusional beliefs that rendered him "unable to consult with his lawyer and assist in his own defense"); *Strickland v. Francis,* 738 F.2d 1542, 1551 (11th Cir.1984) (overturning a state-court finding that the applicant was competent to stand trial because expert testimony overwhelmingly established that his mental illness caused delusions that rendered him "unable to understand the nature of the proceedings against him and to participate meaningfully in his defense"); *United States v. Hemsi,* 901 F.2d 293, 296 (2nd Cir.1990) (evidence supported the trial court's finding of incompetency because the appellant's "major psychiatric disorder and his impaired sense of reality prevented him from focusing on his legal needs and from acting effectively on his intellectual understanding, and would prevent him from cooperating rationally in his defense"); *Lafferty v. Cook,* 949 F.2d 1546, 1556 (10th Cir.1991) (state court erred to find the applicant competent on the basis of a simple factual understanding of the proceedings against him where his paranoid delusions rendered him unable "to realistically determine where his best interests lie"); *United States v. Boigegrain,* 155 F.3d 1181, 1189–90 (10th Cir.1998) (evidence sufficient to support trial court's finding of incompetency when "the defendant was delusional and suffered from 'paranoid ideation,' causing him to believe that his lawyer was participating in a conspiracy, along with the prosecutor and the judge, to incarcerate him for reasons unrelated to the charge against him"); *United States v. Ghane,* 490 F.3d 1036, 1040 (8th Cir.2007) (evidence sufficient to support trial court's finding of incompetency because, though the defendant had a factual understanding of the proceedings against him, "that understanding was not rational because it was

premised on his delusion of a government conspiracy working against him, including the doctors, lawyers, and the court"); *People v. Mondragon,* 217 P.3d 936 (Colo.App.2009) (trial court erred to find the defendant competent based on factual understanding of the proceedings alone when his mental illness prevented him from making a rational decision whether to testify in his own behalf). *See also Wilcoxson v. State,* 22 S.W.3d 289, 305 (Tenn.Crim.App.1999) ("[C]ourts have acknowledged that, even if a criminal defendant has an intellectual understanding of the charges against him, he may be incompetent if his impaired sense of reality substantially undermines his judgment and prevents him from cooperating rationally with his lawyer[.]"). Other courts have followed suit, albeit in unpublished decisions. *See United States v. Nagy,* No. 96 CR. 601(RWS), 1998 WL 341940, at \*7 (S.D.N.Y. June 26, 1998) (the defendant's "understanding of the pending criminal proceedings is necessarily skewed by his [delusional] belief that there is a conspiracy against him involving, among others, judges, the Government, a priest, his landlord, and all psychiatrists who have examined him"); *United States v. Bauman,* No. 07–20052–KHV, 2008 WL 2560706, at \*7 (D.Kan. June 26, 2008) (notwithstanding evidence that the defendant had a factual understanding of the proceedings, the trial court "finds that due to a delusional disorder, defendant lacks sufficient contact with reality to the extent that he cannot rationally consult with or cooperate with his attorney in this case"); *Aldridge v. Thaler,* No. H–05–608, 2010 WL 1050335, at \*33 (S.D.Texas March 17, 2010) ("Without the ability to make crucial decisions and add relevant information to the defense, communication [with counsel] does not amount to the consultation or assistance required by the Supreme Court."); *State v. Williamson,* No. 1106025042, 2013 WL 268981, at \*9 (Del.Super.Ct. January 23, 2013) ("[D]efense lawyers must provide the best defense consistent with the client's direction. However, when delusions infect the process with fanciful aberrations, the trial would be a mockery of justice. Where a psychotic disorder precludes a meaningful defense, then no one can be subject to the gauntlet of trial.").

24 *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (in a criminal case, "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"); *Ex parte Mines,* 26 S.W.3d 910, 915 (Tex.Crim.App.2000) ("Another reason for requiring competency at trial is that the defendant must make significant choices that require the advice of counsel but that are ultimately decided by the defendant. The defendant must be competent to decide whether to invoke or to waive such personal constitutional rights.") (citations omitted).

25 *See Mondragon, supra,* at 942 ("[I]f defendant's mental disease or defect rendered him incapable of deciding rationally whether to testify, then, because of the nature of that right, he necessarily lacked the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and the requisite factual and rational understanding of the proceedings against him.").

26 *Moore v. State,* 999 S.W.2d 385, 395 (Tex.Crim.App.1999); *Bouchillon v. Collins,* 907 F.2d 589, 593 (5th Cir.1990).

27 *See Reed v. State,* 112 S.W.3d 706, 710 (Tex.App.–Houston [14th Dist.] 2003, pet. ref'd) ("It is not enough for counsel to allege unspecified difficulties in communicating with the defendant.") (citing *Moore, supra,* at 394).

28 *Loftin v. State,* 660 S.W.2d 543, 546–47 (Tex.Crim.App.1983).

29 In 2003, the Legislature comprehensively revised the procedures governing determinations of competency to stand trial, repealing former Article 46.02 of the Texas Code of Criminal Procedure, and replacing it with current Chapter 46B. *See* Acts 2003, 78th Leg., ch. 35, §§ 1 & 15, pp. 57–68 & 72, eff. Jan. 1, 2004.

30 *See* TEX.CODE CRIM. PROC. art. 46B.004(c) ("On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.").

31 *Montoya v. State,* 291 S.W.3d 420, 425 (Tex.Crim.App.2009) ( "suggestion" means the same as *bona fide* doubt under former statutory provisions; hence, "[i]f a trial judge has a *bona fide* doubt about the competency of the defendant, he or she shall conduct an informal inquiry to determine if there is evidence that would support a finding of incompetence"). *Cf. Alcott v. State,* 51 S.W.3d 596, 600–01 (Tex.Crim.App.2001) (under the former statutory scheme, *bona fide* doubt triggered competency inquiry during which the trial court must determine whether there is "some evidence" to support a finding of incompetency so as to trigger a formal competency hearing).

32 *See* Acts 2011, 82nd Leg., ch. 822, §§ 2 & 21(b), p. 1895 & 1901, eff. Sept. 1, 2011 (adding Subsection (c–1) to Article 46B.004 to provide that: "A suggestion of incompetency is the threshold requirement for an informal inquiry under Subsection (c) and may consist solely of a representation from any credible source that the defendant may be incompetent. A further evidentiary showing is not required to initiate the inquiry, and the court is not required to have a bona fide doubt about the competency of the defendant.").

33 TEX.CODE CRIM. PROC. art. 46B.004(c).

34 *Ex parte LaHood,* 401 S.W.3d 45, 52–53 (Tex.Crim.App.2013) (quoting *Sisco v. State,* 599 S.W.2d 607, 613 (Tex.Crim.App.1980) (plurality opinion)). *See also Williams v. State,* 663 S.W.2d 832, 834 (Tex.Crim.App.1984) (applying *Sisco,* and construing prior statutory language that required a formal competency hearing upon a determination that there is evidence from any source "to support a finding of incompetency to stand trial"); *Barber v. State,* 737 S.W.2d 824, 828 (Tex.Crim.App.1987) (same); George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:36, at 49 (3rd ed. 2011) ("The

language used [in the current statutory scheme] for the standard to determine whether a hearing must be held is identical to that in the former statute determining whether a jury trial was required. This clearly incorporates the case law development of that criterion[.]").

35    *See* TEX.CODE CRIM. PROC. art. 46B.005(a) & (b) (if informal inquiry reveals "that evidence exists to support a finding of incompetency," then the trial court should order an expert examination and "shall hold a trial ... before determining whether the defendant is incompetent to stand trial"); George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:53, at 63 (3rd ed. 2011) ("A trial on the merits of the competency issue is apparently required if the trial court determines that evidence exists to support a finding of incompetency. This standard uses the same terminology as former ... Article 46.02, section 4(a) of the Code of Criminal Procedure. Almost certainly, it will be given the same interpretation as that prior statutory language."). If "evidence exists to support a finding of incompetency," a trial is mandated unless the parties can agree without a trial that the defendant is incompetent. TEX.CODE CRIM. PROC. arts. 46B.005(a)–(c), 46B.054. Unlike the former statutory regime, which required that a jury be empaneled to determine competency, under the current statute, the trial court makes the ultimate determination with respect to competency unless either of the parties or the trial court itself registers a preference that "a jury shall make that determination." TEX.CODE CRIM. PROC. art. 46B.051.

36    *E.g., Ferguson v. State,* 579 S.W.2d 2, 4–5 (Tex.Crim.App.1979); *Bigby v. State,* 892 S.W.2d 864, 885 (Tex.Crim.App.1994).

37    *See Drope, supra,* at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

38    TEX.CODE CRIM. PROC. art. 46B.024(4) & (1)(C), respectively.

39    In her dissenting opinion, Judge Keller relies heavily upon the lack of expert opinion that there was any "current evidence to substantiate a delusional or other psychiatric disorder." Dissenting Opinion at 6. It is true that none of the experts in this case ultimately expressed such an opinion. However, it is not evident why the opinion of an expert should be considered indispensable to raising incompetency—especially considering our holding that an expert's opinion is *not* necessary to raise the defense of insanity (which, unlike the standard for incompetency to stand trial, expressly requires a finding that the defendant's condition be "a result of severe mental disease or defect"). *Cf. Pacheco v. State,* 757 S.W.2d 729, 736 (Tex.Crim.App.1988) ("[W]e hold that predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue [of insanity]."); TEX. PENAL CODE § 8.01(a). And while none of the experts here stated unequivocally that the appellant is mentally ill, both Gollaher and Axelrad noted the possibility of paranoid and delusional thinking on his part, and Axelrad observed that he was "an individual who may have a mental illness and [that] the diagnosis may be a paranoid disorder." Axelrad even found appellant to be at least "mildly impaired" on that account in his ability to rationally engage with counsel about the case and about his choice of legal strategies and options. Almeida's conclusion that the appellant displayed no delusional disorder was based upon her perception that there were "no significant changes in [the appellant's] emotional or cognitive functioning" since the year-old evaluations of Gollaher and Axelrad. She took no account of the appellant's subsequent behaviors that might serve to substantiate the initial impressions of Gollaher and Axelrad that he may suffer from a "mental illness" that "may be a paranoid disorder." These circumstances constitute *some* evidence—at *least* "more than none or a scintilla," *see* note 34, *ante*—that the appellant suffers from a debilitating mental illness—enough that, in combination with some evidence of the other two factors, it may be said "that evidence exists to support a finding of incompetency" for purposes of a formal competency trial under Article 46B.005.

40    Supposing (without deciding) that the appellant was incompetent, it is not difficult to imagine how his delusional beliefs could have tainted the trial process. Taking the witness stand against the advice of counsel, he proceeded to testify at odds with the defensive posture of his lawyers based upon a wholesale denial of responsibility that was worse than implausible. This opened the door for the prosecutors to expose the irrationality of his account on cross-examination and then to highlight, at both the guilt and punishment phases of trial, that his willful refusal to acknowledge blame was nothing but a clear signal of his enduring threat to society. To the extent that the appellant's disastrous decision to testify was the product of a conflict with trial counsel that derived from a paranoid pathology, it is constitutionally intolerable. The trial court erred not to conduct a formal competency trial that could have ruled out that substantial possibility before proceeding to trial on the indictment.

We do not mean by these observations to suggest that due process error in putting an incompetent defendant to trial is necessarily subject to a constitutional harm analysis. Although at least one court has held such error to be "structural," *Mondragon, supra,* at 942–43, neither the United States Supreme Court nor this Court has yet declared whether the due process violation of trying an incompetent defendant constitutes the type of constitutional error, such as those enumerated most recently in *United States v. Gonzalez–Lopez,* 548 U.S. 140, 148–49, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), that is not susceptible to a harm analysis. We have no occasion to decide that question today. We simply point out that, if on remand the appellant in this case should indeed be found to be incompetent to stand trial, it is not hard to see how his incompetency had an obviously deleterious impact on the conduct of his trial, and particularly, his exclusive decision whether or not to testify.

41    *See* note 34, *ante.*

42    *See* George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:81, at 89–90 & n. 10 (3rd ed.2011) (citing, *e.g., Torres v. State,* 593 S.W.2d 717, 719 (Tex.Crim.App.1980) (remanding to trial court to decide, *inter alia,* whether "a nunc pro tunc determination of appellant's competency is not possible"); *Ex parte McKenzie,* 582 S.W.2d 153, 155 (Tex.Crim.App.1979) (remanding case to the trial court to "determine if it is possible to conduct a nunc pro tunc competency hearing and, if it is, to hold such a hearing" under the then-extant competency-to-stand-trial statute); *Ex parte Winfrey,* 581 S.W.2d 698, 699 (Tex.Crim.App.1979) (holding that the original competency hearing suffered from a flawed jury instruction, this Court remanded to the trial court for a determination whether, *inter alia,* a retrospective competency hearing was feasible)).

43    TEX.CODE CRIM. PROC. ch. 46B, subch. C.

44    This Court has sometimes disposed of other appellate points of error on original submission before remanding a cause for a retrospective competency determination. *E.g., Brandon v. State,* 599 S.W.2d 567, 574 (Tex.Crim.App.1979) (opinion on original submission); *Barber v. State,* 737 S.W.2d 824, 829 (Tex.Crim.App.1987). Three of the appellant's remaining points of error in this case, however, involve the issue of whether he should have been allowed to represent himself at various points at trial. *See* note 13, *ante.* The ultimate resolution of the issue of his competency to stand trial may prove to have some bearing on these points of error. *See Indiana v. Edwards,* 554 U.S. 164, 178, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) ("[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."). We therefore believe that resolution of these self-representation claims, if necessary, would best await our opinion after remand. The appellant's remaining points of error involve claims that the State exercised certain peremptory challenges to discriminate against African–American veniremen and that the trial court erred in failing to bench warrant the appellant from the penitentiary to assure his attendance at the motion for new trial hearing. The resolution of these claims also may prove unnecessary. In order to avoid resolving the appellant's points of error piecemeal—some now and some later—we will abstain from addressing any of them unless and until it should become necessary to do so in our opinion after remand.

1    TEX.CODE CRIM. PROC. art. 46B.003(a).

2    *See Panetti v. Quarterman,* 551 U.S. 930, 962, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) ("Expert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent.").

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. 10-DCR-054233

THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                            )
vs.                         ) FORT BEND COUNTY, TEXAS
                            )
ALBERT JAMES TURNER         ) 268TH JUDICIAL DISTRICT

_____

**DETERMINATION OF RETROSPECTIVE COMPETENCY**
_____

On May 30, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

MR. FRED FELCMAN
MS. GAIL MCCONNELL
MS. LESLEIGH SAUNDERS
FORT BEND COUNTY DISTRICT ATTORNEY'S OFFICE
301 JACKSON
RICHMOND, TEXAS 77469
Counsel for The State of Texas

MR. RICHARD A. MORROW
SBOT NO. 14542400
LOCKE LORD, L.L.P.
600 CONGRESS AVENUE, SUITE 2200
AUSTIN, TEXAS 78701
Telephone:  512.305.4709
Counsel for Defendant

MR. JAMES RYTTING
SBOT NO. 24002883
Hilder & Associates
819 Lovett Boulevard
Houston, Texas 77006
Telephone:  713.655.9111
Writ Counsel for Defendant

VOLUME 1

DETERMINATION OF RETROSPECTIVE COMPETENCY

May 30, 2014

                                             PAGE VOL.
Proceedings Commence ..............................4    1

Announcements ....................................4    1

Ruling of the Court .............................16    1

Reporter's Certificate ..........................19    1

**PROCEEDINGS**

THE COURT: This is in the matter of The State of Texas vs. Albert James Turner, No. 54233.

If you'll make your announcements, please.

MR. FELCMAN: Fred Felcman for The State of Texas, Judge.

MR. MORROW: Robert Morrow for the defendant, Mr. Turner; and Aisha Khan is with me this morning, your Honor.

THE COURT: Mr. Morrow, I noticed in the files, the papers in the file, that you've entered your appearance as lead attorney for Mr. Turner at this stage.

MR. MORROW: I have, your Honor. I've openly discussed that.

THE COURT: Okay. Very good.

The purpose of this hearing is to determine the necessity of a -- or the necessity and feasibility of a retrospective competency hearing, and you've been joined by counsel for -- who's handling the writ.

Do you want to make your announcements, if you're going to participate?

MR. RYTTING: Yes, James Rytting here for Mr. Albert James Turner.

THE COURT: All right. The way this has come down, as I've read the opinion of the Court of Criminal Appeals, it almost throws this on my lap to determine the feasibility; and I am interpreting that to ask for help from counsel who's best positioned to do so to argue the necessity -- Well, not necessity. The Court of Criminal Appeals has already ordered the necessity of it, but the feasibility and the method by which we will accomplish that task, so I -- Since both of you are basically in the same position, I believe, I don't know who's the lead in this or not; but using normal procedure, since it's the burden of the defendant to raise competency, I believe that burden still rests with the defense, so I'll proceed with you and Mr. Morrow and let you lead off on this issue.

MR. MORROW: Thank you, Judge.

Judge, I did want to mention to the Court that Ms. Amy Martin has put just a tremendous amount of work in this case and would be here with me this morning, but she lost her dad about a week ago, and the funeral is actually right now.

THE COURT: I'm sorry to hear that.

MR. MORROW: Yes, sir, and I apologize. And, of course, she, except for that extraordinary circumstance, would be here so -- and I hope she will be

joining us later on in the litigation as we continue.

So, Judge, we believe that there's a threshold finding that the Court has to deal with which is whether, as you mentioned, there's the feasibility of having this hearing; and we think before that, we're going to ask the Court and we prepared a motion this morning to let us have an expert to determine whether Mr. Turner is competent now to proceed.

And the Green case, which I'll share with the Court, with the prosecutors, 264 S.W.3d 261, out of the San Antonio Court of Appeals, dealt with a situation that's similar to ours, we believe, where the defendant in that case was incompetent, had been incompetent; and in the case, they were determining whether or not they could do a retrospective competency hearing; and the Court in that case found that because of the continued incompetency of the defendant, it was not practical to do so.

So we believe the best way to proceed right now would be to let us have an expert examine Mr. Turner for his present competency and then put that in front of the Court so you can have that to consider before deciding whether you could go forward; that way, we'd have an up-to-date, you know, opinion about his state, and you'd be able to make a better decision about

whether it's possible to have this hearing that the Court has asked you to consider.

THE COURT: Mr. Felcman, your response.

MR. FELCMAN: I appreciate Mr. Morrow's giving me the case; I really do.

This is a very unusual circumstance, okay. We have a 5/4 decision. The five, in reaching a decision in this, use a nonsecular reasoning, circular logic, sort of bypass abusive discretion, and then ignore certain portions of the law; and then they tell you, make a decision whether you can have a retroactive hearing on this matter. Never do they -- Never do they put in the -- in their findings that you will be unable to make a retroactive hearing.

Now, I bring that to the attention of the Court because the five people who wrote this should know what the circumstances are. In this particular case, you've already had several experts look at the defendant and all said he was competent. Or they'd say they couldn't determine it because he didn't cooperate with them.

THE COURT: I think that's a more accurate rendition of their findings is that they're unable to make a decision because Mr. Turner will not cooperate with the process.

MR. FELCMAN: Actually, some of them did find him competent. But I understand; you're correct.

THE COURT: But that is a finding that we've always followed in the law of competency that if the person won't cooperate and won't participate, they are to be determined to be competent.

MR. FELCMAN: That's correct.

THE COURT: Which is -- I guess that's what's got in my crawl about this whole matter is that following that rule of law, I get this returned to me.

MR. FELCMAN: And actually if you read it over, they actually go ahead and say: "Because the doctor couldn't decide whether he's competent, we must presume he's incompetent." Therefore, I disagree with the opinion wholeheartedly; but that doesn't let you off the hook.

THE COURT: Well, did they find that if he didn't participate, then he is incompetent?

MR. FELCMAN: They actually have a section in there because the doctor couldn't have enough information to determine whether he was competent or not, there's not evidence that he is competent; therefore, they sort of switched the burden of proof at one point in time in the opinions.

THE COURT: So they have changed the whole

body of law --

MR. FELCMAN: They've changed the standard.

But that's not Mr. Morrow's fault, whatever. He's just in here arguing his point. I believe that the feasibility of this is quite easily done. The only evidence you will actually have on this matter is --

THE COURT: Well, let's talk about his request first that he -- we need to bring him down and determine his competency presently.

MR. FELCMAN: That's correct, Judge. And the cases he cited is actually correct. He cites you correctly. It doesn't give any specifics on it.

MR. MORROW: May I approach?

MR. FELCMAN: Yeah, sure. Give it to him.

He doesn't give you any specifics about what was the scenario on this one. It doesn't say -- I don't know if it says anything about the reason we're having this is because he wasn't cooperating with his counsel.

Did it say anything like that in there specifically?

MR. MORROW: No. No, I don't think it addresses cooperation that I remember.

MR. FELCMAN: And that's what I think is the key on this particular case. We're just here because the defendant doesn't want to cooperate, all right. And even in the opinion, they say he meets it. We all know nobody's argued that he doesn't have a rational understanding of what's going on here. All we're dealing with here is his ability to cooperate with defense counsel. That's the only issue we're really dealing with here. This case could be pertinent. On the other hand, I don't think it is under the scenario that we have right now.

If he has changed, if something comes up where the -- I guess you could do it if the psychiatrist comes up and he has now got a mental illness, maybe that would be something you would need to address; but I don't think we have -- Do we have anything at all on the record that he's got a new mental illness, or is it basically the same thing as always, he doesn't want to cooperate with anybody?

MR. MORROW: No, I think even Dr. Alexrad and some of the other doctors mentioned a mental illness; and if I could address Fred's point briefly, Judge, we argue really that this vexation that he won't cooperate is really the best evidence of his mental illness; and the trial itself was so -- Judge, you

observed that that was so vividly illustrated. This isn't someone that's just, you know, hardheaded. This is someone whose mental illness, whose fixed delusion that we are all conspiring to kill him has kept him from cooperating.

And when you look at the T.D.C. records, it's consistent throughout his records. He won't sign things; he won't participate in any way, and it's -- That's the mental illness that's expressing itself that makes him incompetent, so while it's extremely frustrating to deal with him, that is his illness, so we ask that we be able to bring that more forcibly to the Court and more vividly to the Court so that you could decide whether you can have this hearing or not.

THE COURT: Okay. This is part of what's bothering me about -- The defense has made the request that he be brought in to determine current competency several times.

MR. MORROW: Yes, sir.

THE COURT: But how does this relate to the Trial on the Merits of the case which is what brought us to this point? I made an explicit finding during the trial that he was competent by my observations. Now, there's room for disagreement there; but at least I'm the one that got to see him for the

several weeks that we sat through that.

Based upon the professionals' examination, they could not reach a decision or they reached a decision finding him competent. We're focused on the Trial on the Merits which brought this issue before the Court of Criminal Appeals, which was to determine whether he was competent during the trial. How is determining his competency now going to impact a decision that I would have to make and the Court of Criminal Appeals would have to make in the end as it relates to his competency at the time of trial? I guess that's the confusing point about your request.

MR. MORROW: Judge, if I believe that due process requires that before this -- you can make the next determination, Is this feasible, we have to have a client that can participate to some degree. If we show he can't participate, can't aid his lawyers, then the answer to the question is there for you, that it's not feasible to go forward; and that will end the inquiry.

Judge, I was joking earlier about the civil proceeding. I'm just focusing on the remand and abatement for the Court of Criminal Appeals. The rest of it's just too much to take in at one time, so I'm looking at what did they ask you to do, what did they ask Judge Elliott to do, and that is to decide, Is it

feasible to have a retrospective competency hearing, and, if so, how are we going to do that.

We believe that we need to have this examination to ensure due process for Mr. Turner so that before you make that decision, you know whether or not he's competent; and if he's not, of course, we're going to argue it's not feasible to go forward.

THE COURT: Okay. Yes, sir.

MR. FELCMAN: I appreciate his argument, but that also validates why it is feasible to have a retroactive hearing. This man will not cooperate. It's just that simple. He won't change his stance on that.

The defense of the defendant during the trial, it's actually now evident why he may not have wanted to cooperate. That's what the Court did in its decision about Pat McCann's -- What was his ultimate defense of the defendant? And when you read over the dissent, they look at it and say, We understand why he wasn't cooperating with the defense. Look what the defense was. Look at the things they did when he said he didn't want them to do that.

We also will have the testimony, of course, things that will aid the Court in making this feasibility -- I mean, making this decision or the jury making this decision. His relationship with the family

members, all the things that occurred during the trial make it far more feasible to have a retroactive competency hearing that ever could occur.

Now, him having examined, Mr. Morrow's not trying to trick the Court. It's in there; but I believe in the long run, it will not have any bearing whatsoever about his retroactive -- or what his competency was back then.

THE COURT: Well, I understand the due process argument you're making, that it's difficult -- Well, it's clear that if there's a Trial on the Merits on any definitive issue, the defendant has a right to not only be there but to participate in that process; and if we, in fact, have a retrospective competency hearing, it's important that he be here, No. 1, and, No. 2, able to participate.

I have some doubts in my mind whether Mr. Turner will change the process that he has used throughout this matter, but that's in the future. I can't read that crystal ball yet.

MR. MORROW: May I speak to that briefly, Judge, before you move on?

THE COURT: Yes, sir.

MR. MORROW: Judge, it's been a long time since someone's approached him to examine him, years

now; and we're in a different posture. And I may be the ridiculous optimist in the world; but I believe if we can talk to him now, which would require him to come back to Fort Bend County, and explain the posture of this case and then present him with a disinterested expert, someone that's not -- that he's not seen before that's part of the conspiracy -- You know, I'm not saying we can cure him. It may get better. But I just want that chance, Judge; and I think that's what due process is, is to bring him back now in 2014 and say, "Mr. Turner, the situation has changed. Here's what the circumstances are, and you need to participate with this doctor."

I think -- You know, I just want that chance, Judge; and I think that's what due process requires; and we would ask the Court, with all due respect, to let us have that opportunity.

MR. FELCMAN: Oh, I agree. Why doesn't he go talk to him? I'm more, You can go talk to him, Counsel, and see what he says. This is going to be a Catch-22 with them; and whatever ends up finding, I will be able to use it to sustain why the feasibility of a retrospective hearing is even more --

Mr. Morrow, you're correct. He ought to be able to talk to his client, but that doesn't have

anything to do with his competency back then.

THE COURT: Let me read this Green case real quick.

MR. FELCMAN: Yeah.

THE COURT: All right. I think out of an abundance of caution, I'm going to grant the defendant's request to have a current competency examination performed on Mr. Turner. Because this is a heavily contested matter, what I'm going to order is that the defense and the State each provide their own expert to examine Mr. Turner to determine his present competency.

I will order a -- bench warrant him to Fort Bend County, and I want this done as rapidly as possible. We've delayed this matter quite a bit, and we need to move forward, so submit your names for your experts to the Court. I will order their examination of Mr. Turner; and if you'll prepare a bench warrant today, Mr. Felcman, I'll submit that order.

MR. MORROW: May I approach with this motion, Judge?

THE COURT: Yes.

MR. FELCMAN: Does anybody have a suggestion of exactly what they're supposed to be looking for regarding his competency? Because this is not a trial setting, this is not a defensible issue, is

it going to be the same standard, or is it going to be something different?

THE COURT: It's going to be the same standard, competency --

MR. FELCMAN: Same.

THE COURT: Because the request is a due process request to assist counsel; and, therefore, it would be the same standard as we use for the trial. And I think that would -- In the abundance of caution, I think that would be the best way to proceed; and we can get this done at the earliest convenience; and dependent upon their findings, we'll hold a hearing very shortly thereafter to proceed to the feasibility part of this issue.

MR. FELCMAN: Now, the five judges up there used that against you. You said, "Abundance of caution." They said that that meant that you had a good faith doubt about the defendant's competency in this matter. They used that, even though you multiple times said, Listen, I'm just doing this out of an abundance of caution.

THE COURT: The abundance of caution is to make a full record for the Court of Criminal Appeals to have before them. I have no doubt in my mind that he was competent; but on the other hand, this is a question

that's been raised by nine folks smarter than I am, or at least five of them; and we're going to give them all the ammunition they can use.

MR. FELCMAN: Thank you, Judge.

MR. MORROW: Judge, can we approach off the docket -- off the record about schedules?

MR. FELCMAN: One last thing, Judge.

THE REPORTER: On the record?

MR. FELCMAN: On the record, please, one last thing.

I know Mr. Morrow's aware of it. There are specific requirements for the qualifications of the psychiatrist, okay, so that has to be met on those.

THE COURT: Off the record, Mindy.

THE REPORTER: Yes, sir.

THE STATE OF TEXAS §

COUNTY OF FORT BEND §

I, Mindy R. Hall, official court reporter in and for the 268th District Court of Fort Bend County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $127.50 and will be paid by Fort Bend County.

WITNESS MY OFFICIAL HAND this, the 18th day of August, 2014.

```
                          /s/Mindy R. Hall_____
                          Mindy R. Hall, CSR
                          Texas CSR 8107
                          Official Court Reporter
                          301 Jackson
                          Richmond, Texas 77469
                          Telephone:  281.341.8611
                          Expiration:  12/31/2014
```

**$**

$127.50 [1] 19/16

**/**

/s/Mindy [1] 19/20

**0**

054233 [1] 1/2

**1**

10-DCR-054233 [1] 1/2
12/31/2014 [1] 19/24
14542400 [1] 2/6
18th [1] 19/18

**2**

2014 [5] 1/12 3/4 15/10 19/19 19/24
22 [1] 15/21
2200 [1] 2/7
24002883 [1] 2/10
261 [1] 6/10
264 [1] 6/10
268TH [2] 1/5 19/4
281.341.8611 [1] 19/23

**3**

30 [2] 1/12 3/4
301 [2] 2/4 19/22

**5**

5/4 [1] 7/7
512.305.4709 [1] 2/8
54233 [1] 4/3

**6**

600 [1] 2/7

**7**

713.655.9111 [1] 2/12
77006 [1] 2/12
77469 [2] 2/4 19/23
78701 [1] 2/8

**8**

8107 [1] 19/21
819 [1] 2/11

**A**

abatement [1] 12/22
ability [1] 10/7
able [5] 6/25 11/12 14/16 15/22 15/25
about [14] 5/20 6/24 6/25 8/9 9/9 9/17 9/19 11/16 12/12 12/20 13/16 14/7 17/18 18/6
above [3] 1/13 19/5 19/9
above-styled [1] 19/9
above-titled [1] 1/13
abundance [5] 16/6 17/9 17/16 17/20 17/22
abusive [1] 7/9
accomplish [1] 5/9
accurate [1] 7/22
actually [8] 5/21 8/1 8/11 8/12 8/19 9/7 9/13 13/14
address [2] 10/15 10/22
addresses [1] 9/25
against [1] 17/16
ago [1] 5/20
agree [1] 15/18
ahead [1] 8/12
aid [2] 12/17 13/23
Aisha [1] 4/8
ALBERT [3] 1/5 4/3 4/25
Alexrad [1] 10/20

all [13] 5/1 7/19 10/3 10/5 10/6 10/16 11/4 14/1 15/16 16/5 18/2 19/6 19/10
almost [1] 5/3
already [2] 5/7 7/18
also [2] 13/10 13/22
always [2] 8/4 10/18
am [2] 5/4 18/1
ammunition [1] 18/3
amount [1] 5/18
Amy [1] 5/18
announcements [2] 4/4 4/22
answer [1] 12/18
Antonio [1] 6/11
any [6] 9/14 9/17 11/8 14/6 14/12 19/14
anybody [2] 10/19 16/22
anything [4] 9/19 9/22 10/16 16/1
apologize [1] 5/23
Appeals [7] 5/3 5/7 6/11 12/6 12/10 12/22 17/23
appearance [1] 4/12
APPEARANCES [1] 2/1
appreciate [2] 7/4 13/9
approach [3] 9/15 16/19 18/5
approached [1] 14/25
are [7] 5/10 7/17 8/6 11/4 13/2 15/12 18/12
argue [3] 5/6 10/23 13/7
argued [1] 10/5
arguing [1] 9/5
argument [2] 13/9 14/10
as [9] 4/12 5/2 6/1 6/4 10/18 12/10 16/13 16/13 17/8
ask [6] 5/5 6/6 11/12 12/24 12/25 15/16
asked [1] 7/2
assist [1] 17/7
Associates [1] 2/11
attention [1] 7/15
attorney [1] 4/12
ATTORNEY'S [1] 2/3
August [1] 19/19
AUSTIN [1] 2/8
AVENUE [1] 2/7
aware [1] 18/11

**B**

back [4] 14/7 15/4 15/10 16/1
ball [1] 14/20
Based [1] 12/2
basically [2] 5/10 10/18
be [28]
bearing [1] 14/6
because [11] 6/16 7/16 7/20 7/24 8/12 8/20 9/20 10/3 16/8 16/24 17/6
been [4] 4/20 6/13 14/24 18/1
before [9] 1/13 6/5 6/23 12/5 12/14 13/5 14/22 15/6 17/24
believe [10] 5/10 5/13 6/2 6/12 6/19 9/6 12/13 13/3 14/5 15/2
bench [2] 16/12 16/17
BEND [8] 1/4 1/15 2/3 15/4 16/13 19/2 19/4 19/17
best [4] 5/5 6/19 10/24 17/10
better [2] 6/25 15/8
bit [1] 16/14
body [1] 9/1
both [1] 5/9
bothering [1] 11/16
Boulevard [1] 2/11
Brady [1] 1/14
briefly [2] 10/22 14/21
bring [4] 7/15 9/10 11/12 15/10
brought [3] 11/17 11/22 12/5
burden [3] 5/12 5/13 8/23
bypass [1] 7/9

**C**

came [1] 1/12
can [11] 6/22 7/11 11/14 12/14 12/16 15/3 15/8 15/19 17/10 18/3 18/5
can't [3] 12/17 12/17 14/20
case [12] 5/19 6/9 6/13 6/14 6/16 7/5 7/17 10/2 10/9 11/21 15/5 16/2
cases [1] 9/13
Catch [1] 15/21
Catch-22 [1] 15/21
cause [3] 1/2 1/13 19/10
caution [5] 16/6 17/9 17/17 17/21 17/22
certain [1] 7/10
certify [3] 19/5 19/12 19/15
chambers [1] 19/11
chance [2] 15/9 15/15
change [2] 13/12 14/18
changed [4] 8/25 9/2 10/12 15/11
circular [1] 7/8
circumstance [2] 5/25 7/6
circumstances [2] 7/17 15/12
cited [1] 9/13
cites [1] 9/13
civil [1] 12/21
clear [1] 14/11
client [2] 12/16 15/25
come [2] 5/2 15/3
comes [2] 10/12 10/14
competency [21]
competent [12] 6/8 7/19 8/2 8/6 8/13 8/21 8/22 11/23 12/4 12/7 13/6 17/25
computerized [1] 1/16
confusing [1] 12/12
CONGRESS [1] 2/7
consider [2] 6/22 7/2
consistent [1] 11/7
conspiracy [1] 15/7
conspiring [1] 11/4
contains [1] 19/6
contested [1] 16/9
continue [1] 6/1
continued [1] 6/16
convenience [1] 17/11
cooperate [9] 7/20 7/24 8/5 10/3 10/7 10/19 10/24 13/11 13/15
cooperating [3] 9/20 11/5 13/19
cooperation [1] 9/25
correct [6] 8/2 8/7 9/12 9/13 15/24 19/6
correctly [2] 9/14 19/13
cost [1] 19/15
could [8] 6/15 6/23 10/9 10/13 10/22 11/13 12/3 14/3
couldn't [3] 7/20 8/13 8/20
counsel [10] 2/5 2/9 2/13 4/20 5/5 9/21 10/8 15/20 17/7 19/8
COUNTY [8] 1/4 1/15 2/3 15/4 16/13 19/2 19/4 19/17
course [3] 5/24 13/6 13/23
court [28]
crawl [1] 8/9
Criminal [6] 5/3 5/7 12/6 12/10 12/22 17/23
crystal [1] 14/20
CSR [2] 19/21 19/21
cure [1] 15/8
current [2] 11/17 16/7

**D**

dad [1] 5/20
date [1] 6/24
day [1] 19/18
DCR [1] 1/2
deal [2] 6/3 11/11
dealing [2] 10/7 10/9

**D**

dealt [1] 6/11
decide [3] 8/13 11/14 12/25
deciding [1] 6/23
decision [12] 6/25 7/7 7/8 7/11 7/24 12/3 12/4 12/9 13/5 13/16 13/24 13/25
defendant [11] 2/9 2/13 4/8 5/12 6/12 6/17 7/18 10/3 13/13 13/17 14/12
defendant's [2] 16/6 17/18
defense [8] 5/14 10/8 11/16 13/13 13/17 13/19 13/20 16/10
defensible [1] 16/25
definitive [1] 14/12
degree [1] 12/16
delayed [1] 16/14
delusion [1] 11/3
dependent [1] 17/11
determination [3] 1/9 3/3 12/15
determine [9] 4/18 5/4 6/7 7/20 8/21 9/11 11/17 12/6 16/11
determined [1] 8/6
determining [2] 6/14 12/8
did [8] 5/17 8/1 8/17 9/22 12/24 12/24 13/15 13/20
didn't [3] 7/20 8/18 13/21
different [2] 15/1 17/2
difficult [1] 14/10
disagree [1] 8/14
disagreement [1] 11/24
discretion [1] 7/9
discussed [1] 4/15
disinterested [1] 15/5
dissent [1] 13/18
DISTRICT [4] 1/3 1/5 2/3 19/4
do [15] 4/22 5/5 6/15 6/18 7/5 7/12 7/12 10/13 10/16 12/24 12/25 13/2 13/21 16/1 19/5
docket [1] 18/6
doctor [3] 8/13 8/20 15/13
doctors [1] 10/21
does [2] 11/20 16/22
doesn't [9] 8/15 9/14 9/17 9/18 10/3 10/5 10/18 15/18 15/25
doing [1] 17/20
don't [5] 5/11 9/19 9/24 10/10 10/16
done [3] 9/7 16/13 17/11
doubt [2] 17/18 17/24
doubts [1] 14/17
down [2] 5/2 9/10
Dr [1] 10/20
due [7] 12/13 13/4 14/9 15/9 15/15 15/16 17/6
during [4] 11/23 12/7 13/13 14/1

**E**

each [1] 16/10
earlier [1] 12/20
earliest [1] 17/11
easily [1] 9/6
Elliott [2] 1/14 12/25
end [2] 12/10 12/19
ends [1] 15/21
enough [1] 8/20
ensure [1] 13/4
entered [1] 4/11
even [4] 10/4 10/20 15/23 17/19
ever [1] 14/3
evidence [4] 8/22 9/7 10/24 19/7
evident [1] 13/14
exactly [1] 16/23
examination [4] 12/2 13/4 16/7 16/16
examine [3] 6/20 14/25 16/11
examined [1] 14/4
except [1] 5/24

**F**

exhibits [1] 19/13
expert [4] 6/7 6/20 15/6 16/10
experts [2] 7/18 16/16
Expiration [1] 19/24
explain [1] 15/4
explicit [1] 11/22
expressing [1] 11/9
extraordinary [1] 5/24
extremely [1] 11/10

fact [1] 14/14
faith [1] 17/18
family [1] 13/25
far [1] 14/2
fault [1] 9/4
feasibility [8] 4/19 5/4 5/8 6/4 9/6 13/24 15/22 17/13
feasible [6] 12/15 12/19 13/1 13/7 13/10 14/2
FELCMAN [4] 2/2 4/5 7/3 16/18
file [1] 4/11
files [1] 4/11
find [2] 8/2 8/17
finding [5] 6/3 8/3 11/22 12/4 15/21
findings [3] 7/13 7/23 17/12
first [1] 9/10
five [4] 7/7 7/16 17/15 18/2
fixed [1] 11/3
focused [1] 12/4
focusing [1] 12/21
folks [1] 18/1
followed [1] 8/4
following [2] 1/12 8/10
forcibly [1] 11/12
foregoing [1] 19/5
FORT [8] 1/4 1/15 2/3 15/4 16/13 19/2 19/4 19/17
forward [4] 6/23 12/19 13/7 16/15
found [1] 6/16
FRED [2] 2/2 4/5
Fred's [1] 10/22
front [1] 6/22
frustrating [1] 11/11
full [1] 17/23
funeral [1] 5/21
further [2] 19/12 19/15
future [1] 14/19

**G**

GAIL [1] 2/2
get [3] 8/10 15/8 17/11
give [4] 9/14 9/16 9/17 18/2
giving [1] 7/5
go [6] 6/23 8/12 12/19 13/7 15/19 15/19
going [13] 4/23 6/6 10/6 12/8 13/2 13/6 15/20 16/6 16/9 17/1 17/1 17/3 18/2
good [2] 4/16 17/17
got [4] 8/9 10/14 10/17 11/25
grant [1] 16/6
Green [2] 6/9 16/2
guess [3] 8/8 10/13 12/11

**H**

had [3] 6/13 7/18 17/17
Hall [3] 19/3 19/20 19/21
hand [3] 10/10 17/25 19/18
handling [1] 4/20
hardheaded [1] 11/2
has [13] 5/1 5/7 5/18 6/3 7/2 10/12 10/14 11/4 11/16 14/12 14/18 15/11 18/13
have [36]
having [3] 6/5 9/20 14/4
he [34]

he go [1] 15/19
he's [7] 8/13 8/14 9/5 10/17 13/6 13/6 15/6
hear [1] 5/22
hearing [14] 4/17 4/19 6/5 6/15 7/1 7/12 7/14 11/14 13/1 13/11 14/3 14/15 15/23 17/12
heavily [1] 16/8
held [2] 1/13 1/14
help [1] 5/5
her [1] 5/20
here [9] 4/24 5/19 5/25 9/5 10/2 10/6 10/7 10/9 14/15
Here's [1] 15/11
hereby [1] 19/5
Hilder [1] 2/11
him [20]
his [23]
hold [1] 17/12
Honor [2] 4/9 4/14
Honorable [1] 1/14
hook [1] 8/16
hope [1] 5/25
Houston [1] 2/12
how [3] 11/20 12/7 13/2

**I**

I'll [3] 5/14 6/9 16/18
I'm [9] 5/22 11/25 12/21 12/23 15/7 15/19 16/6 16/9 17/20
I've [2] 4/14 5/2
ignore [1] 7/10
illness [7] 10/14 10/17 10/22 10/25 11/3 11/9 11/11
illustrated [1] 11/1
impact [1] 12/8
important [1] 14/15
included [1] 19/8
incompetency [1] 6/17
incompetent [5] 6/13 6/13 8/14 8/18 11/10
information [1] 8/21
inquiry [1] 12/19
interpreting [1] 5/4
is [46]
isn't [1] 11/2
issue [6] 5/15 10/8 12/5 14/12 16/25 17/14
it [28]
it's [16] 5/12 7/1 11/7 11/8 11/10 12/18 12/23 13/7 13/11 13/14 14/5 14/10 14/11 14/15 14/24 17/3
its [1] 13/15
itself [2] 10/25 11/9

**J**

JACKSON [2] 2/4 19/22
JAMES [5] 1/5 2/10 4/3 4/24 4/25
joined [1] 4/20
joining [1] 6/1
joking [1] 12/20
Judge [19] 1/14 4/6 5/16 5/17 6/2 9/12 10/23 10/25 12/13 12/20 12/25 14/22 14/24 15/9 15/15 16/20 18/4 18/5 18/7
judges [1] 17/15
JUDICIAL [1] 1/5
jury [1] 13/24
just [10] 5/18 9/5 10/2 11/2 12/21 12/23 13/12 15/8 15/14 17/20

**K**

kept [1] 11/4
key [1] 10/2
Khan [1] 4/8
kill [1] 11/4

## K

know [10] 5/11 6/24 7/16 9/19 10/5 11/2 13/5 15/7 15/14 18/11

## L

L.L.P [1] 2/7
lap [1] 5/3
last [2] 18/7 18/10
later [1] 6/1
law [4] 7/10 8/4 8/10 9/1
lawyers [1] 12/17
lead [3] 4/12 5/11 5/15
least [2] 11/25 18/2
LESLEIGH [1] 2/3
let [6] 5/15 6/7 6/20 8/15 15/17 16/2
let's [1] 9/9
like [1] 9/22
Listen [1] 17/20
litigation [1] 6/1
LOCKE [1] 2/7
logic [1] 7/9
long [2] 14/6 14/24
look [5] 7/18 11/6 13/18 13/19 13/20
looking [2] 12/24 16/24
LORD [1] 2/7
lost [1] 5/20
Lovett [1] 2/11

## M

machine [1] 1/17
made [2] 11/16 11/22
make [12] 4/4 4/22 6/25 7/11 7/14 7/24 12/9 12/10 12/14 13/5 14/2 17/23
makes [1] 11/10
making [4] 13/23 13/24 13/25 14/10
man [1] 13/11
Martin [1] 5/18
matter [8] 4/2 7/12 8/9 9/8 14/19 16/9 16/14 17/19
may [8] 1/12 3/4 9/15 13/14 14/21 15/1 15/8 16/19
maybe [1] 10/14
McCann's [1] 13/16
MCCONNELL [1] 2/2
me [7] 4/8 5/19 7/5 8/10 11/16 16/2 19/11
mean [1] 13/24
meant [1] 17/17
meets [1] 10/4
members [1] 14/1
mental [6] 10/14 10/17 10/21 10/24 11/3 11/9
mention [1] 5/17
mentioned [2] 6/4 10/21
Merits [3] 11/21 12/5 14/11
met [1] 18/13
method [1] 5/8
mind [2] 14/17 17/24
Mindy [4] 18/14 19/3 19/20 19/21
more [6] 7/22 11/12 11/13 14/2 15/19 15/23
morning [3] 4/9 5/20 6/7
MORROW [5] 2/6 4/7 4/10 5/15 15/24
Morrow's [4] 7/4 9/4 14/4 18/11
motion [2] 6/6 16/20
move [2] 14/22 16/15
MR [6] 2/2 2/6 2/10 4/8 4/10 7/4
Mr. [18] 4/12 4/25 5/15 6/8 6/21 7/3 7/24 9/4 13/4 14/4 14/18 15/11 15/24 16/8 16/11 16/17 16/18 18/11
Mr. Albert [1] 4/25
Mr. Felcman [2] 7/3 16/18
Mr. Morrow [2] 5/15 15/24
Mr. Morrow's [3] 9/4 14/4 18/11

Mr. Turner [10] 4/12 6/8 6/21 7/24 13/4 14/18 15/11 16/8 16/11 16/17
MS [2] 2/2 2/3
Ms. [1] 5/18
Ms. Amy [1] 5/18
much [1] 12/23
multiple [1] 17/19
must [1] 8/13
my [6] 5/3 8/9 11/23 14/17 17/24 19/18

## N

names [1] 16/15
necessity [5] 4/18 4/18 5/6 5/6 5/8
need [5] 9/10 10/15 13/3 15/12 16/15
Never [2] 7/12 7/12
new [1] 10/17
next [1] 12/15
nine [1] 18/1
no [10] 1/2 2/6 2/10 4/3 9/24 9/24 10/20 14/15 14/16 17/24
nobody's [1] 10/5
nonsecular [1] 7/8
normal [1] 5/12
not [24]
noticed [1] 4/10
now [14] 5/21 6/8 6/20 7/15 10/11 10/14 11/24 12/8 13/14 14/4 15/1 15/3 15/10 17/15
numbered [2] 1/13 19/10

## O

observations [1] 11/24
observed [1] 11/1
occur [1] 14/3
occurred [2] 14/1 19/10
off [5] 5/15 8/15 18/5 18/6 18/14
offered [1] 19/14
OFFICE [1] 2/3
official [3] 19/3 19/18 19/22
Oh [1] 15/18
okay [5] 4/16 7/6 11/15 13/8 18/13
one [6] 8/24 9/18 11/25 12/23 18/7 18/9
only [3] 9/7 10/8 14/13
open [1] 19/10
openly [1] 4/15
opinion [4] 5/2 6/24 8/15 10/4
opinions [1] 8/24
opportunity [1] 15/17
optimist [1] 15/2
order [4] 16/9 16/12 16/16 16/18
ordered [1] 5/7
other [4] 10/10 10/21 17/25 19/7
ought [1] 15/24
ours [1] 6/12
out [3] 6/10 16/5 17/20
over [2] 8/12 13/17
own [1] 16/10

## P

paid [1] 19/17
papers [1] 4/11
part [3] 11/15 15/7 17/13
participate [9] 4/23 8/5 8/18 11/8 12/16 12/17 14/13 14/16 15/12
particular [2] 7/17 10/2
parties [2] 19/8 19/14
Pat [1] 13/16
people [1] 7/16
performed [1] 16/8
person [1] 8/5
pertinent [1] 10/9
please [2] 4/4 18/9
point [5] 8/24 9/5 10/22 11/22 12/12
portions [2] 7/10 19/7
position [1] 5/10

positioned [1] 5/5
possible [2] 7/1 16/14
posture [2] 15/1 15/4
practical [1] 6/17
preparation [1] 19/16
prepare [1] 16/17
prepared [1] 6/6
present [3] 6/21 15/5 16/11
presently [1] 9/11
Presiding [1] 1/14
presume [1] 8/14
procedure [1] 5/12
proceed [5] 5/14 6/8 6/19 17/10 17/13
proceeding [1] 12/21
proceedings [5] 1/12 1/16 4/1 19/7 19/13
process [9] 7/25 12/14 13/4 14/10 14/13 14/18 15/10 15/15 17/7
professionals' [1] 12/2
proof [1] 8/23
prosecutors [1] 6/10
provide [1] 16/10
psychiatrist [2] 10/13 18/13
purpose [1] 4/17
put [3] 5/18 6/21 7/13

## Q

qualifications [1] 18/12
question [2] 12/18 17/25
quick [1] 16/3
quite [2] 9/6 16/14

## R

raise [1] 5/13
raised [1] 18/1
rapidly [1] 16/13
rational [1] 10/6
reach [1] 12/3
reached [1] 12/3
reaching [1] 7/7
read [5] 5/2 8/11 13/17 14/20 16/2
real [1] 16/3
really [4] 7/5 10/8 10/23 10/24
reason [1] 9/19
reasoning [1] 7/8
record [10] 1/1 10/17 17/23 18/6 18/8 18/9 18/14 19/9 19/12 19/16
records [2] 11/6 11/7
reflects [1] 19/13
regarding [1] 16/24
relate [1] 11/20
relates [1] 12/11
relationship [1] 13/25
remand [1] 12/21
remember [1] 9/25
rendition [1] 7/23
reported [2] 1/16 19/11
reporter [2] 19/3 19/22
REPORTER'S [4] 1/1 19/9 19/12 19/16
request [6] 9/10 11/16 12/12 16/7 17/6 17/7
requested [1] 19/7
require [1] 15/3
requirements [1] 18/12
requires [2] 12/14 15/16
respect [1] 15/17
respective [1] 19/14
response [1] 7/3
rest [1] 12/22
rests [1] 5/13
retroactive [5] 7/11 7/14 13/11 14/2 14/7
retrospective [7] 1/9 3/3 4/19 6/15 13/1 14/14 15/23
returned [1] 8/10
RICHARD [1] 2/6

**R**

**Richmond [3]** 1/15 2/4 19/23
**ridiculous [1]** 15/2
**right [7]** 5/1 5/21 6/20 10/4 10/11 14/12 16/5
**Robert [1]** 4/7
**room [1]** 11/24
**rule [1]** 8/10
**run [1]** 14/6
**RYTTING [2]** 2/10 4/24

**S**

**S.W.3d [1]** 6/10
**said [5]** 7/19 13/20 17/16 17/17 17/20
**same [6]** 5/10 10/18 17/1 17/3 17/5 17/8
**San [1]** 6/11
**sat [1]** 12/1
**SAUNDERS [1]** 2/3
**say [7]** 7/19 8/12 9/18 9/22 10/4 13/18 15/10
**saying [1]** 15/8
**says [2]** 9/19 15/20
**SBOT [2]** 2/6 2/10
**scenario [2]** 9/18 10/10
**schedules [1]** 18/6
**section [1]** 8/19
**see [2]** 11/25 15/20
**seen [1]** 15/6
**setting [1]** 16/25
**several [3]** 7/18 11/18 12/1
**share [1]** 6/9
**she [3]** 5/20 5/24 5/25
**shortly [1]** 17/12
**should [1]** 7/16
**show [1]** 12/16
**sign [1]** 11/7
**similar [1]** 6/12
**simple [1]** 13/12
**since [3]** 5/9 5/12 14/25
**sir [5]** 5/23 11/19 13/8 14/23 18/15
**situation [2]** 6/11 15/11
**smarter [1]** 18/1
**so [19]** 5/5 5/9 5/14 5/25 6/2 6/18 6/19 6/22 8/25 10/25 11/1 11/10 11/11 11/13 12/23 13/2 13/4 16/15 18/13
**some [4]** 8/1 10/21 12/16 14/17
**someone [3]** 11/2 11/3 15/6
**someone's [1]** 14/25
**something [3]** 10/12 10/15 17/2
**sorry [1]** 5/22
**sort [2]** 7/9 8/23
**speak [1]** 14/21
**specific [1]** 18/12
**specifically [1]** 9/23
**specifics [2]** 9/14 9/17
**stage [1]** 4/13
**stance [1]** 13/12
**standard [4]** 9/3 17/1 17/4 17/8
**state [8]** 1/3 2/5 4/3 4/5 6/25 16/10 19/1 19/4
**stenotype [1]** 1/16
**still [1]** 5/13
**styled [1]** 19/9
**submit [2]** 16/15 16/18
**suggestion [1]** 16/23
**SUITE [1]** 2/7
**supposed [1]** 16/23
**sure [1]** 9/16
**sustain [1]** 15/22
**switched [1]** 8/23

**T**

**T.D.C [1]** 11/6
**take [1]** 12/23

**talk [5]** 9/9 15/3 15/19 15/19 15/25
**task [1]** 5/9
**Telephone [3]** 2/8 2/12 19/23
**tell [1]** 7/10
**testimony [1]** 13/22
**TEXAS [13]** 1/3 1/4 1/15 2/4 2/5 2/8 2/12 4/3 4/6 19/1 19/5 19/21 19/23
**than [1]** 18/1
**Thank [2]** 5/16 18/4
**that [96]**
**that's [19]** 6/12 7/22 8/7 8/8 9/4 9/12 10/1 10/8 11/2 11/9 11/9 12/12 13/15 14/19 15/6 15/7 15/9 15/15 18/1
**their [5]** 7/13 7/23 16/10 16/16 17/12
**them [7]** 7/21 8/1 13/21 15/21 17/24 18/2 18/2
**then [8]** 6/21 7/9 7/10 8/18 12/17 14/8 15/5 16/1
**there [8]** 8/20 9/22 11/24 12/18 14/5 14/13 17/16 18/11
**there's [5]** 6/2 6/4 8/22 11/24 14/11
**thereafter [1]** 17/13
**therefore [3]** 8/14 8/23 17/7
**they [22]**
**they'd [1]** 7/19
**they're [2]** 7/23 16/23
**They've [1]** 9/2
**thing [3]** 10/18 18/7 18/10
**things [4]** 11/8 13/20 13/23 14/1
**think [13]** 6/5 7/22 9/24 10/1 10/10 10/16 10/20 15/9 15/14 15/15 16/5 17/9 17/10
**this [61]**
**those [1]** 18/13
**though [1]** 17/19
**threshold [1]** 6/3
**through [1]** 12/1
**throughout [2]** 11/7 14/19
**throws [1]** 5/3
**time [4]** 8/24 12/11 12/23 14/24
**times [2]** 11/18 17/19
**titled [1]** 1/13
**today [1]** 16/17
**too [1]** 12/23
**total [1]** 19/15
**transcription [1]** 19/6
**tremendous [1]** 5/18
**trial [12]** 1/2 10/25 11/21 11/23 12/5 12/7 12/11 13/14 14/1 14/11 16/25 17/8
**trick [1]** 14/5
**true [1]** 19/6
**truly [1]** 19/13
**trying [1]** 14/5
**TURNER [14]** 1/5 4/3 4/8 4/12 4/25 6/8 6/21 7/24 13/4 14/18 15/11 16/8 16/11 16/17

**U**

**ultimate [1]** 13/16
**unable [2]** 7/13 7/23
**under [1]** 10/10
**understand [3]** 8/2 13/18 14/9
**understanding [1]** 10/6
**unusual [1]** 7/6
**up [5]** 6/24 10/12 10/14 15/21 17/15
**up-to-date [1]** 6/24
**upon [2]** 12/2 17/12
**us [5]** 6/1 6/7 6/20 11/22 15/17
**use [4]** 7/8 15/22 17/8 18/3
**used [3]** 14/18 17/16 17/19
**using [1]** 5/11

**V**

**validates [1]** 13/10
**very [3]** 4/16 7/6 17/12

**vexation [1]** 10/23
**vividly [2]** 11/1 11/13
**volume [4]** 1/1 1/1 3/2 19/9

**W**

**want [8]** 4/22 5/17 10/3 10/18 13/21 15/9 15/14 16/13
**wanted [1]** 13/15
**warrant [2]** 16/12 16/17
**was [15]** 6/13 6/17 7/19 8/21 9/18 10/25 11/1 11/23 12/6 12/7 12/20 13/16 13/20 14/7 17/25
**wasn't [2]** 9/20 13/19
**way [5]** 5/1 6/19 6/23 11/8 17/10
**we [34]**
**we'd [1]** 6/24
**we'll [1]** 17/12
**we're [9]** 6/5 9/19 10/2 10/7 10/8 12/4 13/6 15/1 18/2
**we've [2]** 8/4 16/14
**week [1]** 5/20
**weeks [1]** 12/1
**Well [5]** 5/6 8/17 9/9 14/9 14/11
**were [2]** 6/14 19/11
**what [16]** 7/17 9/18 10/1 11/21 12/24 12/24 13/15 13/16 13/19 14/7 15/9 15/11 15/15 15/20 16/9 16/23
**what's [3]** 8/9 10/6 11/15
**whatever [2]** 9/5 15/21
**whatsoever [1]** 14/6
**when [3]** 11/6 13/17 13/20
**where [2]** 6/12 10/13
**whether [12]** 6/4 6/7 6/14 6/23 7/1 7/11 8/13 8/21 11/14 12/7 13/5 14/17
**which [9]** 5/9 6/3 6/9 8/8 11/21 12/5 12/6 15/3 19/10
**while [1]** 11/10
**who [1]** 7/16
**who's [3]** 4/20 5/5 5/11
**whole [2]** 8/9 8/25
**wholeheartedly [1]** 8/15
**whose [2]** 11/3 11/3
**why [5]** 13/10 13/14 13/18 15/18 15/22
**will [15]** 5/9 5/25 7/13 7/24 9/7 12/19 13/11 13/22 13/23 14/6 14/18 15/21 16/12 16/16 19/17
**WITNESS [1]** 19/18
**won't [6]** 8/5 8/5 10/23 11/7 11/8 13/12
**work [1]** 5/19
**world [1]** 15/2
**would [12]** 5/19 5/25 6/20 10/15 10/15 12/9 12/10 15/3 15/16 17/8 17/9 17/10
**writ [2]** 2/13 4/21
**writing [1]** 19/8
**wrote [1]** 7/16

**Y**

**Yeah [2]** 9/16 16/4
**years [1]** 14/25
**Yes [7]** 4/24 5/23 11/19 13/8 14/23 16/21 18/15
**yet [1]** 14/20
**you [41]**
**you'd [1]** 6/25
**you'll [2]** 4/4 16/17
**you're [4]** 4/23 8/2 14/10 15/24
**you've [3]** 4/11 4/20 7/18
**your [9]** 4/4 4/9 4/11 4/14 4/22 7/3 12/12 16/15 16/15

# Exhibit C

10 – DCR – 054233
UNOR
Unsigned Order
3020945

No. 10-DCR-054233

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 268TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| ALBERT JAMES TURNER | § | FORT BEND COUNTY, TEXAS |

## ORDER

On this day, the Court considered whether a retrospective competency trial is feasible. After hearing the arguments of counsel, and considering the evidence available, the Court finds that a retrospective competency trial is feasible.

The Court hereby sets the retrospective competency trial for:

_December 1_____, 2014, at 9:00 a.m.

The Court further ORDERS the clerk of this Court to provide a copy of this order to Mr. Robert Morrow, attorney for the defendant on direct appeal and the State (attention Fred Felcman, First Assistant District Attorney).

Signed this day, April _____, 2014.

Hon. Brady G. Elliott
Judge Presiding, 268th District Court

FILED

2014 APR 28 AM 8: 53

CLERK DISTRICT COURT
FORT BEND CO., TX

7

ROUTED TO COURT
RT'D TO D. CLERK

# Exhibit D



No. 10-DCR-054233

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 268TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| ALBERT JAMES TURNER | § | FORT BEND COUNTY, TEXAS |

## STATE'S BENCH MEMORANDUM ON THE FEASIBILITY OF A RETROACTIVE COMPETENCY HEARING

To the Honorable Judge of the 268th District Court:

COMES NOW the State of Texas, by and through her District Attorney for Fort Bend County, and files this bench memorandum urging the Court to find that a retroactive competency hearing is feasible. In support thereof, the State shows:

### Procedural History

Jury selection in this death penalty case began with general exemptions and exceptions on April 18, 2011. On May 31, 2011, a jury convicted the defendant of capital murder. On June 7, 2011, the jury answered the special issues yes and no, and the trial court sentenced the defendant to death as a matter of law. Turner filed a motion for new trial, which was heard on August 8, 2011, and denied.

On October 30, 2013, the Court of Criminal Appeals remanded this case, instructing:

FILED

2014 APR 28 AM 8: 52

*[signature]*

CLERK DISTRICT COURT
FORT BEND CO., TX

1

On remand, the trial court shall first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence, and any other pertinent considerations. Should the trial court deem a retrospective competency trial to be feasible, it shall proceed to conduct such a trial in accordance with Chapter 46B, Subchapter C, of the Code of Criminal Procedure. Regardless of whether the trial court deems a retrospective competency trial to be feasible, the record of the proceedings on remand shall then be returned to this Court for reinstatement of the appeal.

*Turner v. State*, 422 S.W.3d 676, 696-97 (Tex. Crim. App. 2013) (footnotes omitted).

On April 2, 2014, the Court of Criminal Appeals denied the State's motion for rehearing and issued its mandate.

### *A retrospective competency trial is feasible*

In determining whether a retrospective competency trial is feasible, the Court should consider the following factors:

1. The passage of time;

2. The "quality and quantity" of evidence that would be available if the trial court were to conduct such a retrospective inquiry, including

   a. the present recollection of expert witnesses who testified at the original hearing;

   b. statements made by the defendant at trial,

   c. the availability of contemporaneous medical and psychiatric evidence,

   d. the availability of transcript or video record of the relevant proceedings,

2

e.     the availability of witnesses, both expert and nonexpert, who could offer testimony regarding the defendant's mental status at the time of trial

3.     The ability of the judge and jury to observe the subject of their inquiry.

*Brandon v. State*, 599 S.W.2d 567, 573 (Tex. Crim. App.1979),[1] *vacated and remanded on other grounds* 453 U.S. 902 (1981) (citing *Pate v. Robinson*, 383 U.S. 375 (1966)); George E. Dix and John M. Schmolesky, 43 Tex. Prac., Criminal Practice and Procedure § 31:81 (3d ed.); Francis C. Amendola, et. al., 22A C.J.S. Criminal Law § 791, Retrospective Hearings (March 2014).

"No single factor is determinative, and the issue should be decided on a case-by-case basis." 22A C.J.S. § 791.

Here, the passage of time is not a significant factor. Trial counsel are the source of the opinion that Turner was incompetent to stand trial. Pat McCann and Tyrone Moncriffe are available to testify to their observations and interactions with Applicant, as are the prosecutors in the case. The jailers and detention deputies are also available to testify about their observations and interactions with Turner.

Dr. Shawanda Williams-Anderson and Dr. Connie Almeida both examined or attempted to examine Turner during jury selection are available to testify.

---

[1]    *See also* the cases collected by the court providing "ample authority that the requirements of due process may be fully met as it concerns the appellant here if he were not granted a trial to determine, after the fact, whether he was competent at the time he was tried and convicted." *Brandon*, 599 S.W.2d at 573.

3

The quality and quantity of available evidence is substantial. Turner took the stand and the transcription of his testimony is available as well as the many interactions between Turner and the Court during the course of jury selection and the trial.

The medical records of the jail will reflect Turner's physical and mental health during jury selection and the trial. And a brain scan was taken a week before trial on April 11, 2011.

Most importantly, unlike *Pate*, there are six one-half hour video recordings of jail visits with family and a friend,[2] from which a competency jury can observe the affect and demeanor of Turner with those he is comfortable with and trusts. A listing of these visits during the time period between April 18, 2011, general exemptions and excuses of the venirepersons, and June 7, 2011, when Turner was sentenced is attached hereto as Exhibit A. A listing of the numerous telephone calls to family and friends that also reflecting Turner's cognitive and reasoning abilities during the duration of the trial is attached hereto as Exhibit B.

The quality and quantity of evidence showing Turner's competence to stand trial is good, substantial, and readily available.

---

[2]     Willie Bradford, who testified at trial and was a co-worker of Turner's at the Jester IV unit.

WHEREFORE, PREMISES CONSIDERED, the State urges the Court to affirmatively find that a competency hearing is feasible and to set this case for a jury trial on competency at its earliest available setting after the capital murder trial in the 434th District Court has been completed..

Respectfully submitted,

John F. Healey, Jr.
SBOT 09328300
District Attorney, 268th Judicial District
Fort Bend County, Texas

Gail Kikawa McConnell
SBOT # 11395400
Assistant District Attorney
301 Jackson Street, Room 101
Richmond, Texas 77469
(281) 341-4460 / (281) 238-3340 (fax)
Gail.McConnell@co.fort-bend.tx.us

## CERTIFICATE OF SERVICE

I certify that the foregoing State's memorandum was served in person on Mr. Robert Morrow, Attorney for the defendant, on April 28, 2014.

Gail Kikawa McConnell

5

No. 10-DCR-054233

| STATE OF TEXAS | § | IN THE 268TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| ALBERT JAMES TURNER | § | FORT BEND COUNTY, TEXAS |

## ORDER

On this day, the Court considered whether a retrospective competency trial is feasible. After hearing the arguments of counsel, and considering the evidence available, the Court finds that a retrospective competency trial is feasible.

The Court hereby sets the retrospective competency trial for:

_____, 2014, at 9:00 a.m.

The Court further ORDERS the clerk of this Court to provide a copy of this order to Mr. Robert Morrow, attorney for the defendant on direct appeal and the State (attention Fred Felcman, First Assistant District Attorney).

Signed this day, April _____, 2014.


_____
Hon. Brady G. Elliott
Judge Presiding, 268th District Court

7

# Exhibit A

| | Date | Time | Duration | Visitor # | Visitor |
|---|---|---|---|---|---|
| 1 | 4/24/2011 | 12:04pm | 29 min, 48 sec | Visitor 12 | Juanita Turner Dawey |
| 2 | 5/5/2011 | 5:50pm | 29 min, 55 sec | Visitor 14 | Willie Bradford Jr. |
| 3 | 5/17/2011 | 6:32pm | 29 min, 55 sec | Visitor 6 | Willie Bradford Jr. |
| 4 | 5/26/2011 | 6:35pm | 29 min, 55 sec | Visitor 16 | Rhodes Lillie Turner |
| 5 | 5/28/2011 | 9:19am | 29 min, 55 sec | Visitor 25 | Juanita Turner Dawey |
| 6 | 5/30/2011 | 1:18pm | 29 min, 53 sec | Visitor 19 | Willie Bradford Jr. |
| 7 | 6/2/2011 | 2:03pm | 27 min, 44 sec | Visitor 10 | Kelly J. Colon |

# Exhibit B

| | Date | Time | Number called | Duration | Call log |
|---|---|---|---|---|---|
| 1 | 4/7/2011 | 19:22:32 | (407) 765-0779 | 10:28 | 470B10JF |
| 2 | 4/8/2011 | 20:08:33 | (407) 760-0308 | 15:00 | 480B206D |
| 3 | 4/9/2011 | 12:30:40 | (407) 765-0779 | 14:38 | 490B2076 |
| 4 | 4/9/2011 | 18:40:08 | (407) 760-0308 | 15:00 | 492720K7 |
| 5 | 4/17/2011 | 9:29:03 | (407) 760-0308 | 15:00 | 4H0B20EK |
| 6 | 4/18/2011 | 19:15:01 | (407) 760-0308 | 14:29 | 4I0B20G5 |
| 7 | 4/20/2011 | 20:05:43 | (407) 760-0308 | 15:00 | 4K2720TZ |
| 8 | 4/24/2011 | 10:18:36 | (407) 760-0308 | 15:00 | 4O0B20N2 |
| 9 | 4/24/2011 | 18:47:53 | (407) 760-0308 | 13:38 | 4O0B20NR |
| 10 | 4/25/2011 | 17:13:53 | (407) 760-0308 | 15:00 | 4P0B20OJ |
| 11 | 4/27/2011 | 20:46:18 | (407) 760-0308 | 15:00 | 4R27200D |
| 12 | 5/1/2011 | 11:08:00 | (407) 765-0779 | 14:47 | 510B20U6 |
| 13 | 5/6/2011 | 19:27:39 | (407) 760-0308 | 15:00 | 560B210R |
| 14 | 5/9/2011 | 19:41:34 | (407) 765-0779 | 13:06 | 590B204G |
| 15 | 5/11/2011 | 18:25:05 | (407) 765-0779 | 7:01 | 5B0B206S |
| 16 | 5/11/2011 | 19:59:08 | (407) 760-0308 | 11:00 | 5B0B207A |
| 17 | 5/16/2011 | 19:06:09 | (407) 765-0779 | 8:27 | 5G0B20E4 |
| 18 | 5/17/2011 | 17:58:19 | (407) 765-0779 | 8:34 | 5H0B20FM |
| 19 | 5/17/2011 | 19:21:31 | (407) 760-0308 | 15:00 | 5H0B20G3 |
| 20 | 5/19/2011 | 21:31:12 | (407) 760-0308 | 6:03 | 5J0B10GM |
| 21 | 5/19/2011 | 21:38:47 | (407) 760-0308 | 14:21 | 5J0B10GN |
| 22 | 5/19/2011 | 20:14:59 | (407) 765-0779 | 14:58 | 5J0B20JM |
| 23 | 5/20/2011 | 17:37:11 | (407) 760-0308 | 15:00 | 5K0B10HU |
| 24 | 5/25/2011 | 18:45:17 | (407) 760-0308 | 15:00 | 5P0B20QM |
| 25 | 5/26/2011 | 17:06:28 | (407) 760-0308 | 13:57 | 5Q0B20RO |
| 26 | 5/27/2011 | 12:29:30 | (407) 765-0779 | 10:16 | 5R0B20TA |
| 27 | 5/29/2011 | 16:21:16 | (407) 760-0308 | 15:00 | 5T0B20Z3 |
| 28 | 5/29/2011 | 17:01:49 | (407) 760-0308 | 15:00 | 5T0B20Z4 |
| 29 | 5/30/2011 | 15:52:47 | (407) 760-0308 | 15:00 | 5U27202L |
| 30 | 6/1/2011 | 19:18:33 | (407) 760-0308 | 14:49 | 610B204K |
| 31 | 6/5/2011 | 16:51:01 | (407) 760-0308 | 15:00 | 650B20B9 |
| 32 | 6/5/2011 | 17:23:36 | (407) 760-0308 | 14:00 | 650B20BB |
| 33 | 6/5/2011 | 20:14:56 | (407) 761-4872 | 15:00 | 650B20BM |
| 34 | 6/6/2011 | 18:49:35 | (407) 761-4872 | 15:00 | 662720C1 |
| 35 | 6/8/2011 | 15:37:01 | (407) 761-4872 | 12:00 | 680G10TM |
| 36 | 6/8/2011 | 19:31:36 | (407) 760-0308 | 15:00 | 680G10U3 |
| 37 | 6/9/2011 | 17:09:50 | (407) 760-0308 | 15:00 | 690G10VH |
| 38 | 6/9/2011 | 17:50:54 | (407) 446-1987 | 15:00 | 690G10VJ |
| 39 | 6/10/2011 | 4:06:15 | (407) 760-0308 | 4:06 | 6A0G10W5 |

# Exhibit E

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. 10-DCR-054233
APPELLATE CASE NO. AP-76,580

THE STATE OF TEXAS         ) IN THE DISTRICT COURT
                                  )
vs.                        ) FORT BEND COUNTY, TEXAS
                                  )
ALBERT JAMES TURNER      ) 268TH JUDICIAL DISTRICT

_____

**MOTIONS HEARING**

_____


On January 16, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Brady G. Elliott, Judge Presiding, held in Richmond, Fort Bend County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

MR. FRED FELCMAN
Texas Bar No. 06881500
Assistant District Attorney
MR. CHAD BRIDGES
Texas Bar No. 00790369
Assistant District Attorney
MS. GAIL MCCONNELL
MS. LESLEIGH MORTON
301 Jackson
Richmond, Texas 77469
Telephone:  281.238.3230
Counsel for The State of Texas

MS. AMY D. MARTIN
Texas Bar No. 24041402
Law Office of Amy Martin
202 Travis Street, Suite 300
Houston, Texas 77002
Telephone:  713.320.3525
Amymartinlaw@gmail.com
Mitigation Specialist for Defendant

VOLUME 1

Motions Hearing

January 16, 2015

                                                    PAGE  VOL.

Announcements .....................................4    1

Defense's Motion to strike Murray .................4    1

Court's Ruling on Defendant's Motion  .............6    1

Defendant's Motion to address current incompetency 6  1

Court's Ruling on motion .........................12    1

Reporter's Certificate ...........................17    1

**PROCEEDINGS**

THE COURT: Okay. We're here on the matter of The State of Texas vs. Albert James Turner, No. 54233.

Let me have your announcements, please.

MS. MARTIN: Amy Martin for the defendant, Albert James Turner.

MR. FELCMAN: Fred Felcman for the State, Judge.

THE COURT: And, Ms. Martin, you're waiving having Mr. Turner here for this hearing?

MS. MARTIN: Yes, sir.

THE COURT: All right. This was originally scheduled for a status, but I have a few motions that have been filed, one of them was the motion of the defense to strike the State's expert, Murray, I believe is his name.

MS. MARTIN: Dr. Brian Murray.

THE COURT: Dr. Brian Murray.

Mr. Felcman, do you have anything to say on that?

MR. FELCMAN: First of all, this was not the State's expert. This was an expert appointed by the Court during an ex parte hearing between the defense and the Court. Dr. Brian Murray's report was never given to

us nor supplied to us by defense counsel because it was contrary to what the defense status or the position in the case was. The reason we found out about Dr. Brian Murray is that we found a bill in it, and the second is that we have the statement from Pat McCann setting out what Brian Murray had actually said on it.

As far as a competency, we had no intention of calling Dr. Brian Murray on this matter.

MS. MARTIN: Can I respond briefly, your Honor?

THE COURT: Yes.

MS. MARTIN: Dr. Brian Murray never produced a report until the State got a report from him in November. They're the ones who got him to write a report and, according to him, make adjustments to that report, but in no way did he create a report for the defense. And he is designated as an expert on one of their designations.

MR. FELCMAN: That's correct. That's correct. But the -- So she understands, the reason he didn't create a report is because he told Pat McCann what he would testify to and Pat McCann put that in his statement, so that's the reason he asked for a report.

THE COURT: The essence of the argument is the defense wants Mr. Murray stricken as an expert. The

State agrees --

MR. FELCMAN: I'm not striking him as an expert. I agree I'm not calling him as an expert.

THE COURT: The State's not going to call him or offer his report?

MR. FELCMAN: That's correct.

MS. MARTIN: I'm also asking that no other expert depend on what is in Mr. Murray's report when they make their decision.

THE COURT: Do you know of any expert that's adopted his report?

MS. MARTIN: Not that I know of.

THE COURT: Then we'll strike Dr. Murray as an expert and grant the defendant's motion.

All right. Now, is there any other motion except for the competency exam?

MS. MARTIN: I don't think so, Judge.

MR. FELCMAN: No, sir.

THE COURT: All right. We'll take up the defendant's filing of a motion to address Mr. Turner's current incompetency.

You may proceed, Ms. Martin.

MS. MARTIN: When the Court of Criminal Appeals handed down their decision, there were two steps: One was to determine feasibility of having a

retrospective competency trial. Only if that was possible is there to be a retrospective competency trial.

Our request is to have a hearing to determine if it's feasible or not. To have a hearing, all you need is some evidence. It doesn't necessarily have to come from any particular source: A psychologist, a psychiatrist, a person, documents. There just has -- It just has to meet a level of some information that supports an inference of incompetency.

We were never given the opportunity to have a hearing to argue feasibility, also known as Mr. Turner's current incompetency. We were never given the opportunity to bring forth exhibits and bring forth witnesses to argue: No, it's not feasible because he's incompetent.

So what we're requesting now is to have that hearing to show it's not feasible. The reason that we believe that in this particular situation things are going to be very different is because the Court of Criminal Appeals looked at the evidence as it existed at trial, and they found: Okay, there was enough here. It's triggering a trial.

Now we have not only the information that the Court of Criminal Appeals had during their opinion,

we now have so much more. We now have more bad relationships with defense counsel; we have letters where he exhibits paranoia; we have a diagnosis of mental illness where he received what's the equivalent of outpatient treatment. We have more evidence than the Court had at the time when they decided there's enough evidence to have a competency trial; therefore, it has to be determined, given that evidence, if he today is currently competent to have a retrospective trial because like Green said, there has to be a base.

Due process is absolutely required for a retrospective competency trial. That's all over the place: U.S. Supreme Court, Fifth Circuit, Code -- Criminal Court of Appeals. Over and over, due process has to be met.

Due process cannot be met with the current situation that Mr. Turner is in. He will be sitting there as if he has no attorney because his attorney will be unable to engage with him whatsoever. Now we've gotten to the point -- because, of course, we've always been arguing the ability to interact and confer with counsel. We're now at the point where he doesn't understand the proceedings.

In a meeting with him, he referred to everything as -- quote, unquote -- this competency shit.

He believes that this proceeding is meant to prevent him from presenting a motion. We're not sure what the motion is. We think it's a motion to recuse. And he believes now he was brought to Fort Bend County to do something and that -- but he wasn't able to come out into the courtroom because they wanted to make sure he didn't make a motion.

We tried to explain to him that you are coming back because of your competency issue and you're going to have a trial. He interpreted that as: Sure, right, I'm no longer on death row. He does not understand whatsoever, which is not surprising given the complication that we're talking about the past.

So we've gone from you can't confer -- meaningfully confer with your attorneys to he's not sure what this is, which isn't surprising. Many of us on any given day have had the same type of confusion, so it's gone to the point of not only is he not going to talk to me, I don't even know what questions to ask him to get through to him because he doesn't understand what we're doing. And for that reason, he has to be restored. He has to be restored to competency so we can have the retrospective competency trial that the Court of Criminal Appeals demanded.

THE COURT: Mr. Felcman.

MR. FELCMAN: I don't understand the argument. She, first of all, says she has all the evidence she had at the time, plus additional evidence now to show that he was incompetent at that time, and that's what we're here for, the retrospective. Now she's saying something additional, and I can't follow the logic that somehow he disagrees and doesn't understand what the competency hearing is for, but then he turns around and says it's a competency hearing.

All we're here for today is whether it's feasible to have a retrospective competency hearing, not what he's like today or tomorrow or 20 years from now. And the grounds for that are quite simple.

First of all, the passage of time, although that's not a critical thing; but it has not been a great passage of time. The State of Texas tries cases dealing with mental states that are seven or eight years old.

Second, the quality and quantity of the evidence. The evidence they would have at the time of the competency hearing two and a half years ago is the very same ones they've got now: Pat McCann, Tyrone Moncriffe. They also have access to any other doctor they've got at that time. There is nothing, not one bit of evidence they do not have now that they didn't have

back then.  In fact, she said they had more.  All this really is is that -- I'm going to tell it -- is they did not do what he wanted them to do; therefore, he will not talk to them anymore.

The feasibility, in actuality, for you to say it is not feasible to have a competency hearing, in my opinion, would be actually an abuse of discretion because she has not told you one bit why they don't have the evidence to proceed.  The fact is, if he's incompetent now, that would actually help them out.  The logic is he has to be competent to have an incompetency hearing is an Alice In Wonderland type of logic.  We would never try anybody then.  Therefore, I'm asking you just to deny it.  If she doesn't think it's proper, let her go ahead and take it up on appeal, and that's my argument, Judge.

We have filed an answer.  Also, we just got this motion from her yesterday, but we filed an answer previous to it.  It set out exactly what the law was.  You properly ruled that it was feasible.  We're prepared to go, Judge.

MS. MARTIN:  May I respond?

THE COURT:  Uh-huh.

MS. MARTIN:  That ruling that it was feasible was without argument of counsel and without the

admission of evidence. It was a form that had been filed in April and signed in September and faxed out. There was no hearing or ability for everyone to come together and say, This is what we have, where does the -- where do we think he's at.

This has nothing to do with who it's easier on or how many hours I get to work. He gets due process. The only way to have due process is you're competent. You have to be competent for a retrospective competency trial. He's not.

MR. FELCMAN: I disagree. There is no case that says that.

THE COURT: Well, let me address the first issue of having no hearing to determine the retrospective. I, in fact, conducted a hearing on May 30th of '14 where I found that it was feasible to go forward with the competency exam -- or feasible to go forward with a retrospective competency hearing. I also ordered at that time another competency exam with Mr. Turner, and he refused to talk to the doctors that I sent up to talk to him, so the feasibility issue has already been decided.

As to his current competency on -- between May 30th and July the 2nd in which the State asked me to reconsider the motion to grant the additional competency

exam, he had an opportunity to speak to the doctor that I have appointed to conduct the competency exam, so the feasibility issue has been decided.

We're looking at his competency at the time of the Trial on the Merits at the time that Mr. McCann indicated to the Court he wanted a competency hearing, which, in this Court's opinion, it conducted because the Court did not find and still does not believe Mr. McCann formally requested a jury competency hearing, but the Court of Criminal Appeals has decided to the contrary, and I will follow their instructions.

I'm not sure how the -- his current competency relates back to his competency at the time of trial. Now, I'm interpreting your argument to mean that it's necessary that he be competent in order to confer with counsel to go through the retrospective competency hearing. It raises certainly a question, but all the evidence that is going to be produced is his competency at the time of the Trial on the Merits of this case which has nothing to do with his current competency, so I'm going to deny your motion to --

MS. MARTIN: May I respond briefly, Judge?

THE COURT: -- address his current competency.

And you can put what you want on the

record.

MS. MARTIN: The one -- I may be not making the connection with the current competency, but a retrospective competency trial requires due process, end of story. Due process requires competency, end of story. So regardless of what proceeding we're entering into, he has to be competent.

By way of example, he doesn't understand what proceeding he's going to be sitting in, and if we flash something on this -- For example, the State gave us pictures of his cell at T.D.C.J. I look at it; I see what's on there; I turn to my client to say, Hey, can you explain me -- explain to me what that's about.

THE COURT: And how does his picture of his cell at T.D.C.J. have any relation to his competency at the time of the Trial on the Merits of this case?

MS. MARTIN: The State submitted it. I'm not sure.

MR. FELCMAN: We just turned over everything possible. I'm not going to be stuck where, Oh, no, we didn't turn over something they could use. We turned over everything.

MS. MARTIN: It's in their motion.

THE COURT: I may not like asking this question, but I sent a professional up to interview

Mr. Turner subsequent to the hearing on the 30th of May. Has that -- Other than the fact that he reported that Turner wouldn't talk to him, was there any evaluation created by that professional? Is that the Dr. Murray that we're talking about?

MS. MARTIN: Oh, no. Dr. Murray's not qualified to do competency.

THE COURT: Okay. I sent somebody up there to do that, report back --

MS. MARTIN: Dr. Self maybe? Oh, no, Dr. Mohler.

THE COURT: The report I got back was that Turner refused to talk to him. Did he make any kind of finding?

MS. MARTIN: Not that I'm aware of.

MR. FELCMAN: No.

THE COURT: So we're right back to where we were on the original competency hearing or competency situation at the time of the trial which we're going to have the feasibility on is he still won't talk to any professionals, so I'm not -- We're going in a circle. I want to give Mr. Turner all of his rights, but there's nothing that at this point that would change -- that you've shown me that would change my position on a decision I've already made, that's it's feasible to have

the retrospective competency hearing.

MR. FELCMAN:  Thank you, Judge.

THE COURT:  Off the record.

THE STATE OF TEXAS §

COUNTY OF FORT BEND §

I, Mindy R. Hall, official court reporter in and for the 268th District Court of Fort Bend County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $138.00 and will be paid by Fort Bend County.

WITNESS MY OFFICIAL HAND this, the 20th day of January, 2015.

/s/Mindy R. Hall_____
Mindy R. Hall, CSR
Texas CSR 8107
Official Court Reporter
301 Jackson
Richmond, Texas 77469
Telephone: 281.341.8611
Expiration: 12/31/2016

**$**

$138.00 [1]  17/16

**'**

'14 [1]  12/16

**/**

/s/Mindy [1]  17/20

**0**

00790369 [1]  2/4
054233 [1]  1/2
06881500 [1]  2/2

**1**

10-DCR-054233 [1]  1/2
12/31/2016 [1]  17/24
16 [2]  1/12 3/4

**2**

20 [1]  10/12
2015 [3]  1/12 3/4 17/19
2016 [1]  17/24
202 [1]  2/10
20th [1]  17/18
24041402 [1]  2/9
268TH [2]  1/5 17/4
281.238.3230 [1]  2/7
281.341.8611 [1]  17/23
2nd [1]  12/24

**3**

300 [1]  2/10
301 [2]  2/6 17/22
30th [3]  12/16 12/24 15/1

**5**

54233 [1]  4/4

**7**

713.320.3525 [1]  2/11
76,580 [1]  1/2
77002 [1]  2/10
77469 [2]  2/6 17/23

**8**

8107 [1]  17/21

**A**

ability [2]  8/21 12/3
able [1]  9/5
about [4]  5/3 9/13 14/13 15/5
above [3]  1/13 17/5 17/9
above-styled [1]  17/9
above-titled [1]  1/13
absolutely [1]  8/11
abuse [1]  11/7
access [1]  10/23
according [1]  5/15
actuality [1]  11/5
actually [3]  5/6 11/7 11/10
additional [3]  10/3 10/6 12/25
address [3]  6/20 12/13 13/23
adjustments [1]  5/15
admission [1]  12/1
adopted [1]  6/11
ago [1]  10/21
agree [1]  6/3
agrees [1]  6/1
ahead [1]  11/15
ALBERT [3]  1/5 4/3 4/7
Alice [1]  11/12
all [15]  4/13 4/22 6/15 6/19 7/6 8/12 10/2 10/2 10/10 10/14 11/1 13/17 15/22

17/6 17/10
already [2]  12/22 15/25
also [5]  6/7 7/12 10/23 11/17 12/18
although [1]  10/15
always [1]  8/20
AMY [3]  2/8 2/9 4/6
Amymartinlaw [1]  2/11
announcements [1]  4/5
another [1]  12/19
answer [2]  11/17 11/19
any [10]  6/10 6/15 7/7 9/16 10/23 14/15 15/3 15/13 15/20 17/14
anybody [1]  11/13
anymore [1]  11/4
anything [1]  4/20
AP [1]  1/2
AP-76,580 [1]  1/2
appeal [1]  11/15
Appeals [6]  6/24 7/21 7/25 8/14 9/24 13/10
APPEARANCES [1]  2/1
APPELLATE [1]  1/2
appointed [2]  4/23 13/2
April [1]  12/2
are [4]  7/19 9/8 10/13 10/17
argue [2]  7/12 7/15
arguing [1]  8/21
argument [5]  5/24 10/2 11/16 11/25 13/14
around [1]  10/9
as [13]  5/7 5/7 5/17 5/25 6/2 6/3 6/14 7/12 7/21 8/18 8/25 9/10 12/23
ask [1]  9/19
asked [2]  5/23 12/24
asking [3]  6/7 11/13 14/24
Assistant [2]  2/3 2/4
attorney [4]  2/3 2/4 8/18 8/18
attorneys [1]  9/15
aware [1]  15/15

**B**

back [6]  9/9 11/1 13/13 15/9 15/12 15/17
bad [1]  8/1
Bar [3]  2/2 2/4 2/9
base [1]  8/10
be [22]
because [12]  5/1 5/21 7/15 7/20 8/10 8/18 8/20 9/6 9/9 9/20 11/8 13/8
been [6]  4/15 8/21 10/16 12/1 12/22 13/3
before [1]  1/14
believe [3]  4/17 7/19 13/9
believes [2]  9/1 9/4
BEND [6]  1/4 1/15 9/4 17/2 17/4 17/17
between [2]  4/24 12/23
bill [1]  5/4
bit [2]  10/24 11/8
Brady [1]  1/14
Brian [7]  4/18 4/19 4/25 5/3 5/6 5/8 5/12
BRIDGES [1]  2/3
briefly [2]  5/9 13/22
bring [2]  7/14 7/14
brought [1]  9/4

**C**

call [1]  6/4
calling [2]  5/8 6/3
came [1]  1/12
can [4]  5/9 9/22 13/25 14/12
can't [2]  9/14 10/6
cannot [1]  8/16
case [5]  1/2 5/3 12/12 13/19 14/16
cases [1]  10/17
cause [3]  1/2 1/13 17/10

cell [2]  14/11 14/15
certainly [1]  13/17
certify [3]  17/5 17/12 17/15
CHAD [1]  2/3
chambers [1]  17/11
change [2]  15/23 15/24
circle [1]  15/21
Circuit [1]  8/13
client [1]  14/12
Code [1]  8/13
come [3]  7/7 9/5 12/3
coming [1]  9/9
competency [39]
competent [6]  8/9 11/11 12/9 12/9 13/15 14/7
complication [1]  9/13
computerized [1]  1/16
conduct [1]  13/2
conducted [2]  12/15 13/7
confer [4]  8/21 9/14 9/15 13/15
confusion [1]  9/17
connection [1]  14/3
contains [1]  17/6
contrary [2]  5/2 13/11
correct [4]  5/19 5/20 6/6 17/6
correctly [1]  17/13
cost [1]  17/15
could [1]  14/21
counsel [7]  2/7 5/1 8/2 8/22 11/25 13/16 17/8
COUNTY [6]  1/4 1/15 9/4 17/2 17/4 17/17
course [1]  8/20
court [18]
Court's [1]  13/7
courtroom [1]  9/6
create [2]  5/16 5/21
created [1]  15/4
Criminal [6]  6/23 7/21 7/25 8/14 9/24 13/10
critical [1]  10/15
CSR [2]  17/21 17/21
current [8]  6/21 7/13 8/16 12/23 13/12 13/20 13/23 14/3
currently [1]  8/9

**D**

day [2]  9/17 17/18
DCR [1]  1/2
dealing [1]  10/17
death [1]  9/11
decided [4]  8/6 12/22 13/3 13/10
decision [3]  6/9 6/24 15/25
defendant [2]  2/12 4/6
defendant's [2]  6/14 6/20
defense [7]  4/16 4/24 5/1 5/2 5/17 5/25 8/2
demanded [1]  9/24
deny [2]  11/14 13/21
depend [1]  6/8
designated [1]  5/17
designations [1]  5/18
determine [3]  6/25 7/5 12/14
determined [1]  8/8
diagnosis [1]  8/3
did [4]  5/16 11/2 13/8 15/13
didn't [4]  5/21 9/7 10/25 14/21
different [1]  7/20
disagree [1]  12/11
disagrees [1]  10/7
discretion [1]  11/7
DISTRICT [5]  1/3 1/5 2/3 2/4 17/4
do [12]  4/20 6/10 9/4 10/25 11/3 11/3 12/5 12/6 13/20 15/7 15/9 17/5
doctor [2]  10/23 13/1

**D**

doctors [1] 12/20
documents [1] 7/8
does [4] 9/11 12/4 13/8 14/14
doesn't [6] 7/6 8/22 9/20 10/7 11/14 14/8
doing [1] 9/21
don't [4] 6/17 9/19 10/1 11/8
down [1] 6/24
Dr [2] 4/19 15/11
Dr. [9] 4/18 4/25 5/3 5/8 5/12 6/13 15/4 15/6 15/10
Dr. Brian [5] 4/18 4/25 5/3 5/8 5/12
Dr. Murray [2] 6/13 15/4
Dr. Murray's [1] 15/6
Dr. Self [1] 15/10
due [7] 8/11 8/14 8/16 12/7 12/8 14/4 14/5
during [2] 4/24 7/25

**E**

easier [1] 12/7
eight [1] 10/17
Elliott [1] 1/14
end [2] 14/4 14/5
engage [1] 8/19
enough [2] 7/22 8/6
entering [1] 14/6
equivalent [1] 8/4
essence [1] 5/24
evaluation [1] 15/3
even [1] 9/19
everyone [1] 12/3
everything [3] 8/25 14/20 14/22
evidence [14] 7/6 7/21 8/5 8/7 8/8 10/3 10/3 10/20 10/20 10/25 11/9 12/1 13/18 17/7
ex [1] 4/24
exactly [1] 11/19
exam [5] 6/16 12/17 12/19 13/1 13/2
example [2] 14/8 14/10
except [1] 6/16
exhibits [3] 7/14 8/3 17/13
existed [1] 7/21
expert [10] 4/16 4/23 4/23 5/17 5/25 6/3 6/3 6/8 6/10 6/14
Expiration [1] 17/24
explain [3] 9/8 14/13 14/13

**F**

fact [4] 11/1 11/9 12/15 15/2
far [1] 5/7
faxed [1] 12/2
feasibility [6] 6/25 7/12 11/5 12/21 13/3 15/20
feasible [10] 7/5 7/15 7/18 10/11 11/6 11/20 11/25 12/16 12/17 15/25
FELCMAN [4] 2/2 4/8 4/20 9/25
few [1] 4/14
Fifth [1] 8/13
filed [4] 4/15 11/17 11/18 12/2
filing [1] 6/20
find [1] 13/8
finding [1] 15/14
first [4] 4/22 10/2 10/14 12/13
flash [1] 14/10
flash something [1] 14/10
follow [2] 10/6 13/11
following [1] 1/12
foregoing [1] 17/5
form [1] 12/1
formally [1] 13/9
FORT [6] 1/4 1/15 9/4 17/2 17/4 17/17
forth [2] 7/14 7/14

forward [2] 12/17 12/18
found [4] 5/3 5/4 7/22 12/16
FRED [2] 2/2 4/8
further [2] 17/12 17/15

**G**

GAIL [1] 2/5
gave [1] 14/10
get [2] 9/19 12/7
gets [1] 12/7
give [1] 15/22
given [6] 4/25 7/11 7/13 8/8 9/12 9/17
gmail.com [1] 2/11
go [5] 11/15 11/21 12/16 12/17 13/16
going [11] 6/4 7/20 9/10 9/18 11/2 13/18 13/21 14/9 14/20 15/19 15/21
gone [2] 9/14 9/18
got [6] 5/13 5/14 10/22 10/24 11/18 15/12
gotten [1] 8/20
grant [2] 6/14 12/25
great [1] 10/16
Green [1] 8/10
grounds [1] 10/13

**H**

had [9] 5/6 5/7 7/25 8/6 9/17 10/3 11/1 12/1 13/1
half [1] 10/21
Hall [3] 17/3 17/20 17/21
HAND [1] 17/18
handed [1] 6/24
has [19]
have [37]
having [3] 4/11 6/25 12/14
he [40]
he's [7] 7/15 9/15 10/12 11/9 12/5 12/10 14/9
hearing [24]
held [2] 1/13 1/15
help [1] 11/10
her [2] 11/15 11/18
here [5] 4/2 4/11 7/22 10/5 10/10
hereby [1] 17/5
Hey [1] 14/12
him [15] 5/13 5/14 5/15 6/2 6/3 6/5 8/19 8/24 9/1 9/8 9/19 9/20 12/21 15/3 15/13
his [17] 4/17 5/22 6/5 6/11 8/18 12/23 13/4 13/12 13/13 13/18 13/20 13/23 14/11 14/14 14/15 14/15 15/22
Honor [1] 5/10
Honorable [1] 1/14
hours [1] 12/7
Houston [1] 2/10
how [3] 12/7 13/12 14/14
huh [1] 11/23

**I**

I'm [13] 6/2 6/3 6/7 9/11 11/2 11/13 13/12 13/14 13/21 14/17 14/20 15/15 15/21
I've [1] 15/25
illness [1] 8/4
included [1] 17/8
incompetency [4] 6/21 7/10 7/13 11/11
incompetent [3] 7/16 10/4 11/10
indicated [1] 13/6
inference [1] 7/10
information [2] 7/10 7/24
instructions [1] 13/11
intention [1] 5/8
interact [1] 8/21
interpreted [1] 9/10
interpreting [1] 13/14
interview [1] 14/25

is [40]
isn't [1] 9/16
issue [4] 9/9 12/14 12/21 13/3
it [22]
it's [13] 7/5 7/15 7/18 7/23 9/3 9/17 10/9 10/10 11/14 12/6 13/15 14/23 15/25

**J**

Jackson [2] 2/6 17/22
JAMES [3] 1/5 4/3 4/7
January [3] 1/12 3/4 17/19
Judge [7] 1/14 4/9 6/17 11/16 11/21 13/22 16/2
JUDICIAL [1] 1/5
July [1] 12/24
jury [1] 13/9
just [5] 7/9 7/9 11/14 11/17 14/19
just has [1] 7/9

**K**

kind [1] 15/13
know [3] 6/10 6/12 9/19
known [1] 7/12

**L**

law [2] 2/9 11/19
LESLEIGH [1] 2/5
let [3] 4/5 11/14 12/13
letters [1] 8/2
level [1] 7/9
like [3] 8/10 10/12 14/24
logic [3] 10/7 11/11 11/12
longer [1] 9/11
look [1] 14/11
looked [1] 7/21
looking [1] 13/4

**M**

machine [1] 1/17
made [1] 15/25
make [5] 5/15 6/9 9/6 9/7 15/13
making [1] 14/3
many [2] 9/16 12/7
MARTIN [5] 2/8 2/9 4/6 4/10 6/22
matter [2] 4/3 5/8
may [8] 6/22 11/22 12/16 12/24 13/22 14/2 14/24 15/1
maybe [1] 15/10
McCann [6] 5/5 5/21 5/22 10/22 13/6 13/9
MCCONNELL [1] 2/5
me [8] 4/5 9/19 12/13 12/24 14/13 14/13 15/24 17/11
mean [1] 13/14
meaningfully [1] 9/15
meant [1] 9/1
meet [1] 7/9
meeting [1] 8/24
mental [2] 8/4 10/17
Merits [3] 13/5 13/19 14/16
met [2] 8/15 8/16
Mindy [3] 17/3 17/20 17/21
Mitigation [1] 2/12
Mohler [1] 15/11
Moncriffe [1] 10/23
more [4] 8/1 8/1 8/5 11/1
MORTON [1] 2/5
motion [12] 4/15 6/14 6/15 6/20 9/2 9/3 9/3 9/7 11/18 12/25 13/21 14/23
motions [3] 1/9 3/3 4/15
MR [2] 2/2 2/3
Mr. [13] 4/11 4/20 5/25 6/8 6/20 7/13 8/17 9/25 12/20 13/6 13/9 15/1 15/22
Mr. Felcman [2] 4/20 9/25
Mr. McCann [2] 13/6 13/9

## M

Mr. Murray [1]  5/25
Mr. Murray's [1]  6/8
Mr. Turner [5]  4/11 8/17 12/20 15/1 15/22
Mr. Turner's [2]  6/20 7/13
MS [4]  2/5 2/5 2/8 4/10
Ms. [1]  6/22
Ms. Martin [1]  6/22
much [1]  8/1
Murray [10]  4/16 4/18 4/19 5/4 5/6 5/8 5/12 5/25 6/13 15/4
Murray's [3]  4/25 6/8 15/6
my [5]  11/7 11/15 14/12 15/24 17/18

## N

name [1]  4/17
necessarily [1]  7/6
necessary [1]  13/15
need [1]  7/6
never [5]  4/25 5/12 7/11 7/13 11/13
no [20]
not [35]
nothing [4]  10/24 12/6 13/20 15/23
November [1]  5/14
now [15]  6/15 7/17 7/24 8/1 8/1 8/19 8/22 9/4 10/4 10/5 10/12 10/22 10/25 11/10 13/14
numbered [2]  1/13 17/10

## O

occurred [1]  17/10
Off [1]  16/3
offer [1]  6/5
offered [1]  17/14
Office [1]  2/9
official [3]  17/3 17/18 17/22
Oh [3]  14/21 15/6 15/10
Okay [3]  4/2 7/22 15/8
old [1]  10/18
one [6]  4/15 5/17 6/25 10/24 11/8 14/2
ones [2]  5/14 10/22
only [4]  7/1 7/24 9/18 12/8
open [1]  17/10
opinion [3]  7/25 11/7 13/7
opportunity [3]  7/11 7/14 13/1
order [1]  13/15
ordered [1]  12/19
original [1]  15/18
originally [1]  4/14
other [5]  6/7 6/15 10/23 15/2 17/7
Our [1]  7/4
out [6]  5/3 5/5 9/5 11/10 11/19 12/2
outpatient [1]  8/5
over [6]  8/12 8/14 8/14 14/19 14/21 14/22

## P

paid [1]  17/17
paranoia [1]  8/3
parte [1]  4/24
particular [2]  7/7 7/19
parties [2]  17/8 17/14
passage [2]  10/14 10/16
past [1]  9/13
Pat [4]  5/5 5/21 5/22 10/22
person [1]  7/8
picture [1]  14/14
pictures [1]  14/11
place [1]  8/13
please [1]  4/5
plus [1]  10/3
point [4]  8/20 8/22 9/18 15/23
portions [1]  17/7

position [2]  5/2 15/24
possible [2]  7/2 14/20
preparation [1]  17/16
prepared [1]  11/21
presenting [1]  9/2
Presiding [1]  1/14
prevent [1]  9/1
previous [1]  11/19
proceed [2]  6/22 11/9
proceeding [3]  9/1 14/6 14/9
proceedings [6]  1/12 1/16 4/1 8/23 17/7 17/13
process [7]  8/11 8/14 8/16 12/8 12/8 14/4 14/5
produced [2]  5/13 13/18
professional [2]  14/25 15/4
professionals [1]  15/21
proper [1]  11/14
properly [1]  11/20
psychiatrist [1]  7/8
psychologist [1]  7/8
put [2]  5/22 13/25

## Q

qualified [1]  15/7
quality [1]  10/19
quantity [1]  10/19
question [2]  13/17 14/25
questions [1]  9/19
quite [1]  10/13
quote [1]  8/25

## R

raises [1]  13/17
really [1]  11/2
reason [5]  5/3 5/20 5/23 7/18 9/21
received [1]  8/4
reconsider [1]  12/25
record [6]  1/1 14/1 16/3 17/9 17/12 17/16
recuse [1]  9/3
referred [1]  8/24
reflects [1]  17/13
refused [2]  12/20 15/13
regardless [1]  14/6
relates [1]  13/13
relation [1]  14/15
relationships [1]  8/2
report [13]  4/25 5/13 5/13 5/15 5/16 5/16 5/21 5/23 6/5 6/8 6/11 15/9 15/12
reported [3]  1/16 15/2 17/11
reporter [2]  17/3 17/22
REPORTER'S [4]  1/1 17/9 17/12 17/16
request [1]  7/4
requested [2]  13/9 17/7
requesting [1]  7/17
required [1]  8/11
requires [2]  14/4 14/5
respective [1]  17/14
respond [3]  5/9 11/22 13/22
restored [2]  9/21 9/22
retrospective [13]  7/1 7/2 8/9 8/12 9/23 10/5 10/11 12/9 12/15 12/18 13/16 14/4 16/1
Richmond [3]  1/15 2/6 17/23
right [5]  4/13 6/15 6/19 9/11 15/17
rights [1]  15/22
row [1]  9/11
ruled [1]  11/20
ruling [1]  11/24

## S

said [3]  5/6 8/10 11/1
said on [1]  5/6
same [2]  9/17 10/22

say [4]  4/20 11/6 12/4 14/12
saying [1]  10/6
says [3]  10/2 10/9 12/12
scheduled [1]  4/14
second [2]  5/4 10/19
see [1]  14/11
Self [1]  15/10
sent [3]  12/21 14/25 15/8
September [1]  12/2
set [1]  11/19
setting [1]  5/5
seven [1]  10/17
she [7]  5/20 10/2 10/2 10/3 11/1 11/8 11/14
she's [1]  10/6
shit [1]  8/25
show [2]  7/18 10/4
shown [1]  15/24
signed [1]  12/2
simple [1]  10/13
sir [2]  4/12 6/18
sitting [2]  8/17 14/9
situation [3]  7/19 8/17 15/19
so [14]  5/20 5/23 6/17 7/17 8/1 9/14 9/17 9/22 12/21 13/2 13/20 14/6 15/17 15/21
some [2]  7/6 7/9
somebody [1]  15/8
somehow [1]  10/7
something [4]  9/5 10/6 14/10 14/21
source [1]  7/7
speak [1]  13/1
Specialist [1]  2/12
STATE [12]  1/3 2/7 4/3 4/8 5/13 6/1 10/16 12/24 14/10 14/17 17/1 17/4
State's [3]  4/16 4/23 6/4
statement [2]  5/5 5/23
states [1]  10/17
status [2]  4/14 5/2
stenotype [1]  1/16
steps [1]  6/25
still [2]  13/8 15/20
story [2]  14/5 14/6
Street [1]  2/10
stricken [1]  5/25
strike [2]  4/16 6/13
striking [1]  6/2
stuck [1]  14/20
styled [1]  17/9
submitted [1]  14/17
subsequent [1]  15/1
Suite [1]  2/10
supplied [1]  5/1
supports [1]  7/10
Supreme [1]  8/13
sure [6]  9/2 9/6 9/10 9/15 13/12 14/18
surprising [2]  9/12 9/16

## T

T.D.C.J [2]  14/11 14/15
take [2]  6/19 11/15
talk [7]  9/18 11/4 12/20 12/21 15/3 15/13 15/20
talking [2]  9/13 15/5
Telephone [3]  2/7 2/11 17/23
tell [1]  11/2
testify [1]  5/22
TEXAS [15]  1/3 1/4 1/15 2/2 2/4 2/6 2/7 2/9 2/10 4/3 10/16 17/1 17/5 17/21 17/23
than [2]  8/5 15/2
Thank [1]  16/2
that [62]
that's [11]  5/19 5/19 5/23 6/6 6/11 8/12 10/5 10/15 11/15 14/13 15/25

## T

**their [6]** 5/18 6/9 6/24 7/25 13/11 14/23
**them [4]** 4/15 11/3 11/4 11/10
**then [4]** 6/13 10/8 11/1 11/13
**there [13]** 6/15 6/24 7/2 7/9 7/22 8/10 8/18 10/24 12/3 12/11 14/12 15/3 15/9
**there's [2]** 8/6 15/22
**therefore [3]** 8/7 11/3 11/13
**they [12]** 6/9 7/22 8/6 9/6 10/20 10/23 10/25 10/25 11/1 11/2 11/8 14/21
**They're [1]** 5/14
**they've [2]** 10/22 10/24
**thing [1]** 10/15
**things [1]** 7/19
**think [4]** 6/17 9/3 11/14 12/5
**this [23]**
**through [2]** 9/20 13/16
**time [14]** 8/6 10/3 10/4 10/14 10/16 10/20 10/24 12/19 13/5 13/5 13/13 13/19 14/16 15/19
**titled [1]** 1/13
**today [3]** 8/8 10/10 10/12
**together [1]** 12/4
**told [2]** 5/21 11/8
**tomorrow [1]** 10/12
**total [1]** 17/15
**transcription [1]** 17/6
**Travis [1]** 2/10
**treatment [1]** 8/5
**trial [17]** 1/2 7/1 7/3 7/22 7/23 8/7 8/9 8/12 9/10 9/23 12/10 13/5 13/14 13/19 14/4 14/16 15/19
**tried [1]** 9/8
**tries [1]** 10/16
**triggering [1]** 7/23
**true [1]** 17/6
**truly [1]** 17/13
**try [1]** 11/13
**turn [2]** 14/12 14/21
**turned [2]** 14/19 14/22
**TURNER [10]** 1/5 4/3 4/7 4/11 8/17 12/20 15/1 15/3 15/13 15/22
**Turner's [2]** 6/20 7/13
**turns [1]** 10/9
**two [2]** 6/24 10/21
**type [2]** 9/17 11/12
**Tyrone [1]** 10/22

## U

**U.S [1]** 8/13
**Uh [1]** 11/23
**Uh-huh [1]** 11/23
**unable [1]** 8/19
**understand [6]** 8/23 9/12 9/20 10/1 10/8 14/8
**understands [1]** 5/20
**unquote [1]** 8/25
**until [1]** 5/13
**up [5]** 6/19 11/15 12/21 14/25 15/8
**us [4]** 5/1 5/1 9/16 14/11
**use [1]** 14/21

## V

**very [2]** 7/20 10/22
**volume [4]** 1/1 1/1 3/2 17/9

## W

**waiving [1]** 4/11
**want [2]** 13/25 15/22
**wanted [3]** 9/6 11/3 13/6
**wants [1]** 5/25
**was [21]**
**wasn't [1]** 9/5
**way [3]** 5/16 12/8 14/8

**we [27]**
**we'll [2]** 6/13 6/19
**we're [15]** 4/2 7/17 8/22 9/2 9/13 9/20 10/5 10/10 11/20 13/4 14/6 15/5 15/17 15/19 15/21
**we've [3]** 8/19 8/20 9/14
**Well [1]** 12/13
**were [5]** 6/24 7/11 7/13 15/18 17/11
**what [19]**
**what's [2]** 8/4 14/12
**whatsoever [2]** 8/19 9/12
**when [3]** 6/8 6/23 8/6
**where [8]** 8/3 8/4 8/22 12/4 12/5 12/16 14/20 15/17
**whether [1]** 10/10
**which [7]** 9/12 9/16 12/24 13/7 13/20 15/19 17/10
**who [2]** 5/14 12/6
**why [1]** 11/8
**will [5]** 8/17 8/18 11/3 13/11 17/17
**without [2]** 11/25 11/25
**WITNESS [1]** 17/18
**witnesses [1]** 7/15
**won't [1]** 15/20
**Wonderland [1]** 11/12
**work [1]** 12/7
**would [7]** 5/22 10/20 11/7 11/10 11/13 15/23 15/24
**wouldn't [1]** 15/3
**write [1]** 5/14
**writing [1]** 17/8

## Y

**years [3]** 10/12 10/18 10/21
**Yes [2]** 4/12 5/11
**yesterday [1]** 11/18
**you [15]** 4/20 6/10 6/22 7/6 9/8 9/14 11/5 11/8 11/13 11/20 12/9 13/25 13/25 14/13 16/2
**you're [3]** 4/10 9/9 12/8
**you've [1]** 15/24
**your [6]** 4/5 5/9 9/9 9/15 13/14 13/21

# Exhibit F

CAUSE NO. 10-DCR-054233

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| V. | § | FORT BEND COUNTY, TEXAS |
| ALBERT JAMES TURNER | § | 268TH    JUDICIAL DISTRICT |

## MOTION TO ADDRESS MR. TURNER'S CURRENT INCOMPETENCY

Mr. Turner is currently incompetent making it, at this time, unfeasible to conduct a retrospective competency trial without violating his right to Due Process.  The court must:

1. Conduct a current competency trial; or
2. Send Mr. Turner to an appropriate state or federal psychiatric facility for competency restoration; or
3. Rule the retrospective competency trial unfeasible

*****

Albert Turner, by and through his attorney of record, and pursuant to the 5th, 6th, 8th & 14th Amendments to the United States Constitution and Article 1, sections 3, 10, 13 & 19 of the Texas Constitution, Article 39.14 of the Texas Code of Criminal Procedure, makes this motion.

1. On May 31, 2011, Defendant was convicted of capital murder and on June 7, 2011 he was sentenced to death.

2. On October 30, 2013, the Court of Criminal Appeals sustained the Defendant's ninth point of error, abated the appeal, and remanded the case, directing the trial court to first determine if a retrospective competency trial is feasible.  If it is, the court shall conduct a retrospective competency trial.

3. A retrospective competency trial is not feasible, at this time, because of Mr. Turner's current incompetency.  A retrospective competency trial is only feasible if an

individual's due process rights are protected. *Drope v. Missouri*, 420 U.S. 162, 183 (1975).

4. Mr. Turner must be able to assist his counsel during the retrospective competency trial and he is not currently capable of doing that. *Greene v. State*, 264 S.W.3d 271, 272 (Tex. App.—San Antonio 2008).

5. The Court of Criminal Appeals remanded the case because Mr. Turner was denied a competency trial at a point when he should have been granted one. Just like at trial, an informal inquiry has been initiated here. All of the evidence of *incompetency* must be examined (and all evidence of competency disregarded) to decide if there is some evidence that may lead to a conclusion of incompetency. There is a scintilla of evidence of Mr. Turner's incompetency and the law requires a current competency trial.

6. The Court of Criminal Appeals held that there was enough evidence as of August 8, 2011 to warrant a retrospective competency trial. Now, 3 years later, the evidence of incompetence has become more voluminous. There have been additional mental health interventions and expressions of Mr. Turner's paranoid delusions. *Turner at* 696.

7. The Court must conduct a current competency trial to determine if Mr. Turner is competent right now, so that a retrospective competency trial can be conducted within the bounds of Due Process.

8. Alternatively, the Court should send Mr. Turner to an appropriate state or federal psychiatric facility for competency restoration to ensure any subsequent proceeding is Constitutional.

9. Alternatively, the Court should rule a retrospective competency trial unfeasible, and

forward the findings to the Court of Criminal Appeals in accordance with its opinion.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court conduct a current competency trial; or, in the alternative, send Mr. Turner to an appropriate state psychiatric facility for competency restoration; or, alternatively, rule the retrospective competency trial unfeasible.

Respectfully submitted,

_____
ROBERT A. MORROW
State Bar No. 14542600
24 Waterway Ave., Suite 660
The Woodlands, Texas  77380
Telephone: 281-379-6901


_____
AMY MARTIN
State Bar No. 24041402
202 Travis St., Suite 300
Houston, Texas 77002
Telephone: 713-320-3525


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing motion has been sent to Fred Felcman, counsel for the State, on January 15, 2015.

_____
ROBERT MORROW

CAUSE NO. 10-DCR-054233

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| V. | § | FORT BEND COUNTY, TEXAS |
| ALBERT JAMES TURNER | § | 268TH    JUDICIAL DISTRICT |

## ORDER ON MOTION TO ADDRESS
## MR. TURNER'S CURRENT INCOMPETENCY

Before the court is the Defendant's Motion to Address Mr. Turner's Current Competency. After considering the motion, the evidence, and the arguments of the parties, it is the opinion of the Court that:

_____There must be a current competency trial conducted in accordance   with Article 46B of the Texas Code of Criminal Procedure.

_____Mr. Turner will be sent to an appropriate state or federal psychiatric facility in order to be restored to competency.

_____The retrospective competency trial is unfeasible and the findings and records generated since the remand should be forwarded to the Court of Criminal Appeals.

Signed this the _____, 2015.

_____
JUDGE PRESIDING

CAUSE NO. 10-DCR-054233

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| V. | § | FORT BEND COUNTY, TEXAS |
| ALBERT JAMES TURNER | § | 268TH   JUDICIAL DISTRICT |

**DEFENDANT'S BRIEF IN SUPPORT OF THE MOTION TO ADDRESS
MR. TURNER'S CURRENT INCOMPETENCY**

Mr. Turner is currently incompetent making it, at this time, unfeasible to conduct a retrospective competency trial without violating his right to Due Process.  The court must:

1. Conduct a current competency trial; or
2. Send Mr. Turner to an appropriate state or federal  psychiatric facility for competency restoration; or
3. Rule the retrospective competency trial unfeasible

\*\*\*\*\*\*

The Texas Court of Criminal Appeals held that it was error to deny Mr. Turner a competency trial and provided clear instructions for remedying that error:

> Accordingly, we sustain the appellant's ninth point of error, abate the appeal, and remand the cause to the trial court. On remand, the trial court shall first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence, and any other pertinent considerations.

*Turner v. State*, 422 S.W.3d 676, 696-97 (Tex. Crim. App. 2013), *reh'g denied (Apr. 2, 2014).*

***Feasibility comes first***

A retrospective competency trial is only feasible if an individual's due process rights are protected. *Drope v. Missouri*, 420 U.S. 162, 183 (1975).  Determining the feasibility of a

retrospective competency trial is done on a case-by-case basis; it is fact specific. *Caballero v. State*, 587 S.W.2d 741, 743 (Tex. Crim. App. 1979).

The Court of Criminal Appeals has acknowledged "the difficulties inherent in making a retrospective determination of a defendant's competency. The United States Supreme Court has stressed these difficulties in its decisions." *Brandon v. State*, 599 S.W.2d 567, 573 (Tex. Crim. App. 1979) *cert. granted, judgment vacated on other grounds,* 453 U.S. 902 (1981).

Some of these difficulties include passage of time, present recollection of expert witnesses who previously testified, and ability of the judge and jury to observe the defendant. *Caballero at* 743. However, such a determination can be made within the limits of due process depending upon the quality and quantity of the evidence available. *Barber v. State*, 737 S.W.2d 824, 828 (Tex. Crim. App. 1987).

The Court of Criminal Appeals has held that "if the pre-trial competency hearing was not held and should have been, or was improper for some reason and merited a new hearing, the appeal would be abated and a retrospective competency hearing could be held." *Huff v. State*, 807 S.W.2d 325, 326 (Tex. Crim. App. 1991); *See also Ex parte Garrett*, No. WR-75,447-01, 2011 WL 2382572, at *1 (Tex. Crim. App. June 8, 2011).

### *No competency, no Due Process*

Mr. Turner's current competency is one of several "pertinent considerations" that the Court of Criminal Appeals has required the trial court to examine. Mr. Turner must be able to assist his trial counsel. *Greene v. State*, 264 S.W.3d 271, 272 (Tex. App.—San Antonio 2008). If he cannot assist his counsel, his Constitutional right to Due Process will be violated. In *Greene*, the Court of Appeals held:

> Clearly, Greene's ability to assist his trial attorney will be critical to the outcome of issues to be addressed at the retrospective competency determination and he should not be deprived of his right to assist counsel.

*Greene* at 273.

*Court of Criminal Appeals' instructions on what not to do*

The Court of Criminal Appeals was clear about what factors led to its decision that a competency trial should have been conducted during Mr. Turner's trial; those factors are still present and now there is additional evidence indicating (1) Mr. Turner must be restored to competency or (2) that the threshold is met to require a current competency trial. Texas Code of Criminal Procedure 46B.004(c).

The Court of Criminal Appeals held that the appointment of Dr. Connie Almeida during trial was evidence that the trial court "was obviously persuaded" that there was a *bona fide* doubt as to Mr. Turner's competency. *Turner* at 692.

After remand, when the parties met in court to discuss the retrospective competency trial, defense counsel requested an evaluation for current competency. The trial court ordered that Mr. Turner be evaluated for current competency. This decision is identical to the one to appoint Dr. Almeida at trial and, likewise, it shows that the court "was obviously persuaded" that there was a *bona fide* doubt as to Mr. Turner's current competency.

The Court of Criminal Appeals explained how to proceed from this point on to determine if a competency trial is required:

> The question therefore becomes whether, in light of what became known to the trial court by the conclusion of this informal inquiry, it should have conducted a formal competency trial. The answer depends upon whether "some evidence from any source" had arisen by that time "that would support a finding that [the appellant] may be incompetent to stand trial." In making this determination, a trial court **must consider only that evidence tending to show incompetency**, "putting aside all competing indications of competency, to find whether there is some evidence, a quantity **more than none** or a scintilla, that rationally may lead to a conclusion of incompetency." If so, then "evidence exists to support a finding of incompetency," and the statutory scheme requires the trial court to conduct a formal competency trial.

*Turner* at 692-93. (footnotes omitted)(emphasis added).


*Consider only evidence of incompetency*

> First, the trial court focused erroneously on evidence of competency rather than evidence of incompetency, relying upon the ultimate conclusions of Drs. Gollaher and Axelrad, as well as Dr. Almeida's subsequent opinion that the appellant's cognitive functioning had not significantly changed in the interim.

*Turner* at 694.

### *No change needed*

> Second, the trial court erred to the extent that it denied the appellant's request for a formal competency trial on the grounds that the appellant failed to demonstrate any "change" of status since the earlier findings of competency by Gollaher and Axelrad. There was no adjudication of the competency issue in the summer of 2010 following their evaluations—not even an informal inquiry to decide whether there was sufficient evidence at that time to invoke a formal competency trial. Thus, there was no prior judicial competency determination to justify a requirement of a change in circumstances.

*Turner* at 694-695.

Right now, prior to the retrospective competency trial, considering only the evidence tending to show incompetency, is there more than no evidence that rationally might lead to a conclusion of incompetency? The answer is "yes."

The Court of Criminal Appeals has remanded this case because, at trial, the answer was also "yes" and the request for a competency trial was denied. If Mr. Turner's request for a current competency trial is denied, it will be the same error and we will be brought back to this point again.

### *All evidence of incompetency allowed*

The only limit on the evidence that a court may consider when determining the necessity of a competency trial is that it must be evidence of incompetency. Some examples are found in Tex. Crim. Proc. Code Ann. art. 46B.024, the statute that addresses competency evaluations. Some of the items listed include a defendant's capacity to "disclose to counsel pertinent facts, events, and states of mind;" "engage in a reasoned choice of legal strategies and options;" and "testify." The statute also requires an expert to consider "whether the defendant has a mental illness." Experts are also directed that they "shall consider . . . other

issues determined relevant by the expert."

### *Court of Criminal Appeals' compelling evidence*

The Court of Criminal Appeals provided several examples of evidence that it believes warranted conducting a competency trial:

Evaluations of Dr. Axelrad and Dr. Gollaher:

> Both of the [their] competency reports reflect the substantial possibility that he was suffering from paranoia that may have been the product of "a paranoid disorder," and that he was apparently exhibiting delusions. Gollaher expressly found that the appellant had a factual understanding of the proceedings and could "communicate events in an understandable manner and can report his state of mind." But her report did not speak specifically to whether his condition would adversely affect his capacity either to "engage with counsel in a reasonable and rational manner[,]" or to "engage in a reasoned choice of legal strategies and options[.]" Axelrad's report did speak to those capacities and, in fact, he found the appellant to be "mildly impaired" with respect to both. Axelrad noted that, "[i]n the event [that the appellant] has a paranoid disorder, this may be contributing to the problems he is experiencing with his attorney." Notwithstanding the experts' ultimate conclusions that the appellant was competent, the trial court was effectively put on notice of the need to maintain vigilance to assure that the appellant's due process rights were preserved.

*Turner* at 693-94.

Attorney's reports of Mr. Turner's paranoia and lack of communication

> The appellant's paranoia had progressed to the point that, if the representations of his own lawyers are to be credited, he believed that they were openly conspiring with the prosecutors to secure his conviction. He flatly refused to communicate with them during the voir dire proceedings.

*Turner* at 694.

Mr. Turner's ongoing delusions

> By May of 2011, there had arisen new evidence in the form of the appellant's obviously irrational belief that his ongoing delusion with respect to the Mayor of Kendleton somehow provided him with a defense to prosecution for capital murder that was preferable to the approach that his trial lawyers urged him to pursue. That the appellant persisted in this delusion-fueled belief against the

emphatic advice of counsel, together with the earlier suggestions that he suffered from a paranoid disorder, was enough to raise the likelihood of incompetency to a level beyond that which is evinced by a mere dispute between an ordinarily obstinate defendant and his legal counsel over plausible trial strategies.

*Turner at* 695.

### *Additional evidence of incompetency discovered since the Mr. Turner's trial*

<u>Mental Health History</u>

In the Court of Criminal Appeals' opinion, it is noted that Mr. Turner did not have any mental health history. *Id.* at 693. Now, that is not the case. In October of 2011, he was transferred to the Skyview Unit of TDCJ for mental health treatment[1].

Mr. Turner was moved to a psychiatric unit because he had not eaten in 9 days, was hoarding his blood pressure medication, and had not showered in a month. He was "unshaven and disheveled . . . quiet and sullen." He had also given away all of his things (commissary).

He was dysphoric, had "some mental confusion," and received a diagnosis of Major Depressive Disorder. In August of 2011, in a mental health interview, Mr. Turner "reported that he is not mentally ill and just wanted to make that clear." He expressed concern that his letters were not being sent to his sister. The notation also includes the statement: "Pt. reported that **he doesn't trust his lawyers and is willing to let the clock run out on his appeals process due to this fact.**"

Mr. Turner later discussed his case and the file notes reflect:

> He informs there is no evidence against him except for circumstantial evidence as the blood in the house and in his own car was not any of his, and the blood in the car was not the victims. He weaves a tale of a conspiracy beginning at Kendelton with the Police Chief and Mayor (who was caught in a relationship with his wife that resulted in wife having Mayor's child and getting strung out on heroin). TDCJ, judge, Kendelton officials, private school where his children attend (which was founded by his in-laws and in bylaws indicates continued free education for his children), and even **his own lawyer are**

---

[1] All of the information related to TDCJ is in Mr. Turner's records.

**involved in this conspiracy by withholding evidence of witnesses he was unable to confront due to having been videoed versus live covering up of motions, tying up his retirement monies in order to keep him from paying for a 'real' lawyer.** He has refused to sign a document in relation to Habeas Corpus due to once signed there is no going back.

The impressions documented by the mental health provider are:

> He has a recurring theme of 'out to get him'. One person being out to get someone is believable, but the more people involved the less believable it becomes. With Mr. Turner, he does not only have several different individuals involved, but several different agencies of government. His reasoning for conspiracy involving the judge includes a photo in a newspaper in which the judge was seen shaking hands with the Mayor of Kendelton with the Police Chief looking on and a situation in the court room whereby a motion that had been filed by his sister was in question and he was to verify his knowledge of same and he had already done so and was physically forced to place his thumb print on the document. The conspiracy involves several departments within TDCJ and across units as well. He appears to be more paranoid than anything, but this involves a close look at the whole situation. If he is treated for paranoia this could be misconstrued to the paranoid mind as an attempt to help in the conspiracy against him.

Not all of the relevant documentation is so detailed. One entry states: "Refuses to sign refusal - something to do with his case and DNA and attorneys, so SO and Med signed as witnesses." Even though some of the notes are cryptic, it is clear that contextually, they point to Mr. Turner's current incompetency.

<u>Subsequent to trial, the trial court treated Mr. Turner as if he was incompetent</u>

Mr. Turner did not want his trial counsel to turn his file over to the Office of Capital Writs ("OCW"), his attorneys for his habeas proceedings. Therefore, he would not sign a release. There were 2 hearings on the issue, one of which Mr. Turner was present for, and repeatedly informed the court he did not want to sign the release at that time.

Mr. Turner's choice to not release his files was ignored and, instead, the trial court signed an order for Mr. McCann to give the files to the OCW stating: "the focus of this hearing is what is best for Mr. Turner, and, as such, will order that the files be transferred." (RR67, 52).

The Court of Criminal Appeals, reviewing the trial court's actions, stated: "Assuming Turner is legally competent (as the trial court found in this case), he is entitled to choose not to turn over his trial file; and McCann, as Turner's former counsel and agent, must honor that decision for the reasons that we have explained." *In re McCann*, 422 S.W.3d 701, 709 (Tex. Crim. App. 2013). When someone is legally competent, "they can define his or her own best interests, and that decision will control." *Id.* at 707.

The action of signing the order commanding trial counsel to relinquish Mr. Turner's file because it was in his best interest is evidence that he is presenting as an incompetent person. The Court of Criminal Appeals' held that such an order could only be signed if Mr. Turner was incompetent.

### *"Delusion-fueled belief" persists and prevents effective assistance at all levels*

The Court of Criminal Appeals repeatedly refers to evidence of the attorney-client relationship as presented by the attorneys. *Turner at 694.* Now, there is evidence of the same paranoia that the Court discussed interfering with subsequent attorney-client relationships. "Generally, the close interaction presumed by the lawyer/client relationship makes trial counsel the best source of information about a defendant's competency." *Aldridge v. Thaler*, No. CIV.A. H-05-608, 2010 WL 1050335, at *6 (S.D. Tex. Mar. 17, 2010)

Appellate counsel

Mr. Turner has refused all correspondence from his appellate attorneys and has also refused visits from the attorneys and any of their representatives while he has been housed on death row.

Earlier this month, appellate counsel tried twice to meet with Mr. Turner in the Fort Bend County Jail. The first attempted visit resulted in Mr. Turner telling the deputies "I don't have lawyers."

The next attempt included appellate counsel and an expert doctor. Mr. Turner refused to

come out and jail personnel escorted both individuals back to his cell to speak to him through the cell window. The doctor introduced himself, Mr. Turner briefly looked up, was non-responsive, and stared at the floor. Mr. Turner was told that the doctor was court appointed. When appellate counsel attempted to speak with him; the response was the same.

Writ counsel

The Office of Capital Writs, Mr. Turner's first habeas counsel, spent a lot of time with him after they were appointed. Specifically, over 3-4 months they visited with him 11 times. (RR67, 40). However, the visits were brief because Mr. Turner became paranoid and ended the visits when the lawyers began talking about their representation. OCW filed a "Motion to Bring Mr. Turner Back to Court to Determine if he Wishes to Proceed Pro Se; or in the Alternative, Request this Court Order a Competency Evaluation of Mr. Turner."

In an effort to attempt to help Mr. Turner understand why he needed to sign a release for his lawyers, OCW brought his mother and sister in from Florida the day before Christmas Eve to visit with him in Skyview, a TDCJ mental health unit. His sister Juanita believed she could convince him to sign the release. Even after four hours with him, Mr. Turner would not sign the release for OCW ("the state" as he referred to it). Juanita reported that Mr. Turner said he wanted a writ filed, but not by OCW. But, he seemed to understand that no other counsel would be appointed and that time was running out. Even after the long visit with his family, Mr. Turner refused to visit with counsel from OCW.

Ultimately, because the trial court would not grant its motion for a competency evaluation, OCW filed a "Motion to Bring Mr. Turner Back to Court to Determine if he Wishes to Proceed Pro Se; or in the Alternative, Request this Court Order a Competency Evaluation of Mr. Turner." Both requests were denied and the OCW withdrew as Mr. Turner's habeas counsel. (RR68, 6).

New writ counsel

The court then appointed James Rytting and he had the same difficulty with Mr. Turner. He filed an affidavit stating that he had visited Turner in person at the Polunsky Unit twice and had attempted to meet him on other occasions. He also stated that Turner accepted file-release forms from him, and Turner told Rytting that he would think about executing them. *In re McCann*, 422 S.W.3d 701, 703 (Tex. Crim. App. 2013).

***My lawyers are trying to kill me***

At Polunsky, Mr. Turner was not able to make phone calls. While at Fort Bend County Jail, he spoke several time to his family and those conversations were recorded and the state has provided more than hours of recordings. Those calls provide the best insight into Mr. Turner's ability to consult with his lawyer and his lack of understanding of these proceedings. A universal theme of Mr. Turner's paranoia is his lawyers being corrupt and working with the government, judge, and prison to keep him quiet.

Mr. Turner's first attempted call was to his sister, who he considers his legal liaison. He could not reach her. Then, when he finally gets to speak to his mother for the first time in years, he immediately begins to talk about how his letters to his family are being held whenever he sends something with legal information in it. He rapidly described how his lawyers and the judge were trying to stop his Due Process.

***Does not understand the proceeding***

Mr. Turner believes that the competency trial is an attempt to "derail him" from filing his motion. He refers to it as the "competency crap." He has no understanding of the fact that this proceeding has nothing to do with his current competency and that the outcome will not affect his sister's ability to file motions on his behalf.

It is unclear what the motions are, but he's hoping they mess the lawyers up because they are corrupt. He's in a hurry to file the motions because he believes his attorneys will shut him down when they find out he's doing it.

His paranoia makes him believe that his attorneys want to keep him quiet and they're trying to kill him because that's how the system works.

*Decompensated to double the trouble*

The emphasis in the appeal and remand was Mr. Turner's incompetence under Texas Code of Criminal Procedure Art. 46B.003 (a)(1)-- he did not have the "sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding." Mr. Turner still lacks that ability as evidenced by his incapability of stepping out of his delusion to even acknowledge his defense team or a psychological expert.

However, the current circumstances illustrate that Mr. Turner does not have a "rational as well as factual understanding of the proceedings against" him. Art. 46B.003(a)(2).

A retrospective competency trial is a complicated and rare proceeding in which most experienced criminal defense attorneys will never participate. In this case, novel issues have arisen; even the mechanics of the process are confusing. Mr. Turner does not have "a rational as well as factual understanding of the proceedings against" him without having a sufficiently rational conversation with counsel.

To be legally competent he must be able to understand what fact is at issue in this proceeding, who has the burden of proof, what the potential outcomes are for him, the roles of his attorneys, the Judge and the prosecutors, the applicability of his Constitutional rights to confrontation, counsel, and to testify. Mr. Turner's paranoid delusions prevent him from interacting with counsel and foreclose any chance of a rational understanding of the proceedings against him.

*Behaviors that constitute a scintilla*

In addition to mental health treatment, Mr. Turner has gone on hunger strikes at different times during his incarceration. He also refuses to sign anything or submit a fingerprint. At one point he believed his blood pressure medicine was actually psychiatric medicine. He

believes that Captain Brownfield at the Fort Bend County Jail is the reason his Due Process is being violated. He believes he was being kept in separation to prevent him from completing his "motion". And, if he were able to complete it, he would have to be left out.

### *"Particular cause for concern"—Defendant testifying*

The Court of Criminal Appeals made it very clear that the most troublesome aspect of Mr. Turner's case was the fact that he testified and he may have been incompetent when he did so.

> And we think there is particular cause for concern when a defendant's mental impairment directly touches upon certain fundamental decisions that the criminal justice system reserves for him to make personally—albeit after "engaging" meaningfully with counsel—**such as whether to testify in his own defense**. Precisely because the defendant retains ultimate authority over these decisions, it is critical that he be able "to consult with counsel with a reasonable degree of rational understanding" about them.

*Turner* 690-91.

The Court accurately described Mr. Turner as a person that "persisted in this delusion-fueled belief against the emphatic advice of counsel." *Id.* at 695. And while Due Process requires an understanding and ability to invoke all Constitutional rights, the right to remain silent is paramount. "Most critically, he may well have been incapable of making a rational, non-delusional decision with respect to whether or not to accept his trial counsel's advice not to testify." *Id.*

Without an attempt to restore Mr. Turner to competency, this scenario that the Court of Criminal Appeals found so alarming may repeat itself.. Mr. Turner may choose to exercise his right to testify in this trial and he would be utterly clueless about what he could or should testify about. Of course, counsel would advise him against taking the stand, but given his inability to understand the proceedings and consult with counsel, he would forge ahead to his detriment, just as he did at trial. If the competency trial is flawed in such a way that the Court of Criminal Appeals believes Mr. Turner's rights were not protected, this case will again be remanded and we will find ourselves in this same procedural posture with the same incompetent Mr. Turner. *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978).

*Something has to be done*

- The court must conduct a current competency trial to determine if Mr. Turner is competent so that a retrospective competency trial can be conducted within the bounds of Due Process.

- Alternatively, the court should send Mr. Turner to an appropriate state or federal psychiatric facility for competency restoration so that there can be a constitutionally sound retrospective competency trial.

- Alternatively, the court must rule a retrospective competency trial unfeasible, and forward findings to the Court of Criminal Appeals in accordance with the opinion.

Respectfully submitted,

_Robert A. Morrow_____
ROBERT A. MORROW
State Bar No. 14542600
24 Waterway Ave., Suite 660
The Woodlands, Texas 77380
Telephone: 281-379-6901

_Amy Martin_____
AMY MARTIN
State Bar No. 24041402
202 Travis St., Suite 300
Houston, Texas 77002
Telephone: 713-320-3525

# Exhibit G

AP-76580
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/7/2014 11:40:36 AM
Accepted 7/7/2014 1:22:39 PM
ABEL ACOSTA
CLERK

NO. AP-76,580

| | | |
|---|---|---|
| ALBERT JAMES TURNER | § | IN THE |
| VS. | § | COURT OF CRIMINAL APPEALS |
| THE STATE OF TEXAS | § | STATE OF TEXAS |

**STATE'S MOTION FOR ENFORCEMENT OF THE TRIAL COURT'S LIMITED JURISDICTION ON REMAND**

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

On remand of this case, the trial court ordered the parties to each provide the name of a psychiatrist to evaluate Albert James Turner for competency to stand a retrospective competency trial. The State of Texas, by and through its District Attorney, 268th Judicial District, Fort Bend County, Texas, moves this Court to enforce the limited jurisdiction of the trial court on remand to determine whether a retrospective competency trial is feasible, and if so, to hold the trial. *Turner v. State*, 422 S.W.3d 676, 696-97 (Tex. Crim. App. 2013).

I.

*Procedural History*

On May 31, 2011, a jury convicted Appellant of capital murder, committed on or about December 27, 2009. [58 RR 1, 6] On June 7, 2011, Turner was sentenced

1

to death. On direct appeal, this Court abated Turner's appeal and remanded this case to the trial court to "first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence, and any other pertinent considerations." *Turner*, 422 S.W.3d at 696. If a retrospective competency trial is feasible, the trial court "shall proceed to conduct such a trial in accordance with Chapter 46B, Subchapter C, of the Code of Criminal Procedure." *Id.* at 697.

The trial court held a procedural and scheduling hearing on May 30, 2014. At that hearing, Turner's attorneys presented the court and the State with *Greene v. State*, 264 S.W.3d 271 (Tex. App.--San Antonio, 2008, pet. ref'd), and urged the trial court to have Turner examined for his contemporary competency to stand trial. The attorneys argued that Turner's contemporary competency was relevant to the court's determination of feasibility because Turner should be competent at the retrospective competency trial to assist counsel in proving he was incompetent when his trial was held in April-June 2011.

The State was unaware of the *Greene* opinion, but Turner's attorney accurately stated its holding.[1] In an abundance of caution, the trial court ordered both parties to

---

[1] A copy of *Greene v. State*, 264 S.W.3d 271 (Tex. App.--San Antonio, 2008, pet. ref'd), is attached as Exhibit A to this motion. The petition for discretionary review of the Bexar County District Attorney's Office did not question

suggest a psychiatrist to evaluate Turner's contemporary competency. The trial judge stated on the record that he did not believe Turner was incompetent at trial and did not believe that Turner was incompetent now, but would appoint the psychiatrists to evaluate Turner out of an abundance of caution in light of *Greene.*

On June 9, 2014, the trial court appointed Dr. Mary Alice Conroy to evaluate Turner for contemporary competency. [Exhibit C, copy of the order]

On July 1, 2014, the State filed a motion for reconsideration of the trial court's order to have Turner evaluated for contemporary competency. [Exhibit D, copy of the motion] On July 2, 2014, the trial court denied the motion as not having been raised in the original hearing. [Exhibit E, copy of the order]

II.

*Greene is unsupported by authority and there is none to require contemporary competence at a retrospective hearing.*

The *Greene* court's requirement that a defendant be competent to assist counsel at the retrospective competency is unsupported by authority. The State has not found a case from this Court where a defendant's contemporary competency is listed as a factor to consider in determining whether a retrospective competency hearing is

---

contemporary competency, but focused on whether a retrospective hearing should have been ordered in the first place. The issues raised are attached as Exhibit B to this motion.

3

feasible. *See, e.g., Hawkins v. State*, 660 S.W.2d 65, 84-85 (Tex. Crim. App. 1983) (citng *Brandon v. State*, 599 S.W.2d 567, 573-74 (Tex. Crim. App. 1979), *vacated on other grounds* 453 U.S. 902 (1981) (considerations include the "passage of time, present recollection of expert witnesses who testified at the original hearing, and ability of the judge and jury to observe the subject of their inquiry," but finding that "[r]etrospective determinations are possible depending upon the facts of each case and the quality and quantity of evidence available"); *Cabellero v. State*, 587 S.W.2d 741, 743 (Tex. Crim. App. 1979) (retrospective competency determination is feasible three years later when defendant's relatives and expert witnesses and their records of psychological testing are available to again testify about the defendant's competency).

The State has not found a case from the high court of any other jurisdiction requiring a defendant to be presently competent to assist counsel at a retrospective or nunc competency hearing. *See e.g., Blakeney v. United States*, 77 A.3d 328, 349 (D.C. Cir. 2013) (relevant to determining the feasibility of a postjudgment hearing on a defendant's mental competence are: "(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial"); *People v. Ary*, 246 P.3d 322, 329 n.3

(Cal. 2011), *cert. denied* 132 S.Ct. 136 (2011) (same); *Edwards v. State*, 902 N.E.2d 821, 826 (Ind. 2009) (same); *Maynard v. Boone*, 468 F.3d 665, 674-75 (10th Cir. 2006), *cert. denied* 549 U.S. 1285 (2007) (same); *United States v. Collins*, 430 F.3d 1260, 1267 (10th Cir. 2005) (same); *Johnson v. Commonwealth*, 103 S.W.3d 687, 693 (Ky. 2003), *cert. denied* 540 U.S. 986 (2003) (same); *State v. Sanders,* 549 S.E.2d 40, 54 (W.Va. 2001) (same).

At least the Fourth and Ninth Circuit Courts of Appeals have found that the defendant has due process and fair trial constitutional rights to be present at a competency hearing. *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108-09 (9th Cir. 1986), *accord United State v. Barfield*, 969 F.2d 1554, 1556 (4th Cir. 1992). This finding is largely based on the Ninth Circuit's observation in *Sturgis* that in three of the five competency hearings held in the case, the defendant was present and was found incompetent. *Sturgis*, 796 F.2d at 1109. When the defendant was absent, he was found competent. *Id.* The Ninth Circuit held, that a defendant has a "constitutional right to be present at every stage of the trial where his absence might frustrate the fairness of the proceedings." *Sturgis*, 796 F.2d at 1109.

*Sturgis* and *Barfield*, show that contemporary competency is not required for a retrospective competency hearing.

While certain trial-type rights must be afforded at a competency hearing,

5

contemporary competency is not one of them. *See* Tex. Code Crim. Proc. art. 46B.006 ("defendant is entitled to representation by counsel at any court-ordered competency evaluation and during any proceeding on competency"); Tex. Code Crim. Proc. art. 46B.008 (Texas Rules of Evidence apply to a competency trial); *see also e.g.*, *United States v. Jent*, No. 6: 13–26–DCR–02, 2014 WL 320582, *2 (E.D.Ky. Jan 29, 2014) (18 U.S. C. § 4247(d) governs the competency hearing, and assures certain trial-type rights, including the right to counsel, the right to confront and cross-examine witnesses, and the right to participate in the hearing). Contemporary competency is not a pertinent factor to consider in determining whether a retrospective competency trial is feasible.

### III.

The State has found two cases directly addressing the defendant's right to be competent at a retrospective competency hearing, *Ryder v. State*, 83 P.3d 856, 870-71 (Okla. Crim. App.), *cert. denied* 543 U.S. 886 (2004) (death penalty case); and *State v. McRae*, 594 S.E.2d 71, 79 (N.C. Ct. App.), *pet. denied* 599 S.E.2d 911 (N.C. 2004).

In *Ryder*, the defendant was sentenced to life without parole for one murder and death for another. 83 P.3d at 860. On appeal after the case was remanded for retrospective competency determination, Ryder claimed that "the trial court erred in

6

failing to hold a hearing to determine his contemporary competency prior to proceeding with the retrospective competency determination." *Ryder*, 83 P.3d at 870. Ryder argued that the retrospective competency hearing was a "criminal proceeding," and as such, the hearing should have been "suspended pending his contemporary competency." *Id.*

The Oklahoma Court of Criminal Appeals noted that "[a] competency hearing is a special proceeding for the purpose of ensuring full compliance with due process requirements, but itself is not a criminal prosecution." *Ryder*, 83 P.3d at 870 (quoting *Rogers v. Lansdown*, 829 P.2d 687, 688 (Okla. Crim. App. 1992)). The court then summarily held, "As the retrospective competency hearing in this case occurred after judgment and sentencing, it is not a criminal proceeding that must be suspended pending determination of contemporary competency." *Ryder*, 83 P.3d at 871.

In *McRae*, on appeal from a retrospective competency determination, McRae asserted that "the trial court erred when it found that defendant was competent to proceed at the 7 June 2001 retrospective competency hearing," and in proceeding without the presence of the defendant in violation of his statutory and constitutional rights. *Id.*, 594 S.E.2d at 79. The court noted that the purpose of the competency statutes "is to determine whether defendant is or was capable to stand trial." *Id.* "Our Supreme Court has held that these hearings '[do] not implicate defendant's

7

confrontation rights and [do] not have a substantial relation to his opportunity to defend.'" *Id.* (quoting *State v. Davis*, 506 S.E.2d 455, 466 (N.C. 1998), *cert. denied* 526 U.S. 1161 (1999)). "Therefore, whether or not defendant was competent at the 7 June 2001 retrospective competency hearing does not implicate his constitutional or statutory rights." *McRae*, 594 S.E.2d at 79.

Turner's contemporary competency to stand a retrospective jury trial is irrelevant, and is not a pertinent consideration in determining whether retrospective competency trial is feasible.

IV.

*Contemporary competency is irrelevant to a retrospective competency hearing and outside the limited jurisdiction of the trial court on remand.*

This Court's opinion remanded this case for a determination of whether a retrospective competency trial is feasible. *Turner*, 422 S.W.3d at 696-97.

A defendant's contemporary competency is irrelevant to a retrospective competency hearing. If the competency hearing had been held just before or in the middle of trial, the defendant may or may not have been competent to stand trial. At a retrospective hearing, evidence of the defendant's competence at the time of trial is shown to enable the judge or jury to determine whether the defendant was competent then.

8

In this case, Turner's trial counsel asserted that Turner was incompetent. Though it did not believe Turner was incompetent, the trial court appointed Dr. Connie Almeida to evaluate Turner before his trial began "in an abundance of caution." Many of Turner's relatives were present during the trial and testified at the punishment stage. There are also recordings of Turner's jail phone calls and video recordings of jail visits with friends and family. A retrospective competency trial is easily feasible, unless as Turner's attorneys now propose, Turner must be competent for the retrospective competency trial and some expert finds he is not.

"After a trial court has lost plenary jurisdiction, it may nonetheless re-acquire 'limited' jurisdiction to perform specific functions as authorized by statute or as instructed on remand by a higher court." *State v. Holloway*, 360 S.W.3d 480 (Tex. Crim. App. 2012). "Trial court jurisdiction over a case is an absolute systemic requirement." *State v. Dunbar*, 297 S.W.3d 777, 780 (Tex. Crim. App. 2009). "If there is no jurisdiction, the court has no power to act." *Id.* (citing *Garcia v. Dial*, 596 S.W.2td 524, 528 (Tex. Crim. App. 1980)).

A determination of Turner's contemporary competency is not a pertinent factor to the determination of whether a retrospective competency trial, it is outside the scope of the limited jurisdiction of the trial court on remand, and the State asks this Court to clarify and enforce the limited jurisdiction conferred.

9

WHEREFORE PREMISES CONSIDERED, the State asks the Court to enforce the limited jurisdiction of the trial court on remand to determine whether a retrospective competency hearing is feasible, and if so, to hold a competency trial.

Respectfully submitted,

John F. Healey, Jr.
SBOT # 09328300
District Attorney, 268th Judicial District
Fort Bend County, Texas

/s/ Gail Kikawa McConnell
Gail Kikawa McConnell
SBOT # 11395400
Assistant District Attorney
301 Jackson Street, Room 101
Fort Bend County, Texas 77469
(281) 238-3205 / (281) 238-3340 (fax)
Gail.McConnell@fortbendcountytx.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing State's motion to enforce the trial court's limited jurisdiction on remand, was served on July 7, 2014, by first class mail, return receipt requested # 7013 0600 0002 2111 6334 on Mr. Robert Morrow, 24 Waterway Avenue, Suite 660, The Woodlands, Texas 77380; and on the State Prosecuting Attorney, return receipt requested # 7013 0600 0002 2111 6327 Ms. Lisa McMinn, P.O. Box 13046, Austin, Texas 78711-3046.

/s/ Mattie Sanford
Mattie Sanford

NO. AP-76,580

ALBERT JAMES TURNER,           §   IN THE
Appellant                      §
                               §   COURT OF CRIMINAL APPEALS
VS.                            §
                               §   STATE OF TEXAS
THE STATE OF TEXAS, Appellee   §

## LIST OF EXHIBITS

Exhibit A:   Copy of *Greene v. State*, 264 S.W.3d 271 (Tex. App.--San Antonio 2008, pet. ref'd).

Exhibit B:   Copy of issues raised in the *Greene* petition for discretionary review.

Exhibit C:   Copy of the trial court's appointment of Dr. Conroy

Exhibit D:   Copy of State's motion for reconsideration

Exhibit E:   Copy of the trial court's order, denying the State's motion

# Exhibit A

264 S.W.3d 271
(Cite as: 264 S.W.3d 271)

**H**

Court of Appeals of Texas,
San Antonio.
Shane S. GREENE, Appellant,
v.
The STATE of Texas, Appellee.

No. 04–05–00783–CR.
May 14, 2008.
Discretionary Review Refused Sept. 10, 2008.

**Background:** Defendant was convicted by jury in the 399th Judicial District Court, Bexar County, Juanita A. Vasquez-Gardner, J., of robbery, and punishment at 10 years confinement was assessed. Defendant appealed. Following rehearing, the Court of Appeals, 225 S.W.3d 324, determined that the trial court abused its discretion by not conducting an informal inquiry into defendant's competency during guilt/innocence phase of trial, abated appeal, and remanded.

**Holding:** On restatement and further rehearing, the Court of Appeals, Catherine Stone, J., held that retrospective determination of defendant's competency to stand trial was not feasible within confines of due process, and, thus, defendant was entitled to new trial in the interest of justice.

Reversed and remanded.

West Headnotes

**[1] Constitutional Law 92 ⚖➔4783(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)9 Disadvantaged Persons
            92k4781 Incompetency or Mental Illness
            92k4783 Determination of Competency or Sanity
               92k4783(1) k. In general. Most

Cited Cases

**Criminal Law 110 ⚖➔625.25**

110 Criminal Law
   110XX Trial
      110XX(A) Preliminary Proceedings
         110k623 Separate Trial or Hearing on Issue of Insanity, Incapacity, or Incompetency
            110k625.25 k. Retrospective or nunc pro tunc hearing. Most Cited Cases

Retrospective determination of defendant's competency to stand trial following his robbery conviction was not feasible within confines of due process, and, thus, defendant was entitled to new trial in the interest of justice; defendant's fluctuating mental condition made it impracticable for trial court to conduct a retrospective inquiry into defendant's competency to stand trial in a timely or judicially efficient manner, almost three years had passed since defendant's conviction, and he had yet to maintain a level of competence sufficient to proceed with any judicial proceedings, and, based on defendant's most recent psychiatric evaluation, he was expected to remain incompetent for the indefinite future. U.S.C.A. Const.Amend. 14; Rules App.Proc., Rules 43.3, 43.6.

**[2] Constitutional Law 92 ⚖➔4783(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)9 Disadvantaged Persons
            92k4781 Incompetency or Mental Illness
            92k4783 Determination of Competency or Sanity
               92k4783(1) k. In general. Most Cited Cases

Retrospective determination of competency to stand trial may be conducted consistent with the requirements of due process in most cases. U.S.C.A.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

264 S.W.3d 271
(Cite as: 264 S.W.3d 271)

Const.Amend. 14.

**[3] Criminal Law 110 ⬤⟿625.25**

110 Criminal Law
   110XX Trial
      110XX(A) Preliminary Proceedings
         110k623 Separate Trial or Hearing on Issue of Insanity, Incapacity, or Incompetency
            110k625.25 k. Retrospective or nunc pro tunc hearing. Most Cited Cases

Difficulties inherent in making a retrospective determination of defendant's competency to stand trial include: (1) the passage of time, (2) the present recollection of expert witnesses who testified at the original hearing, and (3) the ability of the judge and jury to observe the subject of their inquiry.

*271 Angela J. Moore, Chief Public Defender, San Antonio, TX, for Appellant.

Crystal D. Chandler, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice (not participating).

## OPINION ON REINSTATEMENT AND FURTHER REHEARING

CATHERINE STONE, Justice.

The facts of the underlying case are fully discussed in the previous opinion issued*272 by this court; therefore, we mention only those additional facts that are necessary to address the issue of whether a retrospective competency inquiry is proper under the circumstances presented. After further consideration, this court has determined that a retrospective competency inquiry would deny appellant Shane Greene due process under the facts of this case. We therefore hold that Greene is entitled to a new trial in the interest of justice. Accordingly, we reverse the trial court's judgment and remand the cause to the trial court for a new trial.

Following the issuance of our opinion on rehearing on February 7, 2007, [FN1] Greene was evaluated by medical personnel and declared incompetent on April 16, 2007. Greene's retrospective competency inquiry was thus postponed and Greene was referred to the Texas Department of State Health Services ("TDSHS") for psychiatric treatment. On September 20, 2007, TDSHS notified the trial court that Greene was deemed "mentally incompetent to stand trial with no possibility of regaining competence in the foreseeable future." The TDSHS, however, determined Greene did not require further inpatient psychiatric treatment for his condition and returned Greene to the custody of the Bexar County Adult Detention Center. On October 17, 2007, the trial court reported to this court that it would continue to monitor Greene's condition indefinitely.

FN1. *See Greene v. State*, 225 S.W.3d 324 (Tex.App.–San Antonio 2007, no pet.).

Greene was evaluated by a state psychiatrist on October 29, 2007, and was found to be competent following his evaluation. Greene's attorney nevertheless "expressed reservations regarding [Greene's] competency to stand trial." In an abundance of caution, the trial court ordered Greene to undergo an additional competency evaluation. This evaluation, like the earlier psychiatric evaluation, suggested Greene was competent to proceed on January 24, 2008.

On February 11, 2008, Greene asked this court to reconsider whether a retrospective competency inquiry was feasible under the circumstances of this case. This court denied Greene's request, and we ordered the trial court to conduct a retrospective inquiry into Greene's competency no later than March 24, 2008. Before the trial court proceeded with its retrospective competency inquiry, however, the court ordered Greene to undergo a psychiatric evaluation to determine whether he was competent to participate in his retrospective competency determination. A state psychiatrist evaluated Greene's condition on March 17, 2008, and the psychiatrist de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

termined that Greene was not competent to proceed. As a result of Greene's psychiatric evaluation, Greene was referred to the TDSHS for psychiatric treatment and his retrospective competency inquiry was again postponed indefinitely.

[1][2] Greene's fluctuating mental condition has made it impracticable for the trial court to conduct a retrospective inquiry into Greene's competency to stand trial in a timely or judicially efficient manner. It has been almost three years since Greene's conviction, and he has yet to maintain a level of competence sufficient to proceed with any judicial proceedings. A retrospective competency inquiry would be meaningless if Greene does not possess at least some level of competency at the time the inquiry is conducted. Based on Greene's most recent psychiatric evaluation, Greene is expected to remain incompetent for the indefinite future. Consequently, we are left to speculate as to when, if ever, the retrospective competency inquiry may occur in this case. While retrospective competency inquiries may be **273 conducted consistent with the requirements of due process in most cases, *see Barber v. State,* 737 S.W.2d 824, 828 (Tex.Crim.App.1987) (recognizing a retrospective determination of the competency of an accused "can be made within the limits of due process depending upon the quality and quantity of the evidence available"), we are of the opinion that the present case poses an exception.

[3] There are many difficulties inherent in making a retrospective determination of a defendant's competency to stand trial, including: (1) the passage of time; (2) the present recollection of expert witnesses who testified at the original hearing; and (3) the ability of the judge and jury to observe the subject of their inquiry. *Id.; Caballero v. State,* 587 S.W.2d 741, 743 (Tex.Crim.App.1979). The fact that Greene is presently unable to proceed with any judicial proceedings nearly three years after his conviction is problematic because his current mental condition is expected to continue indefinitely. Clearly, Greene's ability to assist his trial attorney will be critical to the outcome of issues to be addressed at the retrospective competency determination and he should not be deprived of his right to assist counsel. However, waiting for Greene to come to a point where he could actually assist his trial attorney could prove to be an exercise of futility since Greene has been unable to maintain a level of competency for any significant period of time since his conviction. Greene's fluctuating mental condition, combined with the mounting passage of time, suggests that a retrospective competency inquiry is simply not feasible in this case.

Given that Greene's present incompetency is expected to continue indefinitely, we conclude that a retrospective competency inquiry is not feasible and hold that Greene is entitled to a new trial in the interest of justice. *See* TEX.R.APP. P. 43.3; 43.6. Accordingly, the judgment of the trial court is reversed and the cause is remanded to the trial court for a new trial.

Tex.App.–San Antonio,2008.
Greene v. State
264 S.W.3d 271

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

**N0. PD-**

TO THE COURT OF CRIMINAL APPEALS
OF TEXAS AT AUSTIN, TEXAS

---

THE STATE OF TEXAS,
            Appellant - Respondent

v.

SHANE S. GREENE,
            Appellee - Petitioner

---

FROM THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS
CAUSE NUMBER 04-05-00783-CR

---

**STATE'S FIRST AMENDED PETITION FOR DISCRETIONARY REVIEW**

---

SUSAN D. REED
Criminal District Attorney
Bexar County, Texas

JAMES ISHIMOTO
TIM MOLINA
Assistant Criminal District Attorney
Bexar County, Texas

<u>ORAL ARGUMENT WAIVED</u>

CRYSTAL CHANDLER
Assistant Criminal District Attorney
Bexar County, Texas
Cadena-Reeves Justice Center
300 Dolorosa, Suite 4030
San Antonio, Texas 78205-3030
Telephone No. (210) 335-2418
State Bar No. 90001609
(On Appeal)

Attorneys for the State

i

## IDENTITY OF THE PARTIES AND COUNSEL

A complete list of all parties to the trial court's judgment or order appealed from, and the names and addresses of all trial and appellate counsel is provided here. See Tex. R. App. P. 38.1(a).

Counsel for the State:
>  **Crystal Chandler**- Counsel on appeal.
>  **James Ishimoto** – Counsel at trial.
>  **Tim Molina** – Counsel at trial.
>  Assistant Criminal District Attorneys
>  Bexar County, Texas
>  Cadena-Reeves Justice Center
>  300 Dolorosa, Suite 4030
>  San Antonio, Texas 78205

Appellee or Criminal Defendant:
>  **Shane Greene**

Counsel for Appellee:
>  **Bill Harris** – Counsel at trial
>  **Angela Moore** – Counsel on appeal
>  410 S. Main Ave., Suite 214
>  San Antonio, Texas 78204

Trial Judges:
>  Honorable Juanita Vasquez-Gardner – **Presiding Judge.**

# TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS .................................................................................................iii

TABLE OF AUTHORITIES ...........................................................................................iv

STATEMENT REGARDING ORAL ARGUMENT.......................................................vii

STATEMENT OF THE CASE.......................................................................................viii

STATEMENT OF PROCEDURAL HISTORY................................................................ x

GROUNDS FOR REVIEW ............................................................................................. 1

### Ground for Review 1:

Whether the Court of Appeals applied an incorrect standard of review to the appellant's complaint that the trial court failed to conduct an informal inquiry pursuant to Article 46B.004(c).......................................3

### Ground for Review 2:

Did the Court of Appeals err by failing to recognize the trial court conducted an "informal inquiry" pursuant to Texas Code of Criminal Procedure article 46B.004(c)?.......................................10

### Ground for Review 3:

Whether the Court of Appeal's finding that the trial court did not conduct an "informal inquiry" implicitly imports a high degree of formality not intended by the Legislature when it created the new "informal inquiry" component of Article 46B.004(c) in the Code of Criminal Procedure.......................12

ARGUMENT ................................................................................................................... 2

CERTIFICATE OF SERVICE ...................................................................................... 15

APPENDIX ..................................................................................................................... 16

# Exhibit C

10 – DCR – 054233
ORDER
Order
3081251



Cause No. 54,233

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 268TH DISTRICT |
| V. | § | COURT OF FORT BEND |
| ALBERT TURNER | § | COUNTY, TEXAS |

## ORDER AUTHORIZING FUNDING FOR A
## COMPETENCY EXPERT IN A DEATH PENALTY CASE

On this 9th day of June, 2014, came to be heard Defendant's Motion for Funding for a Competency Expert in a Death Penalty Case, and the Court is of the opinion and it is hereby ORDERED, that said request is:

_____✓_____ GRANTED in the amount of 2500.00.

_____ ~~DENIED, to which ruling Defendant timely excepts.~~

Additionally, it is ORDERED that the Defendant's expert, Dr. Mary Alice Conroy, along with any designated assistant. shall have access to Mr. Turner in an interview room in the Fort Bend County Jail, during which Mr. Turner, DOB 01/11/1965, will be free from restraints and able to write.

The Defendant's expert, Dr. Conroy, along with any designated assistant, shall also have access to Mr. Turner, TDCJ# 999565, while he is housed in the Texas Department of Criminal Justice. The expert shall have access to an interview room and Mr. Turner shall be free from restraints and able to write.

SIGNED this 9th day of June , 2014.

FILED

JUN 09 2014

AT_____ 9:14 A.M.

Clerk District Court, Fort Bend Co., TX

_____
JUDGE PRESIDING

# Exhibit D

10 – DCR – 054233
MOTI
Motion (No Fee)
3109397

CAUSE NO. <u>10-DCR-054233</u>

EX PARTE

ALBERT JAMES TURNER

§ IN THE 268TH JUDICIAL

§ DISTRICT COURT OF

§ FORT BEND COUNTY, TEXAS

## <u>STATE'S MOTION FOR RECONSIDERATION OF THE ORDER TO EVALUATE TURNER FOR CONTEMPORARY COMPETENCY</u>

TO THE HONORABLE JUDGE OF THE 268TH DISTRICT COURT:

The State of Texas, by and through its District Attorney, 268th Judicial District, hereby requests the Court to reconsider its order to have the convicted person, Albert James Turner, evaluated for his contemporary competency to stand trial, specifically to be able to assist his counsel at a retrospective competency jury trial.

I.

Turner was duly convicted by a jury of capital murder, killing his wife and mother-in-law in the same criminal transaction. In accordance with the jury's answers to the special issues, this Court sentenced Turner to death in accordance with law. The Court of Criminal Appeals abated Turner's appeal and remanded this case to this Court to "first determine whether it is presently feasible to conduct a retrospective competency trial, given the passage of time, availability of evidence,

1

FILED

2014 JUL -1 PM 4: 28

Annie Rebecca Elliott
CLERK DISTRICT COURT
FORT BEND CO., TX

and any other pertinent considerations." *Turner v. State*, 422 S.W.3d 676, 696 (Tex. Crim. App. 2013). If a retrospective competency trial is feasible, this Court "shall proceed to conduct such a trial in accordance with Chapter 46B, Subchapter C, of the Code of Criminal Procedure." *Id.* at 697. The Court of Criminal Appeals did not require this Court to first determine whether Turner is presently competent to stand trial.

## II.

At a hearing on May 30, 2014, Turner's attorney, Robert Morrow, urged the Court to have Turner examined for his contemporary competency to stand trial. Mr. Morrow argued that under *Greene v. State*, 264 S.W.3d 271 (Tex. App.--San Antonio, 2008, pet. ref'd), Turner's contemporary competency was relevant to the determination of whether a retrospective competency hearing is feasible.

In *Greene*, the San Antonio Court of Appeals "ordered the trial court to conduct a retrospective competency inquiry into Greene's competency." 264 S.W.3d at 272. The trial court "ordered Greene to undergo a psychiatric evaluation to determine whether he was competent to participate in his retrospective competency determination." *Id.* A state psychiatrist determined that Green was not competent to proceed and the "retrospective competency inquiry was again postponed indefinitely." *Id.* The court of appeals remarked that Greene was "expected to

2

remain incompetent for the indefinite future." *Id.*

> The fact that Greene is presently unable to proceed with any judicial proceedings nearly three years after his conviction is problematic because his current mental condition is expected to continue indefinitely. Clearly, Greene's ability to assist his trial attorney will be critical to the outcome of issues to be addressed at the retrospective competency determination and he should not be deprived of his right to assist counsel. However, waiting for Greene to come to a point where he could actually assist his trial attorney could prove to be an exercise of futility since Greene has been unable to maintain a level of competency for any significant period of time since his conviction. Greene's fluctuating mental condition, combined with the mounting passage of time, suggests that a retrospective competency inquiry is simply not feasible in this case.

> Given that Greene's present incompetency is expected to continue indefinitely, we conclude that a retrospective competency inquiry is not feasible and hold that Greene is entitled to a new trial in the interest of justice. *See* Tex. R. App. P. 43.3, 43.6. Accordingly, the judgment of the trial court is reversed and the cause is remanded to the trial court for a new trial.

*Green*, 264 S.W.3d at 273.

The State filed a petition for discretionary review; however, the issues raised did not ask whether the court of appeals erred in holding that Greene has a right to assist his trial attorney at a retrospective competency hearing, but focused on whether the trial court had failed to conduct an informal inquiry in the first place.[1]

---

[1] The State obtained a copy of the petition filed on June 13, 2008, by the Bexar County District Attorney's Office. Three grounds were raised:

1. Whether the Court of Appeals applied an incorrect standard of review to the

3

III.

The *Greene* court's requirement that a defendant be competent to assist counsel at the retrospective competency is unsupported by authority. The Court of Criminal Appeals, as in this case, has never included a defendant's contemporary competency as a factor to consider in determining whether a retrospective competency hearing is feasible. *See, e.g., Hawkins v. State*, 660 S.W.2d 65, 84-85 (Tex. Crim. App. 1983); *Brandon v. State*, 599 S.W.2d 567, 573-74 (Tex. Crim. App. 1979), *vacated on other grounds* 453 U.S. 902 (1981) (noting some of the difficulties in holding a retroactive determination of competency, including "passage of time, present recollection of expert witnesses who testified at the original hearing, and ability of the judge and jury to observe the subject of their inquiry," but finding that "[r]etrospective determinations are possible depending upon the facts of each case and the quality and quantity of evidence available").

---

appellant's complaint that the trial court failed to conduct an informal inquiry pursuant to Article 46B.004(c).

2.  Did the Court of Appeals err by failing to recognize the trial court conducted an "informal Inquiry" pursuant to Texas Code of Criminal Procedure article 46 B.004(c)?

3.  Whether the Court of Appeals's finding that the trial court did not conduct an "informal inquiry" implicitly imports a high degree of formality not intended by the Legislature when it created the new "informal inquiry" component of Article 46B.004(c) in the Code of Criminal Procedure.

4

The State has not found a case from the high court of any other jurisdiction requiring a defendant to be presently competent to assist counsel at a retrospective or nunc competency hearing. *See e.g.*, *Blakeney v. United States*, 77 A.3d 328, 349 (D.C. Cir. 2013) (relevant to determining the feasibility of a postjudgment hearing on a defendant's mental competence are: "(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial"); *People v. Ary*, 246 P.3d 322, 329 n.3 (Cal. 2011), *cert. denied* 132 S.Ct. 136 (2011) (same); *Edwards v. State*, 902 N.E.2d 821, 826 (Ind. 2009) (same); *Maynard v. Boone*, 468 F.3d 665, 674-75 (10th Cir. 2006), *cert. denied* 549 U.S. 1285 (2007) (same); *United States v. Collins*, 430 F.3d 1260, 1267 (10th Cir. 2005) (same); *Johnson v. Commonwealth*, 103 S.W.3d 687, 693 (Ky. 2003), *cert. denied* 540 U.S. 986 (2003) (same); *State v. Sanders*, 549 S.E.2d 40, 54 (W.Va. 2001) (same).

At least the Fourth and Ninth Circuit Courts of Appeals have found that the defendant has due process and fair trial constitutional rights to be present at a competency hearing. *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108-09 (9th Cir. 1986), *accord United State v. Barfield*, 969 F.2d 1554, 1556 (4th Cir. 1992). This finding

5

is largely based on the Ninth Circuit's observation in *Sturgis* that in three of the five competency hearings held in the case, the defendant was present and was found incompetent. *Sturgis*, 796 F.2d at 1109. When the defendant was absent, he was found competent. *Id.* The Ninth Circuit held, that a defendant has a "constitutional right to be present at every stage of the trial where his absence might frustrate the fairness of the proceedings." *Sturgis*, 796 F.2d at 1108, 1109. The recognition of the constitutional right to be present at a competency hearing was not based on the defendant's contemporary competency.

"[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Pate v. Robinson*, 383 U.S. 375, 384 (1966). Likewise, since Turner's trial counsel argue that Turner was not competent during the trial, it is contradictory to argue that Turner must be contemporaneously competent to assist them at a retrospective hearing. A defendant's competency can be variable. If this Court follows *Greene*, Turner may have been competent at trial, but if one of the experts finds Turner incompetent now, a new trial will be ordered.

While certain trial-type rights must be afforded at a competency hearing, contemporary competency is not one of them. *See* Tex. Code Crim. Proc. art. 46B.006 ("defendant is entitled to representation by counsel at any court-ordered

competency evaluation and during any proceeding on competency"); Tex. Code Crim. Proc. art. 46B.008 (Texas Rules of Evidence apply to a competency trial); *see also e.g., United States v. Jent*, No. No. 6: 13–26–DCR–02, 2014 WL 320582, *2 (E.D.Ky. Jan 29, 2014) (18 U.S. C. § 4247(d) governs the competency hearing, and assures certain trial-type rights, including the right to counsel, the right to confront and cross-examine witnesses, and the right to participate in the hearing).

### III.

The State has found two cases directly addressing the defendant's right to be competent at a retrospective competency hearing, *Ryder v. State*, 83 P.3d 856, 870-71 (Okla. Crim. App.), *cert. denied* 543 U.S. 886 (2004) (death penalty case); and *State v. McRae*, 594 S.E.2d 71, 79 (N.C. Ct. App.), *pet. denied* 599 S.E.2d 911 (N.C. 2004).

In *Ryder*, the defendant was sentenced to life for one murder and death for another. 83 P.3d at 860. After hearing oral argument on direct appeal, the Oklahoma Court of Criminal Appeals remanded the case to the district court to determine whether a retrospective hearing on the defendadnt's competency at the time of the trial. *Id.* On appeal after the retrospective competency determination, Ryder claimed "the trial court erred in failing to hold a hearing to determine his contemporary competency prior to proceeding with the retrospective competency determination."

7

*Ryder*, 83 P.3d at 870. Ryder argued that under a state statute that defined "criminal proceeding" as "every stage of a criminal prosecution after arrest and before judgment, including, but not limited to, interrogation, lineup, preliminary hearing, motion dockets, discovery, pretrial hearings and trial," the retrospective competency hearing should have been "suspended pending his contemporary competency." *Id.*

The Oklahoma Court of Criminal Appeals noted its prior holding that "[a] competency hearing is a special proceeding for the purpose of ensuring full compliance with due process requirements, but itself is not a criminal prosecution." *Ryder*, 83 P.3d at 870 (quoting *Rogers v. Lansdown*, 829 P.2d 687, 688 (Okla. Crim. App. 1992). The court then summarily held, "As the retrospective competency hearing in this case occurred after judgment and sentencing, it is not a criminal proceeding that must be suspended pending determination of contemporary competency." *Ryder*, 83 P.3d at 871.

In *McRae*, on appeal from a retrospective competency determination, McRae asserted that "the trial court erred when it found that defendant was competent to proceed at the 7 June 2001 retrospective competency hearing," and in proceeding without the presence of the defendant in violation of his statutory and constitutional rights. *Id.*, 594 S.E.2d at 79. The court noted that the purpose of the competency statutes "is to determine whether defendant is or was capable to stand trial." *Id.* "Our

8

Supreme Court has held that these hearings "[do] not implicate defendant's confrontation rights and [do] not have a substantial relation to his opportunity to defendant." *Id.* (quoting *State v. Davis*, 506 S.E.2d 455, 466 (N.C. 1998), *cert. denied* 526 U.S. 1161 (1999)). "Therefore, whether or not defendant was competent at the 7 June 2011 retrospective competency hearing does not implicate his constitutional or statutory rights." *McRae*, 594 S.E.2d at 79.

## IV.

The State has not found a case where the Texas Court of Criminal Appeals has addressed a defendant's contemporary competency to assist counsel at a retrospective hearing or the implication of Fifth or Sixth Amendment trial rights.

In this case, Turner's contemporary competency has little value as the evidence of his alleged incompetency during his jury trial is based largely on the opinions of his trial counsel--Pat McCann, Tyrone Moncriffe, mitigation specialist and counsel Amy Martin, and appellate attorney Robert Morrow. As amply spread in the record, Turner believed he was competent. His recollection of his competency to stand trial will not be of assistance to his attorneys, who believed he was incompetent.

9

WHEREFORE, PREMISES CONSIDERED, the State requests that the Court reconsider its order for each party to propose an expert to determine Turner's present competency to stand a jury trial to determine his competency at the time of his trial, and to find that more than ample evidence by which a retroactive competency trial is feasible.

Respectfully submitted,

John F. Healey, Jr.
SBOT # 09328300
District Attorney, 268th Judicial District

Fred Felcman
SBOT # 06881500
First Assistant District Attorney

Gail Kikawa McConnell
SBOT 11395400
Assistant District Attorney
301 Jackson Street, Room 101
Richmond, Texas 77469
(281) 238-3205 / (281) 238-3340 (fax)
Gail.McConnell@fortbendcountytx.gov

10

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the State's motion for reconsideration has be served on Mr. Robert Morrow, attorney for Albert Turner, by facsimile transmission to 832-813-0321, and via email on July 1, 2014.

_____
Gail Kikawa McConnell

11

# Exhibit E

10-DCR-054233
ORDER
Order
3111371

CAUSE NO. <u>10-DCR-054233 HC1</u>

EX PARTE

ALBERT JAMES TURNER

§      IN THE 268TH JUDICIAL

§      DISTRICT COURT OF

§      FORT BEND COUNTY, TEXAS

<u>ORDER</u>

On this day, the Court considered the State's motion for reconsideration of its order to appoint experts to evaluate Turner's contemporary competency.

The Court hereby sets the State's motion for a hearing on July ~~2~~, 2014, at ~~2:00~~ a.m. ~~p.m. to hear the arguments of counsel.~~ with presence of attorneys ~~for the State of Winter~~ Citizen parties,

~~The Court further stays the~~ evaluations of Turner pending the ~~decision of the Court on the State's motion for reconsideration.~~ Copies this writ motion denied.

~~The Court ORDERS the District Clerk to send a copy of this order Turner's~~ assist in progress hearing. ~~attorney, Robert Morrow, and to the State (attention Assistant District Attorney Gail McConnell).~~

Signed on July ~~2~~, 2014.

_____
Presiding Judge
268th District Court

FILED

2014 JUL -1 PM 4:28

_____
CLERK DISTRICT COURT
FORT BEND CO., TX

ROUTED TO COURT 7-2-14 U
RT'D TO D. CLERK 7-2-14 U

# Exhibit

# H

422 S.W.3d 701
Court of Criminal Appeals of Texas.

In re Patrick McCANN et al.

Nos. AP–76998, AP–76999. | Nov. 20, 2013.

**Synopsis**
**Background:** Death-sentenced client's defense attorney filed petition for writ of mandamus seeking to compel 268th District Court, Fort Bend County, Brady Elliot, J., to overturn order holding attorney in contempt for refusing to turnover client's file to court appointed postconviction counsel.

**[Holding:]** The Court of Criminal Appeals, Hervey, J., held that client, not his trial attorney, owned client's file, and thus, attorney could not be compelled to turn over client's file to appointed postconviction counsel without client's consent.

Writ of mandamus conditionally granted.

Price, J., filed dissenting opinion.

Womack, J., dissented.

West Headnotes (8)

**[1]** **Mandamus**
&#9758; Remedy at Law
**Mandamus**
&#9758; Nature of acts to be commanded

Mandamus relief may be granted if a relator shows that: (1) the act sought to be compelled is purely ministerial, and (2) there is no adequate remedy at law.

1 Cases that cite this headnote

**[2]** **Mandamus**
&#9758; Nature and existence of rights to be protected or enforced
**Mandamus**
&#9758; Nature of acts to be commanded

With respect to the requirement for mandamus that the act sought is purely ministerial, the relator must have a "clear right to the relief sought," meaning that the merits of the relief sought are beyond dispute.

2 Cases that cite this headnote

**[3]** **Mandamus**
&#9758; Nature and existence of rights to be protected or enforced

To show a clear right to the relief sought, as required to obtain mandamus relief, a relator must show that the facts and circumstances of the case dictate but one rational decision under unequivocal, well-settled and clearly controlling legal principles.

1 Cases that cite this headnote

**[4]** **Mandamus**
&#9758; Nature of questions involved

The court may grant relief in a mandamus case based on a well-settled, but rarely litigated point of law.

Cases that cite this headnote

**[5]** **Prohibition**
&#9758; Nature and scope of remedy
**Prohibition**
&#9758; Existence and Adequacy of Other Remedies

Prohibition relief is available only if the relator shows that he has a clear right to the relief sought and no other adequate legal remedy is available.

1 Cases that cite this headnote

**[6]** **Mandamus**
&#9758; Jurisdiction and authority

In an ordinary case, a petition for writ of mandamus should first be presented to a court of appeals unless there is a compelling reason not to do so.

Cases that cite this headnote

**[7]** **Attorney and Client**
&#128273; Files of attorney or client

Death-sentenced client, not his trial attorney, owned client's file, and thus, attorney could not be compelled to turn over client's file to appointed postconviction counsel without client's consent and would have been violating his fiduciary duty to client if he had done so.

1 Cases that cite this headnote

**[8]** **Attorney and Client**
&#128273; Files of attorney or client

The client's file belongs to the client.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*702** Casie Gotro, Houston, TX, Lisa C. McMinn, State's Attorney, Austin, for Relator.

## *OPINION*

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined.

Relator, Patrick McCann, seeks writs of mandamus to overturn orders of the trial court directing him to relinquish his former client's trial file to successor counsel and holding him in contempt for his failure to do so. He also seeks a writ of prohibition to disallow the trial court from enforcing its order compelling him to turn the file over. We will conditionally grant Relator relief on his petition for writs of mandamus and dismiss his petition for a writ of prohibition.

## I. BACKGROUND

Albert James Turner was charged with capital murder. At trial, he was represented by Patrick McCann and Tyrone Moncriffe. In June 2011, Turner was found guilty and sentenced to death. The trial court appointed counsel for Turner's direct appeal and the Office of Capital Writs

("OCW") to handle Turner's postconviction writ. As part of its investigation, OCW asked Turner to authorize the release of his trial file from McCann. Turner refused to sign the release because OCW is a "state agency," [1] and he wanted to speak with his sister before moving forward. Lacking Turner's authorization, McCann refused to release the file believing that his client was invoking his right to keep his privileged information confidential.

In response, OCW filed a motion asking the trial court to order McCann to turn the **\*703** file over. After a hearing, [2] the trial court ordered trial counsel to relinquish Turner's trial file, and McCann refused. He then filed a motion in this Court for leave to file petitions for writs of mandamus and prohibition. While McCann's motion was pending, OCW successfully withdrew as Turner's habeas counsel. Subsequently, we dismissed McCann's motion as moot because OCW, a "state agency," no longer represented Turner. *McCann v. Elliot,* Nos. WR–76,984–01, WR–76,984–02, 2012 WL 752612 (Tex.Crim.App. Mar. 7, 2012) (per curiam) (not designated for publication).

The trial court then appointed new habeas counsel, James Rytting, to represent Turner in his postconviction application, [3] and Rytting, like OCW, sought Turner's trial file for investigatory purposes. Rytting stated that he visited Turner twice in person after his appointment, and he agreed that McCann's characterization of Turner was correct in that Turner did not want the file turned over. [4] Rytting also explained that, based on his visits with Turner, if McCann gave the file to Turner, Rytting would never see it. For his part, McCann continued to refuse to relinquish the trial file based on his understanding of his client's wishes. [5] In a second hearing, the trial court ordered McCann to turn over his file again. After failing to comply with the trial court's second order, the court found McCann in contempt.

On January 7, 2013, this Court granted a Motion for Emergency Relief staying enforcement of the trial court's orders to turn over the file and finding McCann in contempt. *In re McCann,* No. WR–76,984–01 (Tex.Crim.App. Jan. 7, 2013) (per curiam) (not designated for publication). We then filed and set the petitions and ordered the parties to brief the following three issues:

1. To whom does a client's physical file belong?

2. If the file belongs to the client (the defendant in the underlying case here), what are the possible consequences

**\*704** should the client refuse to turn over the file to subsequent counsel?

3. If the file belongs to the client and the client is unable or unwilling to decide whether to turn over the file, to whom does that decision fall (*e.g.* former counsel, subsequent counsel, trial judge, or guardian appointed for that issue)?

*In re McCann,* Nos. AP–76,998 & AP–76,999, 2013 WL 1149840, at \*1 (Tex.Crim.App. Mar. 20, 2013) (per curiam) (not designated for publication). The Court received Rytting's court-ordered brief on April 19, 2013. McCann never submitted a brief on the merits, and the State Bar of Texas filed an amicus brief.

## II. WRITS OF MANDAMUS AND PROHIBITION

**[1]** **[2]** **[3]** **[4]** Mandamus relief may be granted if a relator shows that: (1) the act sought to be compelled is purely ministerial, and (2) there is no adequate remedy at law. *In re State ex rel. Weeks,* 391 S.W.3d 117, 121–22 (Tex.Crim.App.2013). With respect to the requirement that the act sought is purely ministerial, the relator must have a "clear right to the relief sought," meaning that the merits of the relief sought are "beyond dispute." *See Winters v. Presiding Judge of Criminal Dist. Court No. Three of Tarrant Cnty.,* 118 S.W.3d 773, 775–76 (Tex.Crim.App.2003). To show "a clear right to the relief sought," a relator must show that the facts and circumstances of the case "dictate but one rational decision 'under unequivocal, well-settled ... and clearly controlling legal principles.' " *Weeks,* 391 S.W.3d at 122. However, we have also noted that, although an issue may be one of first impression, it does not necessarily follow that the law is not well-settled. *Id.* It is a small step then to hold that, this Court may grant relief in a mandamus case based on a well-settled, but rarely litigated point of law. *See id.* Regarding the requirement of an adequate remedy at law, we have held that even if a relator has a remedy at law, that relator can show that no *adequate* legal remedy exists at law if the remedy is "so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate" *Id.* (quoting *Greenwell v. Court of Appeals for the Thirteenth Judicial Dist.,* 159 S.W.3d 645, 648–49 (Tex.Crim.App.2005)).

**[5]** **[6]** Similarly, prohibition relief is available only if the relator shows that he has a clear right to the relief sought and no other adequate legal remedy is available. *See State ex rel. Lykos v. Fine,* 330 S.W.3d 904, 907 (Tex.Crim.App.2011).

In an ordinary case, a petition for writ of mandamus "should first be presented to a court of appeals unless there is a compelling reason not to do so." *Padilla v. McDaniel,* 122 S.W.3d 805, 807–08 (Tex.Crim.App.2003) (per curiam) (citing TEX.R.APP. P. 52.3(e)). However, the mandamus action was properly filed directly in this Court because this is a capital-murder case in which the death penalty was assessed. *See Padilla,* 122 S.W.3d at 806–07.

## III. DISCUSSION

**[7]** **[8]** To whom does a client's file belong? The client's file belongs to the client. [6] In 1918, the Texas Supreme Court recognized explicitly that an attorney is an **\*705** agent of his client and implicitly that a client owns the contents of his or her file. *See Thomson v. Findlater Hardware Co.,* 109 Tex. 235, 237, 205 S.W. 831, 832 (Tex.1918). Later, we expressly reaffirmed that a client owns the contents of his or her file. [7] *See Burnett v. State,* 642 S.W.2d 765, 769, n. 10 (Tex.Crim.App.1983) (citing *Thomson,* 205 S.W. at 832) ("[W]hen all is said and done, the tape recording, as with deeds, notes, vouchers, documents and papers of a client, is the property of [the client]"). Neither McCann nor the State has referred to our holding in *Burnett,* but the amicus curiae brief filed by the State Bar of Texas cites *Burnett* for the true, but inapplicable, proposition that the right to claim or waive the attorney-client privilege belongs to the client, his guardian, or his conservator. Amended Brief of Amicus Curiae State Bar of Texas, Nos. AP–76,998 & AP–76,999, at 6–7; *see Burnett,* 642 S.W.2d at 770. Today we reaffirm that a client owns the contents of his or her file. Rytting advances a bevy of arguments as to why a client's file, or part of a client's file, does not belong to the client, and to support his arguments, he cites a number of sources. However, as we explain, each of Rytting's arguments is unpersuasive. [8]

First, Rytting argues that **\*706** Texas Disciplinary Rule of Professional Conduct 1.15(d) [9] limits a client's interest in his or her own file to a possessory right to demand a copy of the file, and even that right is qualified, he asserts, because an attorney is allowed to withhold a client's papers to enforce payment of fees in the form of an attorney lien. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). These arguments —that the client has a limited possessory interest in his or her own file and that the attorney-lien language of the

Disciplinary Rules creates a property right in favor of the attorney—are not persuasive. First, Rule 1.15(d) of the Texas Disciplinary Rules of Professional Conduct speaks to only "papers and property to which the client is entitled ... [,]" and it contemplates the retention of client papers only in the case of a valid attorney lien, which has not been asserted here. Second, Rytting's attorney-lien argument is a red herring and actually supports Relator's position. The language of Rule 1.15(d) allows an attorney to retain papers "relating to the client" as allowed by law, if such retention does not prejudice the client in the subject matter of the representation. *Id.* The language of the rule does not designate the owner of the "papers relating to the client"; rather it allows an attorney to assert an attorney lien on those papers. A lien is a "legal right or interest that a creditor has *in another's property*" that usually lasts "until a debt or duty that it secures is satisfied." BLACK'S LAW DICTIONARY 933 (7th ed.1999) (emphasis added). Thus, a lien, by its definition, is a transitory interest in someone else's property and, therefore, the attorney asserting such a lien never owns the property at issue, the client owns the file by implication (if the attorney does not), and Rytting's arguments must fail. [10] Next, Rytting eschews property-right arguments in favor of asserting that ethical and professional duties require a trial attorney to retain *a copy* of the trial file for the benefit of subsequent counsel in a death-penalty case. [11] Specifically, Rytting cites Guideline 11.8 of the State Bar of Texas's Guidelines and Standards for Texas Capital Counsel and Guideline 10.13 of the American Bar Association's Guide for the Appointment and Performance of Defense Counsel in Death Penalty Cases. The two guidelines are substantially similar. **\*707** [12] *Compare* GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 11.8 (State Bar of Tex.2006), *with* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES 10.13 (2003). Rytting, however, neglects to cite Guideline 12.1(F) of the Texas guidelines expressly limiting the ability of trial counsel to turn over a client's file to successor counsel without the consent of the client. [13] Nonetheless, both guidelines are only persuasive authority, and they are designed to safeguard a criminal-defendant's interests, not a successor counsel's "right" to force trial counsel to retain, and turn over, a client's file (or a copy) against the client's wishes. Thus, if the client makes a voluntary decision not to turn over his or her file, a client's former counsel is obligated to refuse to provide a copy of the client's file to facilitate the work of successor counsel. This is because the agent (the client's former attorney) may not relinquish dominion and control of the principal's property without the principal's permission absent circumstances inapplicable in this case (e.g., an attorney lien, incompetency). [14] This is true even if the client **\*708** decides, against his or her best interests, not to relinquish the trial file to subsequent counsel because a legally competent client can define his or her own best interests, and that decision will control. [15] Finally, Rytting argues that if a client is unable or unwilling to decide if it is in his or her best interest to release the trial file to successor counsel, then that decision lies with successor counsel as the "current attorney" for the client and not former counsel or a guardian. However, the authorities cited by Rytting regarding attorney-client privilege are inapposite because, as we have explained, property rights control the outcome of this question, not privilege law or the Texas Disciplinary Rules of Professional Conduct. [16]

If an attorney has no reason to believe that his or her client is legally incompetent, the client's decision not to release his or her trial file is unassailable. However, if the attorney "reasonably believes that the client lacks legal competence[,]" then the attorney "shall take reasonable action to secure the appointment of a guardian or other legal representative...." [17] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.02(g). **\*709** If a guardian or other legal representative has already been appointed, the client's attorney "should ordinarily look to that representative for decisions on behalf of the client." *Id.* at 1.02(g) cmts. 12 & 13. Nevertheless, an attorney can seek to have an appointed guardian replaced if he or she is not acting in the best interest of the client. *See Urbish v. 127th Judicial Dist. Ct.,* 708 S.W.2d 429, 431–32 (Tex.1986) (orig.proceeding) (holding that, when considering only the ward's best interests, a trial court can replace a guardian if it determines that the guardian has an adverse interest to the ward; the decision of the trial court is reviewed for an abuse of discretion). Thus, Rytting's argument that successor counsel's decision regarding his or her client's file prevails over all other claims, including those of his competent client or the client's guardian (if applicable) is unsupportable and an incorrect statement of the law.

In this case, the conflict is between Turner's trial and postconviction attorneys. McCann, Turner's trial attorney, has declined to turn over the file based on his understanding that his former client wants him to hold the file until otherwise directed. Rytting, Turner's postconviction attorney, seeks to force McCann to turn over the file because he believes that it is in his client's best interests. Both attorneys have obligations

under the Texas Disciplinary Rules of Professional Conduct: McCann is obliged to honor his former client's wishes not to reveal privileged information, and Rytting seeks to overturn his appointed client's sentence of death in postconviction proceedings but is being prevented by his own client from effectively doing so. [18] McCann, however, has an additional burden based on the binding precedent of this Court under *Burnett,* and as the agent and holder of his principal's trial file, to follow the wishes of his principal in disposing or retaining the property as the principal directs. [19] Assuming Turner is legally competent (as the trial court found in this case), he is entitled to choose not to turn over his trial file; and McCann, as Turner's former counsel and agent, must honor that decision for the reasons that we have explained. If, however, McCann, Rytting, or another interested party with standing believes that Turner is legally incompetent, that person can seek to have a guardian appointed.

Although the trial judge rejected repeated motions by McCann to have Turner declared incompetent pretrial and at trial, it may be in the client's best interests for Rytting to also attempt to have a guardian appointed. But we acknowledge that, before the appointment of a guardian is warranted, a defendant must do more than simply misbehave; he or she must be proven legally incompetent by a preponderance of the evidence. [20] *See* TEX.CODE CRIM. PROC. art. 46B.003(b). Moreover, the trial judge is correct that certain deadlines have been triggered in this death-penalty **\*710** case that cause Turner's decision to severely damage his chances of success in postconviction proceedings, [21] but if Turner is competent to stand trial, then his choice to undermine the ability of his postconviction attorney to represent him effectively may be a poor one, but it is one the law allows him to make.

### IV. RELATOR IS ENTITLED TO RELIEF

Here, Turner is statutorily presumed competent, and he has expressly been found competent by the trial court. Moreover, his last instructions to McCann were not to release his trial file unless directed to do so. After Turner told McCann to not release his trial file, he declined repeatedly to sign a release authorizing his trial file to be turned over to his appointed postconviction counsel despite his knowledge of the consequences of such an action.

Therefore, in light of this opinion—a client owns his or her trial file and a former attorney is obligated to follow

his or her former client's last known wishes under these circumstances—McCann should not turn over his former client's file, Judge Elliott did not have the authority (inherent or otherwise) to order McCann to violate his fiduciary duty to Turner, [22] and Judge Elliott did not have the authority to enforce that order by holding McCann in contempt for failing to relinquish the file. Moreover, McCann has no adequate remedy at law because, although McCann could seek relief from the order of contempt through an application for writ of habeas corpus, [23] that relief would not resolve the underlying issue of **\*711** the trial judge's order compelling McCann to relinquish Turner's trial file. In addition, Rytting points to no constitutional provision, statute, or caselaw, nor are we aware of any, that allows McCann to appeal the order of the trial judge compelling him to turn over the trial file. *See Johnson v. Tenth Judicial Dist. Ct. of Appeals at Waco,* 280 S.W.3d 866, 873 (Tex.Crim.App.2008). Thus, even if McCann has a remedy at law, it is not adequate under these circumstances.

In addition, because McCann has a clear right to relief, vacating the order of contempt and the order to relinquish Turner's trial file is a purely ministerial act. Therefore, we conditionally grant Relator relief on his petition for writs of mandamus. We assume that the trial court will immediately comply with our order, and the writs of mandamus will issue only in the event that the judge should refuse to do so. [24]

PRICE, J., filed a dissenting opinion.

WOMACK, J., dissented.

PRICE, J., filed a dissenting opinion.
Today the Court holds that, as between a lawyer and his client, the client owns the legal file that is in his lawyer's possession; that the client may dictate the disposition of that file; and that the client's dictates override the express order of a sitting judge. I wholly agree with the Court that "[t]he client's file belongs to the client." [1] But I disagree that this holding suffices to dispose of the mandamus proceeding before us. In my view, the Court asks the wrong question. The right question—the answer to which will properly dispose of the case before us—is whether, *given that* the file "belongs to the client," the convicting court presiding over this capital habeas corpus proceeding lacks all authority to order a disposition of that client's file that is at odds with the client's wishes. In my view, there is no clear answer to that question to be derived from any state precedent.

The Court effectively disposes of the question of the convicting court's authority by summarily declaring that Judge Elliott "did not have the authority (inherent or otherwise) to order McCann to violate his fiduciary duty to Turner[.]" [2] The only precedent the Court is able to muster in support of this declaration, however, simply establishes that a trial court's authority extends only to the issuance of "lawful" orders. [3] But, of course, the very question that the Court effectively begs is whether the convicting court's order compelling McCann to turn over his client's file against his client's wishes was, indeed, "lawful." If the Court must take this occasion to say what the law is for the first time, I fail to understand how it can be said that the law up until now was so "clear" that McCann is entitled to mandamus relief from the convicting court's contempt order. For that reason, I believe that mandamus relief should not lie.

### McCann's Dilemma: "A Lawyer Shall Not ... Reveal Confidential Information" [4]

An attorney's duty to maintain his client's confidences arises from his ethical **\*712** obligations as a practitioner of the profession of lawyering. [5] Both McCann and Rytting are attempting to satisfy what they perceive to be their respective ethical duties, but face the vexing dilemma that those duties cannot simultaneously be satisfied. McCann, for his part, feels that he is bound by his ethical duty to maintain client confidences not to divulge confidential information over the wishes of his client. Rytting feels that he is bound by his ethical duty of effective representation to seek trial counsel's files—whether they contain confidential information or not—and examine them for purposes of preparing an application for writ of habeas corpus. Both lawyers, realizing the ethical quandary they are in, have laid their concerns at the feet of the convicting court and asked for a ruling so that one or the other of them may be absolved of any ethical wrongdoing. What the Court essentially declares today is that the law unequivocally binds Judge Elliott to resolve this ethical quandary in McCann's favor. I disagree.

The bulk of the Court's analysis is devoted to answering the following question: "To whom does a client's file belong?" The Court relies, *inter alia,* on the Texas Supreme Court's opinion in *In re George* to conclude that a client "owns the contents of his or her file." [6] I do not disagree with this conclusion. But *George* itself recognizes that, a client's

ownership of his file notwithstanding, a "compelling reason" may justify "depriv[ing] a client of his or her property." [7] Indeed, in *George,* the Texas Supreme Court did not question the trial court's ultimate authority to order disclosure, but rather sought to describe the circumstances when, and the extent to which, it would be appropriate to *exercise* that authority. [8] Thus, simply to say that the file belongs to Turner, and that Turner, if he is competent, [9] may do what he wishes with the file, does not answer the *determinative* question in this case, which is: *Given that* the client owns the contents of his case file, does a convicting court lack all authority to issue an order disposing of the file in a way that conflicts with the client's expressed wishes? This question is anything but well-settled.

To the extent that the Court relies on ethical considerations to reach its ultimate conclusion, there is good reason to think that the answer to this question is: No, the authority of trial judges is *not* limited in this way. Professors Goode, Wellborn, **\*713** and Sharlot have concluded that "[t]he rules of professional conduct do not ... provide an independent basis for refusing to answer questions during the course of a ... criminal proceeding." [10] That treatise also notes that "the attorney-client privilege empowers a client to block the *compelled* disclosure of confidential attorney-client communications ... [while] the ethical obligation enjoins the lawyer from *voluntarily* revealing confidential information obtained while representing the client." [11] The distinction, in that discussion, between "compelled" and "voluntary" disclosures serves to highlight an important aspect of this case: McCann is not citing the Rules of Professional Conduct for the proposition that he is ethically prohibited from *voluntarily* turning over Turner's files. Were he to make such an argument, I would be inclined to agree with him. Rather, McCann is citing to the Rules of Professional Conduct for the proposition that the trial judge *has no authority to compel* McCann to turn the files over to Rytting, nor even to order him to make a copy and turn that over. And this is where I think McCann's (and, by extension, the Court's) argument ultimately falters.

The Texas Disciplinary Rules of Professional Conduct *explicitly* envision that there will be occasions when a lawyer will face conflicting obligations from, on the one hand, a court order, and, on the other, the Rules themselves. Rule 1.05(c)(4), for instance, states that "[a] lawyer may reveal confidential information ... [w]hen the lawyer has reason to believe it is necessary to do so in order to comply with a *court*

*order* [.]" [12] We have not, either today or at any other time that I am aware of, explained what effect, if any, this provision has on the authority of a trial judge to resolve an ethical Catch–22 such as the one presented in this case. [13] True enough, the Rule states that a lawyer "may reveal," not that he "must reveal." But this simply means that one who voluntarily disobeys a court order to turn over confidential material does not violate *the Disciplinary Rules of Professional Conduct*— it does not mean that he does not violate the court order, that the order is of no effect, or that the Rules altogether strip the court of the authority to issue that order. This conclusion **\*714** is especially apparent when Rule 1.05 is considered in light of other provisions of the Texas Disciplinary Rules of Professional Conduct that make clear that the Rules govern *the profession of lawyering*—not the authority of trial judges —and *by their terms* purport to extend no further. [14]

Moreover, to the extent that the Court relies on property-law considerations in reaching its ultimate conclusion, again there is reason to think that the answer to (what I have called) the determinative question in this case would also cut against a grant of mandamus relief to McCann—that is, that property law *by itself* does not limit the authority of trial judges in the way envisaged by the Court. In coming to the conclusion that McCann's "burden based on the binding precedent ... under *Burnett* " is sufficiently weighty to render Judge Elliott's order unenforceable, the Court purports only to reaffirm our holding in Burnett that "a client owns the contents of his or her file." [15] From there, the Court (correctly) recognizes that the assertion of the attorney-client privilege is not implicated in this case and then (incorrectly) surmises that the second holding of *Burnett* can be disregarded.

To the contrary, I find it significant that *Burnett* 's first holding —according to the Court, that the client owns the contents of his or her file—did not dispose of the relevant issue in that case. Indeed, the fact that the *Burnett* Court saw the need to discuss the law of privilege *after* determining ownership of the file indicates to me that property-rights considerations were, to say the least, insufficient by themselves to illuminate the proper disposition of that case. After all, if the proposition that a competent client can exercise "unassailable" ownership of his or her file were as true in *Burnett* as it seemingly is today, [16] why bother, in that case, to discuss the attorney-client privilege *at all?*

The reason, of course, is that a party's assertion of a property right, without more, does not—and *should not*—

solely determine the extent of a trial judge's authority in these circumstances. In both *Burnett* and *George,* the litigants seeking to avoid respective court orders commanding them to dispose of their "property" in a certain fashion were expected to assert, in addition to their property interests, *something else*—some other definite legal protection or right that actually limited the authority of the trial judge. In *Burnett* this "something else" was the attorney-client privilege. [17] In *George* the "something else" was the threat of an actual conflict of interest. [18] In this case I see no **\*715** "something else"—I see only a bare assertion of a property right, and absolutely *no* argument as to how this property right is so inviolable as to be totally impervious to court order. [19]

Even if I have misread *Burnett* and *George,* I would remain of the opinion that property law alone gives no "clear" or "settled" resolution to the case before us. There are still, in my mind, too many unanswered questions to admit of a such a clear resolution. For instance: The Court addresses at length the wrongfulness of Judge Elliott's order to McCann to turn over his client's *physical* file, but curiously glosses over whether it would have been wrong, *per* Rytting's explicit request, to simply order McCann to relinquish a *copy* of the file. How do we know whether such an order would *also* violate Turner's property rights (that is, which authorities provide a "clear" answer to *this* question)? Is it because the file is just a physical embodiment of what is, in effect, Turner's *intellectual* property? How do we know? If Turner has an intellectual property interest in the contents of the file, how far does that interest extend? All the way? Less than all the way? How do we know? Does making a copy of the file and handing the copy to the client's current attorney violate that interest, whatever its extent? How do we know?

Again, I do not claim to have answers to these questions. I am simply pointing out that the Court's disposition *depends upon,* or at the very least suggests, the pre-existence of clear and definitive answers. Today the Court says for the first time what the law *is* in this area, but then treats its pronouncement as time-honored and long-established. Trial judges who find themselves the subject of our mandamus authority can only scratch their heads.

### Rytting's Dilemma: "A Lawyer Zealously Asserts the Client's Position" [20]

There was a time in our jurisprudence when this Court—and others—recognized the "discretionary" nature of mandamus relief. [21] This discretion, it was thought, existed even when the long-settled prerequisites for mandamus—a clear claim to relief and the absence of an adequate remedy at law—had been met. [22] Perhaps it was in view of this discretion that the Court ordered the parties in this case to brief a question that, on its face, appears not to be grounded in the law as much as **\*716** the potential ramifications of Turner's own self-defeating decision: "If the file belongs to the client (the defendant in the underlying case here), what are the possible consequences should the client refuse to turn over the file to subsequent counsel?" [23]

In its haste to find error in Judge Elliott's decision to override McCann's refusal to turn over Turner's file to Rytting, the Court fixates on the duties and dilemmas facing *McCann* in his own decision whether to turn over Turner's files, but wastes no ink to consider the dilemma faced by Rytting. The Court today does not even mention the "possible consequences" to Turner, notwithstanding the interest it evinced in its earlier briefing order. Again, given the "discretionary" nature of mandamus relief and the fact that mandamus is available only in "extraordinary situations," [24] I am puzzled by the Court's reticence in this regard. Whatever the reason, since the Court has not undertaken to describe the consequences to Rytting and Turner should Judge Elliott's order be overturned, I will.

Rytting has an obligation—an ethical imperative—to review McCann's files on Turner for any signs of ineffective representation at the trial level. This obligation is apparent from a perusal through the admittedly nebulous and lofty expectations of the Disciplinary Rules of Professional Conduct:

> Lawyers, as guardians of the law, play a vital role in the preservation of society. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. *As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.* A lawyer acts as evaluator by examining a client's affairs and reporting about them to the client or to others. In all professional

functions, a lawyer should zealously pursue clients' interests within the bounds of the law. In doing so, a lawyer should be competent, prompt, and diligent. [P]ersonal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer. In representing a client, a lawyer shall not ... neglect a matter entrusted to the lawyer[.] *Competent representation contemplates ... reasonable thoroughness in the study and analysis of the law and facts,* and reasonable attentiveness to the responsibilities owed to the client. A lawyer should feel a moral or professional obligation to pursue a matter on behalf of a client with reasonable diligence and promptness despite opposition, obstruction or personal inconvenience to the lawyer. [A] lawyer shall abide by a client's decisions ... concerning the objectives and general methods of representation, [but] [*t* ] *he lawyer should assume responsibility for the means by which the client's objectives are best achieved. Thus, a lawyer has very broad discretion to determine technical and legal tactics* [.] The advocate has a duty to use legal procedure for the fullest benefit of the client's cause [.] The advocate's task is to present the client's case with persuasive force. [25]

**\*717** It is also apparent from a close study of the more concrete expectations of the Guidelines and Standards for Texas Capital Counsel:

> The objective of these Guidelines is to set forth a state-wide standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any State of Texas jurisdiction. *Counsel at every stage*

*have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case.* This obligation includes at a minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel. Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should [c]onsider all legal claims potentially available; and [*t*]*horoughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted;* and [e]valuate each potential claim in light of ... [t]he importance of protecting the client's right against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited. Counsel who decide to assert a particular legal claim should [p]resent the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law. Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus requires. [H]abeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. [*C* ]*ounsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including ... ineffective assistance of trial ... counsel.* State habeas corpus counsel's lack of diligence, mistakes, missteps,

and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court. It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she ... wants to challenge only the conviction but not the sentence. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. *Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation,* to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim[.] [26]

These are the expectations—the *obligations*—confronting Rytting as he seeks access to McCann's files on Turner.

And this is the reality he faces: Investigating a client's case beyond merely reading the direct appellate record—and reviewing trial counsel's case files *in particular*—is an indispensable first step in **\*718** proving ineffective assistance of counsel at the trial level. This is because "[a] substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on [a] direct appe[llate] ... record." [27] On an appellate record, this Court will presume that "[trial] counsel's conduct fell within the wide range of reasonable professional assistance"—and in order to overcome this "strong presumption," a claimant must "affirmatively demonstrate the alleged ineffectiveness" *in the appellate record.* [28] But "[t]he record in a direct appeal may well contain a less than adequate inquiry into possible tactical reasons for various actions or omissions by counsel and may lack completely trial counsel's own explanations for his actions or inactions." [29] Indeed, one of the crucial purposes of habeas corpus proceedings is to *supplement* the appellate record so as to *demonstrate* trial counsel's ineffectiveness—in a way that the appellate record standing by itself typically

will not. And while it might be said that Rytting could simply depose, seek affidavits from, or otherwise interview McCann to get the information he needs to prove ineffectiveness outside the direct appellate record, the Guidelines specifically state that "habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation." [30] To do so, in other words, would be to compromise an ethical duty. [31]

Even beyond filling in the important details of ineffectiveness claims that are hinted at within—but not apparent from—the record, [32] habeas counsel's review of **\*719** trial counsel's files serves other important purposes in the preparation of an initial application for state habeas corpus relief. It can reveal whole swaths of a client's circumstances that, were they simply not presented at trial, this Court might presume were left out for strategic purposes, but upon review of the file in its *entirety* would be more properly characterized as instances of trial counsel's neglect or poor judgment—and potentially his ineffectiveness. [33] Habeas counsel's review of trial counsel's files can, in addition, serve to aid the investigation of claims *unrelated* to trial counsel's ineffectiveness. It can serve, for example, as a starting point for looking into whether the State possesses undisclosed exculpatory evidence, [34] or whether evidence exists that might establish the client's actual innocence. [35] Moreover, such a review can assist counsel to separate specious claims of all kinds from those with potential merit. In short, reviewing trial counsel's files provides an array of advantages to initial state habeas corpus counsel by aiding him in his considerable investigatory task *in addition to* providing substance and depth to claims that might not otherwise stand a chance at succeeding.

So should the Court overturn Judge Elliott's order today, Turner may have to submit his initial state habeas application —which will set the tone of his entire post-conviction pursuit of relief—with claims of the ineffectiveness of trial counsel that lack meaningful substantiation. Being purely record-based, these claims would probably fail to "allege[ ]facts that, if true, might entitle him to relief." [36] If this is the case, he will most likely be denied an evidentiary hearing to develop the facts—since he has been unable to *allege* concrete facts. [37] Instead, he will limp into federal court with what little fact-development he could muster from his investigation *sans* trial counsel's files, and this meager federal review will avail him little, if anything. And at the end of it all, Turner may very well be executed without ever having a genuine shot at proving that his trial counsel's assistance was deficient.

Judge Elliott believed it possible to resolve McCann and Rytting's ethical dilemma, and at the same time assure Turner the "competent counsel" that Article 11.071 envisions, [38] by granting Rytting access to Turner's files. Perhaps his decision was overly paternalistic. Perhaps it was ill-advised. Perhaps it was even arguably incorrect as a matter of law (although I doubt it). Nevertheless, I am unwilling to subject a trial judge to the stigma of mandamus for a decision that was merely *arguably* incorrect. Mandamus is only appropriate when a relator's claim for relief is "clear"—not arguable—and a claim for relief can only be "clear" when the law undergirding the claim is "well-settled." [39] I think that the law in this area is demonstrably unsettled; at the very least it is *insufficiently* well settled to justify the extraordinary measure of mandamus. And even if I were wrong in this regard, I would think it inappropriate to exercise **\*720** our discretion so as to prevent a trial judge from saving a capital habeas applicant—even one who has not been declared incompetent —from his own manifest paranoias. I respectfully dissent.

Footnotes

1    Based on the record, Turner's concern about OCW was that its employees are not paid by a political subdivision (usually counties), as are indigent-defense attorneys. He was skeptical of lawyers from OCW representing him because they are employed and paid by the State of Texas.

2    At the hearing on whether Turner would sign the release, OCW asked Turner if it would make a difference if he were represented by someone unaffiliated with the State, and Turner responded that "[i]t just depends on, you know, the relationship. That would make a difference, yes, but that still wouldn't make my decision up for me." He also emphasized his need to speak with his sister, who he believed was looking for an attorney to handle Turner's postconviction writ application.

3    Initially, the trial court appointed John E. Wright, but he declined the appointment due to his employment at the Regional Public Defenders for Capital Cases in Lubbock.

According to an affidavit signed by Rytting on February 6, 2013, Rytting had visited Turner in person at the Polunsky Unit twice and had attempted to meet him on other occasions. He also stated that Turner accepted file-release forms from him, and Turner told Rytting that he would think about executing them.

McCann's understanding of Turner's wishes stem from three separate incidents. The first incident was sometime before the hearing with OCW and McCann. At that time, McCann was discussing appellate counsel with his client when, according to McCann, Turner allegedly said, "I don't trust any of y'all. I don't want you to give them anything unless I approve it. My sister's going to hire me a lawyer. You keep the file until I tell you otherwise."

Later, Turner testified at the OCW–McCann hearing, and he stated that he would not sign the release, but he also indicated that he might be willing to sign it in the future. McCann took this as a continued refusal to turn the file over, while the trial judge was of the opinion that Turner was not refusing or agreeing to turn the file over.

Finally, according to McCann, OCW asked him to write a letter to Turner about turning the file over, but whether this was before or after the hearing in which Turner testified is unclear. Nonetheless, McCann wrote the letter, but he stated that he never received a reply.

There is a split among courts that have considered this question. *See generally* Brian J. Slovut, Note, *Eliminating Conflict at the Termination of the Attorney–Client Relationship: A Proposed Standard Governing Property Rights in the Client's File,* 76 MINN. L.REV. 1483 (1992). Many jurisdictions follow the entire-file standard. That is, the client owns all of the documents within the client's file. Thus, a lawyer must relinquish the entire contents of the client's file upon request (assuming that there is no valid attorney lien). On the other hand, other jurisdictions follow the end-product standard that divides ownership between the client and the attorney. *Id.* at 1485.

In *Burnett,* the appellant, on direct appeal from her death sentence, argued that the trial court erred when it admitted into evidence a recorded pre-hypnotic interview between the appellant and a hypnotist hired by her attorneys. *Burnett,* 642 S.W.2d at 766–67. Before resolving the second question presented for our review—whether the attorney-client privilege prevented the admission of the tape into evidence—we first resolved the question of who owned the physical tape. In our analysis, we noted that the parties made "various characterizations" of the recording, including that the admission of the tape violated the appellant's attorney-client privilege, the work product of counsel, or the property rights of the hypnotist. However, we held that the recording, "as with deeds, notes, vouchers, documents and papers of a client," belong to the client. We reached this holding due to the hypnotist's agency relationship with the appellant's attorneys who were in turn the appellant's agents. We also held that admission of the tape was error because the attorney-client privilege applied to exclude the tape from evidence. *Id.* at 769–70. However, because Turner's file has not been offered into evidence in this case, as the pre-hypnotic tape was in *Burnett,* today we need not address the privilege issue because it is not ripe for our review.

*See, e.g., In re George,* 28 S.W.3d 511, 516 (Tex.2000) (citing TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15) (noting that "[t]he attorney is the agent of the client, and the work product generated by the attorney in representing the client belongs to the client"); *Resolution Trust Corp. v. H——, P.C.,* 128 F.R.D. 647, 648 (N.D.Tex.1989) (mem.op.) (holding that, under Texas law, the entire contents of a client's file belong to the client and the argument that "only another lawyer can be trusted with the file.... cannot be taken seriously...." because that practice "is contrary to the fiduciary and agency nature of the relationship between a client and an attorney."); TEX. DISCIPLINARY RULES PROF'L CONDUCT; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (2000); GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL (State Bar of Tex.2006); GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003); TEX. COMM. ON PROF'L ETHICS, Ops. 395 (1979) (noting that an attorney who refuses to turn over a client's file is at risk of liability, even if asserting an attorney lien, because that attorney's actions may subsequently be deemed unethical and sanctionable), 411 (1984) (same), 570 (2006) ("A lawyer must, upon request, provide to a former client the notes of the lawyer from the lawyer's file for that former client except when the lawyer has the right to withhold the notes pursuant to a legal right such as a lawyer's lien, when the lawyer is required to withhold the lawyer's notes (or portions thereof) by court order, or when not withholding the notes (or portions thereof) would violate a duty owed to a third person or risk causing serious harm to the client."); *see also Smith v. State,* 523 S.W.2d 1, 6 (Tex.Civ.App.–Corpus Christi 1975, writ ref'd n.r.e.) (sustaining disciplinary sanctions when an attorney claimed to assert an attorney lien in good faith on certain client files but was subsequently found by a unanimous jury to have withheld the file in bad faith).

Section (d) of Rule 1.15 states,

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law if such retention will not prejudice the client in the subject matter of the representation.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.15(d).

10     We also note that, to perfect an attorney lien, the attorney must possess the papers he or she purports to have a lien on to receive payment for services rendered. *See Thomson,* 205 S.W. at 832 (holding that, to perfect an attorney lien, there are two requirements: (1) the property must actually be in the possession of the attorney, and (2) the property must have come into the possession of the attorney in his or her character as an attorney at law). However, this case has been brought specifically to prevent Rytting from obtaining Turner's trial file; thus, it is impossible for Rytting to perfect an attorney lien under these facts.

11     We address Rytting's argument only to the extent that it would require trial counsel to keep a copy of a client's file for the future use of successor counsel despite the client's wishes to the contrary.

12     According to these guidelines, the duty to facilitate the work of successor counsel includes (1) maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation, (2) providing the client's file, as well as information regarding all aspects of the representation, to successor counsel, (3) sharing potential further areas of legal and factual research with successor counsel, and (4) cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

13     Section F of Guideline 12.1, "Duties of Trial Counsel After Conviction[,]" states the following:

> Trial counsel should cooperate with successor direct appeal, habeas and clemency counsel in providing relevant information to successor counsel, including trial counsel's prior representation files *upon the client's consent,* in order to maintain continuity of representation, and to assist future counsel in presentation of issues relevant to subsequent litigation efforts.

> GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 12.1(F) (State Bar of Tex.2006) (emphasis added).

14     RESTATEMENT (THIRD) OF AGENCY § 8.09 ("An agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal."); *see Gen. Motors Acceptance Corp./Crenshaw, Dupree & Milam, L.L.P. v. Crenshaw, Dupree & Milam, L.L.P./General Motors Acceptance Corp.,* 986 S.W.2d 632, 636 (Tex.App.–El Paso 1998, pet ref'd) (citing *Cooper v. Lee,* 75 Tex. 114, 12 S.W. 483, 486 (1889)) (holding that a "fiduciary relationship exists between attorneys and clients as a matter of law" and that "an agent must obey the lawful directions of its principal").

> While McCann's obligation not to relinquish Turner's trial file may have also stemmed from his duty of confidentiality under the disciplinary rules, there is a more fundamental reason why McCann was obligated not to release Turner's trial file: because Turner owns the contents of his file, and the trial court attempted to require McCann to violate the instructions of his client and principal to whom he has a fiduciary duty. *See In re George,* 28 S.W.3d at 516 (characterizing the attorney-client relationship as one of principal and agent); *Resolution Trust Corp.,* 128 F.R.D. at 648 (stating that the argument that "only another lawyer can be trusted with the file.... cannot be taken seriously...." because that practice "is contrary to the fiduciary and agency nature of the relationship between a client and an attorney"); *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199–200 (Tex.2002) ("Our courts have long recognized that certain fiduciary duties are owed by ... an attorney to a client.") (footnotes omitted); *see also* RESTATEMENT (THIRD) OF AGENCY §§ 8.01, 8.05 (characterizing the principal-agent relationship as a fiduciary one, and stating that an agent specifically "has a duty (1) not to use property of the principal for the agent's own purposes or those of a third party; and (2) not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party"); TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.5 & cmt. (the comment states, in part, that "[b]oth the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidential information of one who has employed ... the lawyer"). The outcome in this case may have been different if Turner had been found incompetent (a question we do not answer today) and if, during the period of his incompetency, a guardian was appointed to make decisions in Turner's best interest, including turning over his trial file to successor counsel despite Turner's protestations to the contrary.

15     This comports with the agency entire-file approach followed in Texas (i.e., all of the contents of a client's file belong to the client). *See supra* note 6. Also, an attorney is required to vigorously advocate for his or her client's best interests, which can be defined by the client, although that attorney may believe that his or her strategy will result in a better outcome for the client. However, a client's ability to define his or her own best interests may end when an attorney's duty under Rule 1.02(g) of the Texas Disciplinary Rules of Professional Conduct begins—when an attorney reasonably believes that the client's ability to make decisions in his or her best interest is compromised, the appointment of a guardian should be sought.

16     For example, the relevant passage from the Restatement (Third) on the Law Governing Lawyers states, "If a former lawyer with whom the client made a privileged exchange and a lawyer now representing the client disagree on whether to assert the privilege, as between them the current lawyer-agent determines whether to assert or waive the privilege." RESTATEMENT (THIRD) ON THE LAW GOVERNING LAWYERS § 86, rpt. cmt. c (2003). The quoted passage merely contemplates who should prevail in a disagreement between a client's former and current attorney. It does not state that a client's current attorney can assert the privilege against the

client's objections. Rytting also cites Weinstein's Federal Evidence and Federal Practice and Procedure for the same proposition, but as we have explained, that proposition is not persuasive under these circumstances.

Although competency has not been directly raised in this proceeding, the competency of Turner was raised numerous times by McCann at trial. At the January 4, hearing regarding turning over of the file, the following exchange took place:

> [RYTTING]: So you don't believe Mr. Turner has made an intelligent decision about turning over the files, therefore authorizing me to get your files?

> [McCANN]: I'm not a psychologist. I did my best to sit there and bring forth the fact that I believe that he suffers from something that prevents him from making capable decisions, but that was not the decision of the Court, and in fairness to the Court, during the hearings we had, the psychological testimony, although voluminous, was fairly gray on several topics because [Turner] refused to talk to the psychologist that we sent to him, including Dr. Almeida.

Later in the same hearing, McCann testified that "I'm placed in a catch–22. I have a client who's invoking the privilege, who is still legally competent, and I can't turn that over, even in the face of a court order...." Rytting asked McCann what his basis was for concluding that Turner is currently legally competent, and McCann responded that "the Court has found him competent. Given that, his invocation of privilege is proper." We agree that McCann is in a precarious position given that Turner, thus far, has been ruled competent and refuses to release his trial file.

In an affidavit authored by Rytting, he agreed that Turner would not relinquish his trial file, and the record shows that Turner refused to sign the release (i.e., the functional equivalent of refusing to turn over the file). Unless Turner signs the release or a guardian is appointed, Rytting is bound by Turner's decision, or indecision, as the case may be.

*See supra* note 14.

While we are sympathetic to the plight of Rytting as the postconviction attorney for a client who refuses to assist his own attorney, we decline to abdicate our duty under our mandamus jurisprudence by allowing a trial court to "save" a capital defendant from his "own manifest paranoias" when a trial court has found the defendant competent, and the defendant chooses not to release his trial file. *See* Dissenting Op. at 720. Moreover, it is entirely unclear how this Court could justify creating, or applying, an unheard of and totally unsupported exception to our mandamus jurisprudence allowing a trial court in a capital case to "save" a defendant who suffers from "his own manifest paranoias." Furthermore, there is no clear limiting principle for such an exception. For example, would this exception properly apply to only mandamus proceedings, only cases in which the death penalty was assessed, or all cases in which a defendant suffers from his or her own manifest paranoias but is not incompetent? Also, it is not clear who would determine whether a defendant suffers from "manifest paranoias" or what the standard of review for such a conclusion would be.

In a death-penalty case, appellate timelines are of the utmost importance for at least two reasons. First, when the death penalty is assessed, a criminal defendant's interest in zealous representation is at its peak. Second, filing deadlines in capital felony cases are different than in other cases. The Texas Constitution and the Texas Code of Criminal Procedure state that capital cases in which the death penalty is assessed are appealed directly to the Court of Criminal Appeals. TEX. CONST. art. V, § 5(b); TEX.CODE CRIM. PROC. art. 37.071(h). In addition, Section 4(a) of Article 11.071 of the Texas Code of Criminal Procedure states that an application for a writ of habeas corpus must be filed "not later than the 180th day after the date the convicting court appoints counsel ... or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later." TEX.CODE CRIM. PROC. art. 11.071, § 4(a) (dealing with applications for writs of habeas corpus in capital cases in which the death penalty was assessed).

*See Stearnes v. Clinton,* 780 S.W.2d 216, 223 (Tex.Crim.App.1989) (orig.proceeding) (granting conditional mandamus relief). In *Stearnes,* we held that a trial court that acts without inherent power acts without authority, and that a relator satisfies "the first prerequisite for mandamus relief" when he or she shows that a trial court acted without authority. *Id.* Furthermore, under Section 21.001 of the Texas Government Code, "[a] court has all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue the ... orders necessary or proper in aid of its jurisdiction." TEX. GOV'T CODE § 21.001(a). Neither order issued by the trial judge in this case was issued to enforce its jurisdiction, and we have not been directed to, nor are we aware of, any inherent or explicit authority authorizing the trial court to enter such orders.

*Ex parte Thompson,* 273 S.W.3d 177, 181 (Tex.Crim.App.2008) (holding that the Court of Criminal Appeal's original jurisdiction for writs of habeas corpus under the Texas Constitution allows it to review orders of contempt entered by district courts); *see* TEX. CONST. art. V, § 5(c); 13 TEX. JUR.3D *Contempt* § 69 (2011).

We dismiss McCann's petition for writ of prohibition. *See Weeks,* 391 S.W.3d at 126 n. 43.

Majority Opinion at 704–05.

*Id.* at 710–11.

*Id.* at 710 n. 22.

*See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(b)(1) ("[A] lawyer shall not knowingly ... [r]eveal confidential information of a client or former client to ... a person that the client has instructed is not to receive the information[.]").

5 *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 1 ("A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.... A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.").

6 *Id.* at 704–05 & n. 8 (citing *In re George,* 28 S.W.3d 511, 516 (Tex.2000)).

7 *George,* 28 S.W.3d at 516.

8 *Id.* at 515–16 ("Once they determine that a restriction [on disclosure] is necessary because an attorney has been disqualified for a prior, substantially related representation, some courts do not inquire into the work product itself. They automatically forbid any work product from being transferred [over the client's wishes] to the successor attorney ... This approach may be appropriate for cases in which the entire suit is based on improperly revealed confidential information ... But we believe that it is inappropriate for a general rule.").

9 My concerns about the Court's conclusion are not dependent upon, nor do they stem from, any issues relating to Turner's present competency. To the contrary, *irrespective of* Turner's mental capacity to make decisions affecting his post-conviction pursuit of relief, my concerns relate only to what I perceive to be the unsettled state of the law.

10 Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 503.3, at 411 (3d ed.2002).

11 *Id.* (emphasis added). The explanation in a previous edition was even more to-the-point: "Protection against *non-compelled* disclosure of a client's confidential communications to his attorney comes from the Texas Disciplinary Rules of Professional Conduct." Steven Goode, Olin Guy Wellborn III, & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 503.2, at 327 (2d ed.1993) (emphasis added). *See also* Robert A. Pikowsky, *Privilege and Confidentiality of Attorney–Client Communication Via E-mail,* 51 BAYLOR L.REV. 483, 490–91 (1999) ("Of course, a professional who is called to testify in judicial proceedings cannot lawfully refuse to do so based exclusively on a duty of confidentiality in the absence of any recognized privilege. Unless a privilege exists as well, the court can properly require the professional's testimony."); Mitchell M. Simon, *Discreet Disclosures: Should Lawyers Who Disclose Confidential Information to Protect Third Parties Be Compelled to Testify Against Their Clients?,* 49 S. TEX. L.REV. 307, 315 (2007) ("The key difference between confidentiality, which governs a lawyer's *voluntary* actions, and privilege is that *privilege* trumps a court's authority to compel testimony.") (emphasis added).

12 TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(c)(4) (emphasis added).

13 *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05 cmt. 22 ("[A] lawyer may be obligated by other provisions of statutes or other law to give information about a client. *Whether another provision of law supersedes Rule 1.05 is a matter of interpretation beyond the scope of these Rules.*") (emphasis added).

14 *See, e.g.,* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶¶ 11–16 ("The[se] rules presuppose a larger legal context ... [which] includes court rules and statutes relating to matters of ... laws defining specific obligations of lawyers and substantive and procedural law in general. [* * *] These rules make no attempt to prescribe either disciplinary procedures or penalties for violation of a rule. [* * *] Violation of a rule ... does [not] create any presumption that a legal duty to a client has been breached ... The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of disciplinary authority, *does not imply that an antagonist in a collateral proceeding ... has standing to seek enforcement of the rule.* Accordingly, *nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.* [* * *] Moreover, these rules are not intended to govern or affect judicial application of either the attorney-client or work product privilege.") (emphasis added).

15 Majority Opinion at 704–05 & n. 7, 709–10 & n. 19.

16 *See id.* at 709.

17 642 S.W.2d at 769.

18 28 S.W.3d at 512 (citing TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09(a)).

19 It could be argued, I suppose, that Turner's property interest works in tandem with McCann's "fiduciary duty," Majority Opinion at 707–08 & n. 14, to place limits on the trial court's authority to order a relinquishment of Turner's property. But again, the fact that McCann has an ethical duty to his client does not necessarily imply that Judge Elliott has a clear legal duty to rule in favor of McCann. And I do not understand how the aggregation of one arguably authority-limiting consideration (property rights) with one arguably *non*-authority-limiting consideration (fiduciary duty) results in a *decidedly* authority-limiting consideration that is somehow greater than the sum of its parts.

20 *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 2 ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.").

21 *See* George E. Dix and John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3d ed.2011) (citing *Dickens v. Court of Appeals for Second Supreme Judicial District of Texas,* 727 S.W.2d 542, 549 (Tex.Crim.App.1987) ("Mandamus is an extraordinary writ, and is not issued as a matter of right, but rests largely in the sound

discretion of the Court.") (citation omitted); *Lanford v. Fourteenth Court of Appeals,* 847 S.W.2d 581, 585 (Tex.Crim.App.1993) ("[M]andamus is a drastic remedy, to be invoked only in extraordinary situations.") (alteration in original) (citation omitted)).

*Id.*

*In re McCann,* Nos. AP–76,998 & AP–76,999, 2013 WL 1149840, at *1 (Tex.Crim.App. Mar. 20, 2013) (per curiam) (not designated for publication).

George E. Dix and John M. Schmolesky, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 61:3, at 930 (3d ed.2011).

TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶¶ 1–3, 6, R. 1.01(b)(1) & cmt. 1, 6, R. 1.02(a)(1) & cmt. 1, R. 3.01 cmt. 1, R. 3.03 cmt. 1 (emphases added and some ellipses omitted throughout).

GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 1.1(A), 11.1(B), 11.2(A), 11.2(B)(1), 12.2(B)(1)(b), 12.2(B)(2)(c), 12.2(B)(3)(b), 12.2(B)(6)(a), 12.2(B)(7)(b) (State Bar of Tex.2006) (emphases added and some ellipses omitted throughout).

*See Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App.1999).

*Id.* at 813–14.

*Id.* at 814 n. 5 (citing George E. Dix and Robert O. Dawson, 41 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 24.94 (2d ed.1995)).

GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL 12.2(B)(1)(b) (State Bar of Tex.2006).

Indeed, it is arguable that Rytting is ethically bound to at least investigate a claim of ineffective assistance *even against his client's expressed wishes. Cf. Summerlin v. Schriro,* 427 F.3d 623, 638–39 (9th Cir.2005) ("[A] lawyer's duty to investigate [mitigation issues] is virtually absolute, regardless of a client's expressed wishes ... [E]ven when faced with client directives limiting the scope of defense, an attorney must conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client.") (internal quotation marks omitted) (quoting *Silva v. Woodford,* 279 F.3d 825, 838–46 (9th Cir.2002)); *Harries v. Bell,* 417 F.3d 631, 638 (6th Cir.2005) ( "[A] 'defendant['s] resistance to disclosure of information does not excuse counsel's duty to independently investigate.' ") (quoting *Coleman v. Mitchell,* 268 F.3d 417, 449–50 (6th Cir.2001)); *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) ("[A] lawyer[ ] may not 'blindly follow' [the client's] commands [because] although the decision whether to use [mitigation] evidence in court is for the client ... the lawyer first must evaluate potential avenues and advise the client of those offering possible merit.") (quoting *Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983)). In any event, this Court has yet to hold otherwise. And the ineffectiveness of trial counsel is, to say the least, an extremely important claim to make, as evidenced by the fact that it is one of the most often-litigated claims in a writ application. *See* Gary Udashen, *Designating and Determining Issues on An Applications for Writ of Habeas Corpus,* Texas Center for the Judiciary 2009 Writs Training Conference at 6 (2009).

For example, at the October 7, 2011 OCW–McCann hearing, the following exchange took place between Turner and counsel for McCann:

> [Counsel for McCann:] Do you think that Mr. McCann did a good job in your trial?
> [Mr. Turner:] (Shakes head negatively).
> [Counsel for McCann:] Is that a no?
> [Mr. Turner:] (No response).
> [Counsel for McCann:] You can say it. It's okay. You're not going to hurt anybody's feelings.
> [Mr. Turner:] No.

*See, e.g., Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

*See, e.g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*See, e.g., Ex parte Elizondo,* 947 S.W.2d 202 (Tex.Crim.App.1996).

*See Ex parte Medina,* 361 S.W.3d 633, 638 n. 10 (Tex.Crim.App.2011).

*Id.* at 637–38 (where a habeas applicant makes conclusory allegations in his initial writ application, even remanding to the trial court for further factual development is inappropriate).

TEX.CODE CRIM. PROC. art. 11.071, § 2.

*In re State ex rel. Weeks,* 391 S.W.3d 117, 122 (Tex.Crim.App.2013).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.